IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

GREAT FALLS DIVISION

UNITED STATES OF AMERICA, )
Plaintiff, ) Volume I
vs. ) Criminal Docket No. CR-23-80-GF-BMM
DOUGLAS DARREN MALATARE, )
Defendant. )

Transcript of Trial with a Jury
Pretrial Conference

Missouri River Federal Courthouse
125 Central Avenue West
Great Falls, MT 59404
Tuesday, September 17, 2024
8:26 a.m. to 1:16 p.m.

BEFORE THE HONORABLE BRIAN MORRIS

UNITED STATES CHIEF DISTRICT COURT JUDGE

Yvette Heinze, RPR, CSR, CVR-S
United States Court Reporter
Missouri River Federal Courthouse
125 Central Avenue West
Great Falls, MT 59404
yvette_heinze@mtd.uscourts.gov
(406) 454-7805

Proceedings recorded by machine shorthand
Transcript produced by computer-assisted transcription

# APPEARANCES

PRESENT ON BEHALF OF THE PLAINTIFF,
UNITED STATES OF AMERICA:

Jeff Starnes
Kalah Paisley
Assistant U.S. Attorney
OFFICE OF THE U.S. ATTORNEY
119 1st Avenue North, Suite 300
Great Falls, Montana 59401

PRESENT ON BEHALF OF THE DEFENDANT:

Elizabeth T. Musick
MUSICK LAW FIRM, PLLC
PO Box 726
Bozeman, MT 59771

Paul Gallardo
FLAHERTY LAW OFFICE
1026 First Avenue South
PO Box 1968
Great Falls, Montana 59403

ALSO PRESENT:

Cherie Hives, legal assistant
Kyle Sinclair, BIA
Bill Murphy, DEA

# I N D E X


| PROCEEDINGS | PAGE |
|---|---|
| Pretrial Conference | 4 |

EXHIBITS

| GOVERNMENT'S | ADMITTED |
|---|---|
| Government's Exhibit 3, 4, and 5 | 14 |
| Government's Exhibit 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, and 26 | 15 |

| DEFENDANT'S | ADMITTED |
|---|---|
| Defendant's Exhibit 500, 501, 502, 503, 504, and 505 | 24 |

PROCEEDINGS

(Open court.)

(Defendant present.)

(Prospective jurors not present.)

THE COURT: Madam Clerk, please call the first case on the Court's calendar.

THE CLERK: This is the time set for jury selection, a jury trial, and final pretrial conference in Cause Number CR-20-53-GF-BMM, United States of America versus Douglas Malatare.

THE COURT: Good morning, Mr. Starnes.

MR. STARNES: Good morning, Your Honor.

THE COURT: Ms. Paisley.

MS. PAISLEY: Good morning, Your Honor.

THE COURT: And who is with you, please?

MS. PAISLEY: We have Kyle Sinclair with the BIA and Bill Murphy with the DEA.

THE COURT: Good morning. Welcome.

And good morning Mr. Gallardo and Ms. Musick.

MR. GALLARDO: Good morning, Your Honor.

MS. MUSICK: Good morning, Your Honor.

THE COURT: Is it "Malatare"? Is that how you say it?

MS. MUSICK: "Malatare."

THE DEFENDANT: Good morning.

THE COURT: "Malatare"?

THE DEFENDANT: Yeah.

THE COURT: And who is your --

MS. MUSICK: This is Cherie Hives, Mr. Gallardo's legal assistant.

THE COURT: Good morning.

All right. Before we get started, one quick note. I have a note from a prospective juror that he brought in this morning. I'll read it:

"I, Walter Albert McKnight, am currently going through some major medical issues with my health. I need to focus on my health. I feel I can't sit on a jury panel under these circumstances. I hope you full understand -- I hope your full understanding on this matter will be taken into consideration. I'd greatly appreciate it. Thank you. Walter Albert McKnight."

I will deal with Mr. McKnight when he comes in. I just wanted to let you know that was his thought.

Madam Clerk, would you put that on the record.

Okay. Mr. Starnes, should I be speaking to you or Ms. Paisley?

MR. STARNES: Well, actually, I'm second chair on this trial.

THE COURT: All right. Ms. Paisley, how long for trial?

MS. PAISLEY: How long for trial, Your Honor? We would expect, if we open tomorrow, that we can rest tomorrow.

THE COURT: Okay. Again, I apologize for the disruption. I've got an appointment I can't miss today. So we're going to go -- pick a jury and see where we end up. I am available till about 1:30. So that should be plenty of time to pick a jury.

MR. STARNES: No. And that's fine, Your Honor. I just wanted to make sure. So we told all of our witnesses to start being here at 8:30 tomorrow morning.

THE COURT: That's fine. That's fine. I just want you to know I'm available till 1:30. If we have a jury at 11:45, we'll break then.

MR. STARNES: Okay. Thank you, Your Honor.

THE COURT: Got it? All right.

And who is first chair? Ms. Musick?

MS. MUSICK: Yes, Your Honor.

THE COURT: How long for your case?

MS. MUSICK: Your Honor, we have three brief witnesses.

THE COURT: Okay. Great. Thank you.

And, Ms. Paisley, make sure you keep your witnesses out of the courtroom till they testify.

MS. PAISLEY: The one exception, Your Honor, we have a third investigator who may be sitting in the back. He's not

currently planning on being a witness, but we may change towards the end. That's Jesse Harwood.

THE COURT: Jesse who?

MS. PAISLEY: Jesse Harwood with Blackfeet Law Enforcement.

THE COURT: Okay. Just let me know if there's an issue about that so I recognize him.

And your witnesses as well. Keep them out until they testify.

MS. MUSICK: Yes, Your Honor.

THE COURT: And I think you have all done voir dire in this court plenty of times. You know what to expect.

Anything in particular you want me to talk about let me know. I will do my usual routine and then give you time as you need it.

I know in the past Mr. Starnes has brought up experience of jurors with drug addiction in their families.

MR. STARNES: And I am going to be handling voir dire, Your Honor. So I intend to go into that.

THE COURT: That's perfectly appropriate given the nature of the case here.

MR. STARNES: Thank you.

THE COURT: Ms. Musick, anything in particular you want me to probe?

MS. MUSICK: Mr. Gallardo is going to be handling

voir dire for us as well, and we agree that drug abuse is the hot topic today.

THE COURT: All right. A couple issues, I have been informed by the IT department that we will not have the touch screen available for the witnesses today -- I don't know if it's for the whole trial or just for today -- for some reason beyond my capabilities. I don't think that's a big problem here.

And then our court reporter will be leaving us tomorrow as well. So we're going to have a remote reporter for the remainder of the trial, and that should go off without a hitch. The only caveat is that we will not have sidebars available. So in the event there's an issue we have to take up outside of the jury, I will probably excuse the jury. So try to limit those as much as we can.

All right. Any evidentiary issues you want me to address now or bring to my attention, Ms. Paisley?

MS. PAISLEY: Your Honor, it sounds like defense is willing to stipulate to the majority of our exhibits. So we can get into exhibits if you wish.

THE COURT: Yes, please.

Ms. Musick, were there any witness -- or excuse me -- any of the government's exhibits to which you intend to object or don't want to be admitted pretrial?

MS. MUSICK: Your Honor, we informed the government

that we objected to Exhibits Number 1 and 2.

And we do have an evidentiary issue with respect to one of their exhibits. And I apologize. I'm pulling up the email from Ms. Paisley right now.

I believe it would be their proposed Exhibit Number 27, Your Honor -- or, no, sorry -- Exhibit Number 6.

THE COURT: Six?

MS. MUSICK: Yes.

THE COURT: Malatare text message exchange?

MS. MUSICK: Yes, Your Honor.

THE COURT: Hold on a second.

Ms. Paisley, what is "Malatare text message exchange"?

MS. PAISLEY: It's the text message exchange between Mr. Malatare and the deceased.

THE COURT: Right before the --

MS. PAISLEY: Yeah, right before talking about the delivery of drugs.

THE COURT: What's your objection, Ms. Musick?

MS. MUSICK: Your Honor, we believe that many of these text messages are simply hearsay. Obviously, statements of Mr. Malatare's would be admissible as statements against the party opponent. However, the text messages that were offered by the decedent, Sean Wippert, we believe are hearsay.

And we do have a case that we believe supports our

position. It's *United States of America v Perry Edward Davis*. It's a Ninth Circuit case with a -- I just have the Westlaw citation. It's 2024 WL 222271.

THE COURT: Four twos?

MS. MUSICK: Yes, sir.

THE COURT: 71? Okay. 2024 Westlaw four twos 71. Okay. I'll take a look at that.

What does the case say?

MS. MUSICK: Your Honor, the case states that text messages of another person, not being the defendant are not admissible as a statement against a party opponent because the -- in this case, the decedent is not a party to this matter. The United States of America is a party to this matter.

THE COURT: And, Ms. Paisley, where were these messages retrieved? From whose phone?

MS. PAISLEY: They were retrieved off the victim's phone after he passed. And, obviously, they are admissible, not necessarily as substantive evidence, but for effect on the listener. So, like, his text messages don't make any sense without the context of the victim's, and they are --

THE COURT: No, I understand.

MS. PAISLEY: And I haven't read that 2024 case, but I'm pulling it up.

THE COURT: Okay. We'll talk about it.

Ms. Musick, give me your view of what the case stands for.

I will come back to you, Ms. Paisley.

MS. MUSICK: Your Honor, in this case, there were text messages that were similar to the text messages that the government seeks to admit in this matter. However, the Court ruled that many of the text messages were logistical and --

THE COURT: What does that mean?

MS. MUSICK: So, for example: "Leaving now." "20 minutes away." "On my way to Channel 2." Those messages were, in the court's words, purely logistical.

And so the Ninth Circuit ruled that they were admitted -- that they were erroneously admitted, at the district court error, because they did not fall under --

THE COURT: What's the context for the messages? I am not sure I -- I'm trying to understand what this logistical message means.

MS. MUSICK: Sure. So, for example, in one of the text messages, so in Exhibit 6, the text messages began with a text message from the decedent to Mr. Malatare stating: "I got a job with housing. On day four now. Cleaning remodeled houses." We're not sure what relevance that would have to this case.

Mr. Malatare's response: "Cool."

Mr. Wippert's next text messages: "Did you make it

home?"

Mr. Malatare's response: "About 3.5 hours."

The decedent then in his next text message is talking about a dental surgery that he just had. In his next message asks Mr. Malatare if he is home. Then they discuss the fact that Mr. Malatare's using the restroom.

We don't believe that many of these text messages are needed.

THE COURT: This Exhibit 6?

MS. MUSICK: Yes.

THE COURT: So Exhibit 6, and then I will look at the *US v Davis* case.

Any other cases you want me to look at regarding the text messages?

MS. MUSICK: No, Your Honor. We had some other research that we did, but it's all out of circuit.

THE COURT: All right. Anything that's relevant to the analysis, though?

MS. MUSICK: Um.

THE COURT: Let's put it this way: Any cases you want me to review, give them to my law clerks this morning. I will look at them today, and we'll discuss it again tomorrow morning.

MS. MUSICK: Okay. Thank you, Your Honor.

THE COURT: Ms. Paisley, anything you want to add

before we move on?

I am going to look at that case, see if it has any relevance, look at the exhibit itself, and try to give you some guidance before tomorrow morning.

MS. PAISLEY: Well, and I think we can pair down 6 to the relevant stuff as well.

THE COURT: Right. If you want to talk with Ms. Musick about it as well --

MS. PAISLEY: Yeah.

THE COURT: I mean, if the objection is it goes off on extraneous matters --

MR. STARNES: We're talking about, like, a dozen text messages. It's not --

THE COURT: And they're probably six words each.

MS. PAISLEY: Yeah. And I would note that a limiting instruction may be appropriate, and I think that's what *Perry Davis* talks about, a limiting instruction.

THE COURT: Fine. I will look at that case.

Okay. Anything else on the exhibits?

MS. MUSICK: No, I don't believe so.

THE COURT: Do you stipulate to the admission of the other exhibits?

(Off-the-record discussion between Ms. Musick and Mr. Gallardo.)

MR. GALLARDO: Your Honor, the only other exhibits

that the defense objects to is Exhibits 1 and 2.

THE COURT: So can I admit 3, 4, and 5?

MR. GALLARDO: Yes.

THE COURT: All right. Exhibits 3, 4, 5 are pre-admitted, Madam Clerk.

(Government's Exhibit 3, 4, and 5 admitted into evidence.)

THE COURT: How about 7 through 28?

MS. MUSICK: We have 27 on the list that was provided to us from the government last night?

THE COURT: I have 28, redacted iPhone messages.

MR. STARNES: Oh, yeah. There's no 28, Your Honor. It was an alternative.

THE COURT: Okay. 7 through 27, can I admit those?

MS. MUSICK: Ms. Paisley, could you clarify what Number 27 is that also states that it's iPhone text messages?

MS. PAISLEY: Those are those text messages in the Bates -- I gave you the Bates stamps to it.

MR. STARNES: So they were in the DCI report. They're the informant DCI text messages. Cam Pavlicek took a picture of the conversation between the informant and Mr. Malatare.

(Off-the-record discussion between Ms. Musick and Mr. Gallardo.)

MR. GALLARDO: Your Honor, we'll object to Exhibit 27 on the same grounds.

THE COURT: 27? Okay.

So how about 7 through 26? Are they admitted?

MR. GALLARDO: Admitted.

THE COURT: All right. 7 through 26 will be admitted.

(Government's Exhibit 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, and 26 admitted into evidence.)

THE COURT: We'll take up 27 when the appropriate time comes.

All right. Any other evidentiary issues? Any legal issues?

I want to briefly touch on -- do you have something?

MS. MUSICK: No. I said I don't believe so.

THE COURT: Jury instructions --

MR. STARNES: Sorry, Your Honor. I just wanted to clarify. So I think the objection to 1 and 2 are just on 403 grounds, not foundation.

THE COURT: Okay. Would you clarify that?

MR. GALLARDO: I don't think we clarified, but, yeah, it's 403 grounds for 1 and 2. We can talk about it.

THE COURT: Well, we'll --

MR. STARNES: It's going to come up pretty quickly, Your Honor, in the first couple of witnesses.

THE COURT: But not during voir dire this morning.

MR. STARNES: Well, it might. Because we might want to talk to the jury about seeing potentially graphic images. And if there's not going to be graphic images shown to them, then there would be no need to bring that up. That's the only reason I asked for clarification.

THE COURT: All right. So tell me your objection, Mr. Gallardo.

MR. GALLARDO: So our objection is, like Mr. Starnes said, just the graphic nature of it. It's the victim, the decedent here, dead in the bathroom. He's slumped over. I think his bottom is exposed. We don't see how that goes -- tends to negate or bolster any element in this case, and we're not disputing the fact that this person passed away.

THE COURT: That's where he was found, wasn't it? You are not alleging that the photos were staged in any way?

MR. GALLARDO: No.

THE COURT: The victim's mother finds him in the bathroom, fallen off the toilet.

MR. GALLARDO: Right.

THE COURT: I haven't seen the photos myself yet. I will take a look at those.

MS. PAISLEY: I can pull them up, Your Honor.

THE COURT: Would you, please.

MS. PAISLEY: And I can also explain -- I mean, the relevance comes in the fact that he passed away from

fentanyl -- acute fentanyl intoxication, and we're going to have testimony from the pathologist about how an individual dies. And how his body is found is relevant for that. I think I --

MR. STARNES: I have some hard copies, Your Honor. May I approach?

THE COURT: You may.

(Complying)

THE COURT: I'll take this under advisement, Mr. Gallardo. But it seems like we're talking about two photos of how the victim was found. I know it's disturbing, perhaps, and graphic but --

MR. STARNES: And, Your Honor, just for context, I anticipate that Mike Brown, who is the coroner that responded to the scene, is going to testify that the condition of the body and how it was positioned when he came in helped shape his, sort of, idea about the cause of death in this case. So it went from "Is this a trauma-related event?" to "Is this something internal or possibly a drug overdose?"

With Government's Exhibit 2, marked two, there's some foaming at the mouth. And the coroner is going to testify that that can be indicative of possible drug overdose. So that's the reason those two photos are in there.

THE COURT: Mr. Gallardo, I'll listen to the testimony as it comes in. When they try to move to admit the

exhibit, raise your objection, and I will discuss it then. I'll rule definitively at that point. But I assume they would come in absent some persuasive authority to the contrary.

Okay. Other exhibits?

MR. STARNES: Exhibit-wise, no, Your Honor.

I did have one issue I just wanted to bring to the Court's attention. I've already emailed the defense about it. So we have a potential juror on our list, and it looks like he's way down on the lists. So this may not be an issue. But his last name is Tierney. He is somehow related to Ashley Tierney, the United States Probation Officer, through two courses of marriage and in-laws and --

Anyway, I got a phone call from Ashley Tierney yesterday afternoon. She said that this individual had contacted her wanting to know if he had to show up given his relationship with her. I told her I couldn't really advise her of that. But if he was -- basically, if you have a summons, you have to show up. And if you're asked questions, you have to answer truthfully. But that's all we could tell any witness. And so I didn't know what else to do other than send an email to the defense.

THE COURT: No, that's fine. Thank you for informing the parties. We'll deal with Mr. Tierney, the potential juror, as appropriate when the time comes.

MR. STARNES: Thank you, Your Honor.

MS. MUSICK: And just for the record, he's also my former law partners' brother-in-law.

MR. STARNES: He's way down the list. So hopefully it's not an issue.

THE COURT: In the small town of Montana, it all starts in Butte.

MS. MUSICK: Yes.

MR. STARNES: That's it. Otherwise, I have no issues.

THE COURT: Thank you.

Then let me just touch briefly on the jury instructions. I'll have the Court's proposed instructions to you, I hope, by the end of our session today.

Ms. Musick, your proposed instruction -- I typically give an instruction if there's a witness who has a prior conviction or has a drug addiction or some other infirmity to say that you take this person's testimony with a grain of salt; be careful how you evaluate it.

I don't typically give the "be careful, accomplice here, you could be facing charges yourself."

What's the authority for those instructions, and why are they relevant here?

Have you seen these, Ms. Paisley?

MS. PAISLEY: What?

THE COURT: You have seen the defense's proposed

instruction?

MS. PAISLEY: I have seen the defense's, and I read the case, and I can find no relevance for this. It's not even actually talking about jury instructions. It's actually admonishing -- you know, on appeal, defense was challenging statements that the government had made to a witness outside of the courtroom sort of admonishing them about the possibility of perjury, and the Ninth Circuit was saying that that was okay. It's not a proposed jury instruction, and I didn't find any cases where that was actually a proposed jury instruction. But I'm also not sure who they would have the Court --

THE COURT: I don't know well enough -- so, I assume -- well, I shouldn't assume.

Mr. Gallardo, what's the basis for these instructions?

MR. GALLARDO: So I think in a case that me and Mr. Starnes had a few years ago, this issue came up, I think. And just out of an abundance of caution, I put it in there. I don't fully expect this to be at play. I put it in there as sort of a placeholder to see how things go.

THE COURT: I will keep it for consideration. I'll see how the testimony goes.

The only witnesses you list, Mr. Starnes, who don't have titles associated with them -- for example, we have Sheldon Meineke, Kayona Thomas, Jaynell Davis --

Darlene Wippert is the victim's mother?

MS. PAISLEY: Yes.

THE COURT: Jade Wippert is the victim's sister?

MS. PAISLEY: Daughter, Your Honor.

THE COURT: Daughter. I'm sorry.

So I assume you're talking about maybe Thomas, Meineke, and Davis? Anyone else?

MR. GALLARDO: I think that's it, Your Honor.

THE COURT: What's the nature of their testimony?

MS. PAISLEY: Well, none of them are coconspirators, if that's the question. I mean, they all have evidence about drug trafficking in Browning relevant to this period of time and specific to Malatare. But none of them are coconspirators.

THE COURT: Okay.

MR. GALLARDO: So to clarify, I do not think that this is an appropriate instruction to read to the jury this morning, and it most likely will not come up. I put it on there just as a placeholder.

THE COURT: Thank you. I just wanted to make sure I addressed that one.

Anything else before we start this morning?

MS. PAISLEY: Your Honor, I wanted to -- there is a drug abuser jury instruction that was put in. I did pull the instruction that it was cited from. That is not the instruction that Judge Christensen gave. We actually believe

that the credibility instruction that's already provided by the Ninth Circuit is just appropriate.

However, if the Court is inclined to give a drug abuser, we'd ask that you just give the one that Judge Christensen has given, not proposed by defense.

THE COURT: And that would after --

MS. PAISLEY: After hearing, Your Honor --

THE COURT: That would be a final instruction, not at the time --

MS. PAISLEY: Yes.

THE COURT: -- the witness testified?

Right. Okay. And we can decide that after I've heard the testimony, if there's sufficient evidence to support the notion that one of the witnesses has a drug problem.

MS. PAISLEY: And the -- should we talk about the final one that we object to as well of theirs? It's also a final instruction.

THE COURT: Which is that?

MS. PAISLEY: It's basically a missing evidence instruction, but what --

THE COURT: Right.

What was that about, Ms. Musick.

MS. MUSICK: We'll withdraw that objection, Your Honor.

THE COURT: There we go, Ms. Paisley.

All right. Anything else?

MR. STARNES: Defense, you all had a couple of exhibits you wanted to put in. Right?

MS. MUSICK: We did.

THE COURT: What are those?

MS. MUSICK: Your Honor, I provided hard copies to Madam Clerk this morning, and I have an additional set if you would --

THE COURT: I have the list here.

MS. MUSICK: Okay.

THE COURT: Which instructions? Any objection to these six instructions?

MR. STARNES: Exhibits, Your Honor? No.

THE COURT: I'm sorry. Excuse me.

So Mike Brown is whom?

MR. STARNES: He is the coroner, Your Honor. He's going to testify in the government's case.

THE COURT: He wore a body cam.

MR. STARNES: He did.

THE COURT: During his -- we're not going to see the autopsy I hope.

MR. STARNES: Oh, no. So the pathologist is --

THE COURT: The coroner showed up at the scene. Okay.

MR. STARNES: The coroner -- there is a -- just so

the Court's aware, Government's Exhibit 5 is a body cam that a different officer that was at the scene -- when the victim's body was found, the coroner was there. It's about a ten-minute video that depicts all of that.

THE COURT: Okay.

MR. STARNES: Then I assume that Mike Brown's video -- I'm just trying to recall off the top of my head. But he's the coroner. He was also at the scene. So it may show a couple different angles or something like that. But we don't object to it.

THE COURT: All right. So 500 through 505 are admitted?

MR. STARNES: Thank you, Your Honor. Yeah, no objection.

THE COURT: All right. Madam Clerk, 500 through 505 are admitted.

(Defendant's Exhibit 500, 501, 502, 503, 504, and 505 admitted into evidence.)

THE COURT: Anything else before we start?

MS. MUSICK: Not from the defense, Your Honor. Thank you.

THE COURT: All right. So we'll get the jury in here. We'll go until about 10:30, take a break, and then finish up.

Thank you, Counsel. See you in a moment.

(Proceedings in recess from 8:59 a.m. until 9:07 a.m.)

(Jury Voir Dire was conducted.)

(The proceedings concluded at 1:16 p.m.)

--o0o--

REPORTER'S CERTIFICATE

I, Yvette Heinze, a Registered Professional Reporter, Certified Shorthand Reporter, and Certified Verbatim Reporter-Stenotype, certify that the foregoing transcript is a true and correct record of the proceedings given at the time and place hereinbefore mentioned; that the proceedings were reported by me in machine shorthand and thereafter reduced to typewriting using computer-assisted transcription; that after being reduced to typewriting, a certified copy of this transcript will be filed electronically with the Court.

I further certify that I am not attorney for, nor employed by, nor related to any of the parties or attorneys to this action, nor financially interested in this action.

IN WITNESS WHEREOF, I have set my hand at Great Falls, Montana, this 29th day of September, 2024.

/s/ *Yvette Heinze*

Yvette Heinze
United States Court Reporter