UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | ) | Volume 2 |
| vs. | ) | Criminal Docket No. CR-23-80-GF-BMM |
| DOUGLAS D. MALATARE, Defendant. | ) | |

...................................

# Partial Transcript of Trial with a Jury
## Opening Statements Excluded

Missouri River Federal Courthouse
125 Central Avenue West
Great Falls, MT 59404
Tuesday, September 18, 2024
8:33 a.m. to 4:26 p.m.

BEFORE THE HONORABLE BRIAN MORRIS

UNITED STATES CHIEF DISTRICT COURT JUDGE

Kimberly R. Greiner, RMR, CRR, CRC, RDR
(Reporter remotely through Zoom.)
United States Court Reporter
Bob Dole Federal Courthouse
500 State Avenue
Kansas City, KS 66101
kim_greiner@ksd.uscourts.gov
(913) 735-2314

Proceedings recorded by machine shorthand, transcript Produced by computer-aided transcription.

APPEARANCES:

PRESENT ON BEHALF OF THE PLAINTIFF,
UNITED STATES OF AMERICA:

Kalah A. Paisley
Jeffrey K. Starnes
OFFICE OF UNITED STATES ATTORNEY
119 1st Ave North
Suite 300
Great Falls, MT 59401

PRESENT ON BEHALF OF THE DEFENDANT:

Elizabeth T. Musick
MUSICK LAW FIRM, PLLC
P.O. Box 726
Bozeman, MT 59771

Paul Gallardo
FLAHERTY GALLARDO law office
1026 1st Avenue S.
Great Falls, MT 59405

ALSO PRESENT:

Cherie Hives, legal assistant
Kyle Sinclair, BIA
William Murphy, DEA

I N D E X

| | Page |
|---|---|
| Hearsay Objection to Text Messages | 31 |
| Preliminary Jury Instructions | 37 |
| Plaintiff's Witnesses: | |
| DARLENE WIPPERT | |
| Direct Examination By Ms. Paisley | 51 |
| Cross-Examination By Ms. Musick | 61 |
| Redirect Examination By Ms. Paisley | 66 |
| JADE WIPPERT | |
| Direct Examination By Ms. Paisley | 68 |
| Cross-Examination By Ms. Musick | 73 |
| MICHAEL BROWN | |
| Direct Examination By Mr. Starnes | 75 |
| Cross-Examination By Mr. Gallardo | 88 |
| Redirect Examination By Mr. Starnes | 95 |
| GAVIN LAWSON | |
| Direct Examination By Mr. Starnes | 98 |
| Cross-Examination By Ms. Musick | 111 |
| Hearsay Objection to Text Messages | 113 |
| Plaintiff's Witnesses: | |
| SCOTT SCHLUETER | |
| Direct Examination By Mr. Starnes | 125 |
| Cross-Examination By Ms. Musick | 142 |
| Redirect Examination By Mr. Starnes | 144 |
| ALDO FUSARO | |
| Direct Examination By Ms. Paisley | 146 |
| Cross-Examination By Ms. Musick | 158 |
| JAYNELL DAVIS | |
| Direct Examination By Mr. Starnes | 164 |
| Cross-Examination By Mr. Gallardo | 172 |
| Redirect Examination By Mr. Starnes | 174 |

I N D E X

(Continued)


| | Page |
|---|---|
| KATHERINE DONOHUE | |
| Direct Examination By Ms. Paisley | 179 |
| Cross-Examination By Mr. Gallardo | 184 |
| CAMERON M. PAVLICEK | |
| Direct Examination By Ms. Paisley | 187 |
| Cross-Examination By Mr. Gallardo | 205 |
| ERIC DENNEY | |
| Direct Examination By Mr. Starnes | 209 |
| Cross-Examination By Ms. Musick | 222 |
| ARON SKUNKCAP | |
| Direct Examination By Mr. Starnes | 225 |
| Cross-Examination By Mr. Gallardo | 231 |
| SHELDON MEINEKE | |
| Direct Examination By Ms. Paisley | 233 |
| Cross-Examination By Ms. Musick | 238 |
| BRENDON WILD GUN | |
| Direct Examination By Ms. Paisley | 244 |
| Cross-Examination By Ms. Musick | 249 |
| JESSE HARWOOD | |
| Direct Examination By Mr. Starnes | 251 |
| Cross-Examination By Ms. Musick | 261 |
| Redirect Examination By Mr. Starnes | 264 |
| WILLIAM T. MURPHY | |
| Direct Examination By Mr. Starnes | 266 |
| Cross-Examination By Mr. Gallardo | 272 |
| Motion for Directed Verdict | 274 |
| Jury Instruction Conference | 286 |

E X H I B I T S

| Plaintiff's Exhibits | Offered | Received |
|---|---|---|
| 6 | 175 | |
| 27 | 35 | 35 |
| 30 | 182 | 182 |

(Court called to order 8:37 a.m.)

(Proceedings held outside the presence of the jury.)

THE COURT: Good morning. Sorry for the delay. Before we bring in the jury, we've got to address the issue with the text message string. I've reviewed the cases, and are you going to handle this, Ms. Paisley?

MS. PAISLEY: Yes.

THE COURT: So with regard to the -- your theory, is that this is a statement -- admission of a crime?

MS. PAISLEY: Yes. Yes, against penal interest. I think we've narrowed it down to the specific transaction I think is what's appropriate.

THE COURT: All right. Which -- so which one is that?

MS. PAISLEY: So if we -- I have it up on the screen right now -- or I'm about to if it will let me.

THE COURT: I had it. There we go. Okay.

MS. PAISLEY: All right. Based on *Davis* -- and just out of an abundance of caution, I think this is the appropriate text messages that comes in because this is the actual transaction. And while it isn't written in the contractual language that we, as lawyers, conduct our business in this -- in the street parlance, this is as clear as a contract.

He's asking: Are you looking for drugs?

He's responding: Yes, asking him to come by and saying how much he's going to buy.

And Doug Malatare agrees.

THE COURT: Who -- which witness would sponsor this exhibit?

MS. PAISLEY: Which witness we are going to bring in? Kate Donohue who did the extraction for this.

THE COURT: Who would explain what this means? You're saying this is in street parlance.

MS. PAISLEY: She can explain that we also have drug users from the community as well as DEA agents and DCI, all who are familiar with this lingo and what this means specifically.

THE COURT: All right.

Ms. Musick, you can remain seated please; it helps with the microphone.

MS. MUSICK: Okay. Your Honor, we understand that Mr. Malatare's statements can come in as statements against a party-opponent. We still object to any of the text messages that were authored by the decedent in this case. The statement, "I can only afford a half," is not necessarily clearly drug lingo. We don't know what a half means. We don't know whether that is actually an admission that would subject him to criminal liability or not. It could be something that's completely innocent.

And the government's interpretation that this is a half a pill is reading something into this phrase that is not actually present, and so I think that that causes it to be an

unreliable statement that should not be admitted into evidence.

THE COURT: Well, Ms. Musick, during the voir dire, there was a discussion about circumstantial evidence. And given the context in which this conversation takes place and Mr. Malatare's visit to the home and what happened afterwards, why would this not be circumstantial evidence at least?

MS. MUSICK: Well, Your Honor, if you look at the remainder of the phone records, which I know that you have not reviewed and I know that the jury will not have reviewed, there are -- is no other evidence in Mr. Wippert's phone that indicates any usage -- any drug usage whatsoever.

And so taken out of context, I believe that this is extremely misleading to the jury. And I also think that the lack of other drug evidence in the phone records as a whole doesn't sufficiently corroborate the fact that this could be interpreted through circumstantial evidence as a drug transaction.

THE COURT: All right. Ms. Paisley, I don't want you to mention this in the opening statement. I want you to lay a foundation, have -- have the witnesses testify as to what -- how they interpret it, what it means. They can provide context to the jury. I don't think it's appropriate at this point to say here's this message, this is what it means. I want the witnesses to testify, as based on their experience either in drug dealing or in dealing with investigating this kind of

crimes, what it means they can provide. Help the jury interpret what it actually means.

MS. PAISLEY: Okay. I just want to point out what Ms. Musick is arguing goes to the weight of the evidence.

THE COURT: I agree. I agree. I want to make sure that this is done properly, that we give the jury the best explanation why it's relevant and how the government interprets it and how it should be construed by them, not left to try to figure out what it means. So don't bring it up in the opening, wait until you have witnesses who testify about it, and you can move for its admission.

MS. PAISLEY: Absolutely, Your Honor.

THE COURT: And you can raise -- you can raise the objections at that time as well, Ms. Musick, for --

MS. MUSICK: Thank you.

THE COURT: I'm sorry, Mr. Starnes, I cut you off.

MS. PAISLEY: We have it marked.

MR. STARNES: We have a potential redacted version that, if the court agrees, this is what we would offer. And so it's basically just a second page. The very first message is redacted. The rest of the exchange would be there, so there would be 1, 2, 3, 4, 5, 6 messages. Four of them are the defendant's words --

THE COURT: All right. Show them to me at the next break.

MR. STARNES: Thank you, Your Honor.

THE COURT: Anything else before we bring in the jury?

MS. PAISLEY: No, Your Honor.

THE COURT: How long for your opening do you think?

MS. PAISLEY: Eight minutes.

THE COURT: Who's going to do the opening for Mr. Malatare?

MS. MUSICK: I am, Your Honor. Less than five minutes. I think.

THE COURT: Great. I'll have my first draft instructions to you at the break.

MS. PAISLEY: The defense conceding all of 27 is admissible then given the fact they didn't respond to that in their motion or in --

MS. MUSICK: Your Honor, I believe we stipulated to the admission of 27 yesterday.

THE COURT: Oh, 27.

MR. STARNES: I don't know that we actually moved it in, so we would move 27 into evidence. That's our misunderstanding.

THE COURT: Thank you.

MR. STARNES: Sorry about the misunderstanding.

MS. MUSICK: No problem.

THE COURT: Are you ready, Ms. Paisley?

MS. PAISLEY: Yes, Your Honor.

THE COURT: And, Ms. Musick, are you ready to go?

MS. MUSICK: Yes, Your Honor.

THE COURT: All right. Madam clerk, please bring in the jury.

(The jury entered the courtroom, after which the following proceedings were had.)

THE COURT: Please be seated. Good morning, members of jury. I hope you had a nice evening. I assume none of you had a discussion about the case, anyone did any research about it?

All right. I don't see any hands raised, so thank you. Please continue that approach for the remainder of the trial.

We're going to start the evidence now. First thing we have opening statements. This is just a short summary by each side of what they think the evidence will show that -- the lawyers aren't witnesses. They're just telling you what they think the evidence will show. And then after the opening statements -- it will take probably about 15 minutes -- we'll move on to the witnesses, take our morning break and go until lunch.

All right. Ms. Paisley, please, for the government.

(Opening statements not requested to be transcribed.)

THE COURT: Ms. Paisley, I think I better instruct the jury first.

MS. PAISLEY: Yes, Your Honor, I realized that.

THE COURT: A little bit out of order this morning this Wednesday.

I need to give you your preliminary instructions now, so please follow along on the screen in front of you.

Jurors, you are now the jury in this case. I want to take a few minutes to tell you something about your duties as jurors and to give you some preliminary instructions.

At the end of the trial, I will give you more detailed written instructions that will control your deliberations. When you deliberate, it will be your duty to weigh and evaluate all the evidence received in the case and the process to decide the facts.

To the facts as you find them, you will apply the law as I give it to you, whether you agree with the law or not. You must decide the case solely on the evidence and the law before you.

Perform these duties fairly and impartially. You should not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances.

Also, do not allow yourself to be influenced by your personal likes or dislikes, sympathy, prejudice, fear, public, opinion, or biases, including unconscious biases. Unconscious biases are stereotypes, attitudes, or preferences that people

may consciously reject but may be expressed without conscious awareness, control, or intention. Like conscious bias, unconscious bias can affect how we evaluate information and make decisions.

Instruction No. 2

This is a criminal case brought by the United States government. The government charged the defendant with distribution of fentanyl resulting in death, in violation of Title 21, United States Code, Section 841(a)(1) and Section (b)(1)(c), and possession with intent to distribute fentanyl, in violation of Title 21, United States Code, Section 841(a)(1).

The charges against the defendant are contained in the indictment. The indictment simply describes the charge the government brings against the defendant. The indictment is not evidence and does not prove anything.

The defendant has pleaded not guilty to the charges and is presumed innocent unless and until the government proves the defendant guilty beyond a reasonable doubt. In addition, the defendant has the right to remain silent. He never has to prove innocence or present any evidence.

Instruction 3

The evidence you are to consider in deciding what the facts are consist of:

1. The sworn testimony of any witness;

2. The exhibits that are received in evidence; and

3. Any facts to which the parties agree.

Instruction 4

The following things are not evidence and you must not consider them as evidence in deciding the facts of this case:

1. Statements and arguments of the attorneys;

2. Questions and objections of the attorneys;

3. Testimony that I instruct you to disregard; and

4. Anything you may see or hear when the court is not in session, even if what you see or hear is done by or said by one of the parties or one of the witnesses.

Instruction No. 5

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is indirect evidence, that is, it is proof of one or more facts from which you can find other facts.

You are to consider both direct and circumstantial evidence. Either can be used to prove any fact. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

Instruction 6

There are rules of evidence that control what can be received in evidence. When a lawyer asks a question or offers

an exhibit into evidence and the lawyer on the other side thinks that it's not permitted by the rules of evidence, that lawyer may object. If I overrule the objection, the question may be answered or the exhibit may be received. If I sustain the objection, the question cannot be answered or the exhibit cannot be received. Whenever I sustain an objection to a question, you must ignore the question and must not guess what the answer would have been.

Sometimes I may order that evidence be stricken from the record and that you disregard or ignore the evidence. That means that, when you are deciding the case, you must not consider the evidence that I told you to disregard.

Instruction No. 7

In deciding the facts in this case, you have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness said or part of it or none of it. In considering the testimony of any witness, you may take into account:

1. The witness's opportunity and ability to see or hear or know the things to which the witness testified;

2. The witness's memory;

3. The witness's manner while testifying;

4. The witness's interest in the outcome of the case, if any;

5. The witness's bias or prejudice, if any;

6. Whether other evidence contradicted the witness's testimony;

7. The reasonableness of the witness's testimony in light of all either evidence; and

8. Any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide the testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told you the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it. What is important is how believable the witnesses are and how much weight you think their testimony deserves.

Instruction No. 8

I will now say a few words about your conduct as

jurors.

First, keep an open mind throughout the trial and do not decide what the verdict should be until you and your fellow jurors have completed your deliberations at the end of the case.

Second, because you must decide this case based only on the evidence received in this case and my instructions as to the law that applies, you must not be exposed to any other information about the case or to issues that evolve during the course of your jury duty. Thus, until the end of the case or unless I tell you otherwise:

Do not communicate with anyone in any way. Do not let anyone else communicate with you in any way about the merits of the case or anything to do with it.

This restriction includes discussing the case in person, in writing, by phone, tablet or computer, or other means via e-mail, via text messaging, or any Internet chat room, blog, website or application, including, but not limited to, Facebook, You Tube, X (formerly known as Twitter), Instagram, LinkedIn, WhatsApp, Snapchat, TikTok or any other form of social media.

This restriction also applies to communicating with your fellow jurors until I give you the case for deliberation, and it applies to communicating with everyone else, including your family members, your employer, the media or the press, the

people involved in the trial, although you may notify your family and your employer you've been seated as a juror in the case and how long you expect the trial to last.

But, if you're asked or approached in any way about your jury service or anything about this case, you must respond you've been ordered not to discuss the matter. In addition, you must report the contact to the court.

Because you will receive all the evidence, legal instructions you properly may consider to return a verdict:

Do not read, watch or listen to any news or media accounts or commentary about the case or anything to do with it.

Although I have no information there will be news reports about this case, do not do any research such as consulting dictionaries, searching the Internet or using other reference materials, and do not make any investigation or in any other way try to learn about the case on your own.

Do not visit or view any place discussed in the case, and do not use the Internet or any other resource to search for or view any place discussed during the trial.

Also, do not do any research about this case, the law, or the people involved, including the parties, the witnesses, or the lawyers until you have been excused as jurors.

If you happen to read or hear anything touching on this case in the media, turn away and report it to the court as

soon as possible.

These rules protect each party's right that this case is decided only by the evidence that's been presented here in this court. Witnesses here in court take an oath to tell the truth, and the accuracy of their testimony is tested through the trial process. If you do any research or investigation outside the courtroom or gain any information through an improper communication, then your verdict may be influenced by inaccurate, incomplete, or misleading information that has not been tested by the trial process. Each of the parties is entitled to a fair trial by an impartial jury, and if you decide the case based on information not presented in court, you will have denied the parties a fair trial.

Remember, you have taken an oath to follow the rules. It's very important you follow these rules. A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over. If any juror is exposed to any outside information, please notify the court immediately.

Instruction No. 9

At the end of the trial, you will have to make your decision based on what you recall of the evidence. You will not have a written transcript of the trial. I urge you to pay close attention to the testimony as it is given.

Instruction 10

If you wish, you may take notes to help you remember the evidence. If you take notes, please keep them to yourself until you and your fellow jurors go to the jury room to decide the case. Do not let note-taking distract you from being attentive. When you leave the court for recesses and you leave at the end of the day, leave your notes in the jury room. No one will read your notes.

Whether you take notes or you do not take notes, you should rely on your own memory of the evidence. Notes are only to assist your memory. You should not be overly influenced by your notes or those of your fellow jurors.

Instruction 11

During the trial, I may need to take up legal matters with the attorneys privately either by having a conference at the bench when the jury is present in the courtroom or by calling a recess. Please understand that while you are waiting, we are working. The purpose of these conferences is not to keep relevant information from you, but to decide how certain evidence is to be treated under the rules of evidence and to avoid confusion and error. Of course, we will do what we can to keep the number and length of these conferences to a minimum. I may not always grant an attorney's request for a conference. Do not consider my granting or denying a request for a conference as any indication of my opinion of the case or what your verdict should be.

Instruction No. 12

The next phase of the trial will now begin.

First, each side will make an opening statement. An opening statement is not evidence. It is simply an outline to help you understand what that party expects the evidence will show. A party is not required to make an opening statement.

The government will then present evidence, and counsel from the defendant may cross-examine. Then, if the defendant chooses to offer evidence, counsel for the government may cross-examine.

After the evidence is presented, I will instruct you on the law that applies to the case and the attorneys will make closing arguments.

After that, you go to the jury room to deliberate on your verdict.

Instruction No. 13

The parties have stipulated and agreed to certain facts that are stated below. And you'll have a copy of these facts, you don't need to write them down.

The facts are now conclusively established:

1. On December 21st, 2022, FBI Special Agent Alex Prostko collected two items of drug evidence from the Blackfeet Law Enforcement Services evidence room and transferred them to the FBI evidence room:

• Evidence Item No. 1 was a quantity of

multicolored pills;

- Evidence Item No. 3 was a quantity of blue and white pills.

No. 2. On March 3rd, 2023, an FBI evidence technician packaged the evidence items in accordance with agency procedures and sent them to the Drug Enforcement Administration (DEA) Western Laboratory located in Pleasanton, California for forensic testing. In this process, the following name changes took place:

- Evidence Item No. 1, the multicolored pills, became Exhibit 1B1; and
- Evidence Item No. 3, the blue and white pills, became Exhibit 1B3.

No. 3. The DEA laboratory received Exhibits 1B1 and 1B3 on March 10th, 2023.

On August 8th of 2023, DEA Special Agent Matthew McIntyre collected one item of drug evidence from the Bureau of Indian Affairs (BIA) that was originally placed into evidence by BIA Special Agent Kyle Sinclair. That item is referred to as BIA Exhibit 1.

No. 5. BIA Exhibit 1 was listed as a blue/white/green/powder/chunks from an unknown crushed pill.

No. 6. On August 11th, 2023, Special Agent McIntyre packaged BIA Exhibit 1 in accordance with agency procedures and sent the evidence to the DEA Western Laboratory located in

Pleasanton, California for forensic testing.

7. The DEA laboratory received BIA Exhibit 1 on August 15th, 2023.

Drug Testing

No. 8. Jarrett J. Farias is a forensic chemist employed by DEA Western Laboratory charged with analyzing evidence for the presence or absence of controlled substances.

9. Shana M. Irby is a senior forensic chemist employed by the DEA Western Laboratory charged with analyzing evidence of the presence or absence of controlled substances.

10. Radhiyah Himawan is a senior forensic chemist employed by DEA Western Laboratory charged with analyzing evidence of the presence or absence of controlled substances.

Exhibit 1B1, The Multicolored Pills

No. 11. Jarrett J. Farias tested Exhibit 1B1 using various tests at the lab. On April 14th of 2023, Farias issued a report which discussed the testing technique used as well as findings from these tests. Farias's report shows the following:

- Exhibit 1B1 was 476 multicolored pills (pink, orange, purple, green and yellow) in a plastic bag;
- A random sampling of nine of the pills were tested from this exhibit;
- Testing identified the substance N-Phenyl-N-

[1-(2-phenylethyl)-4-piperdinyh] propenamide, commonly known as fentanyl, in the pills tested; and

- The net weight of the fentanyl identified was 52.574 grams plus or minus 0.003 grams;

Exhibit 1B3, The Blue and White Pills:

No. 12. On April 6th, 2023, Shana Irby tested Exhibit 1B3 using various tests at the lab. On April 6th, 2023, Irby issued a report which discussed the techniques used as well as the findings from these tests. Irby's report shows the following:

- Exhibit 1B3 was 173 blue and white pills in a plastic bag;
- A random sampling of nine pills were tested from this exhibit;
- Testing identified the substance commonly known as fentanyl in the pills; and
- The net weight of the fentanyl identified was 18.2 grams plus or minus 0.2 grams.

BIA Exhibit 1:

13. On August 20th, [verbatim] 2023, Radhiyah Himawan tested BIA Exhibit 1 using various tests at the lab. On August 23rd, Himawan issued a report discussing the techniques used as well as findings from these tests. Himawan's report shows the following:

• BIA Exhibit 1 was residue from a crushed substance; and

• Testing identified the substance commonly known as fentanyl in the residue.

14. N-Phenyl-N-[1-(2-phenylethyl)-4-piperdinyh] propenamide, commonly known as fentanyl, is a Schedule II controlled substance.

Mr. Starnes, you make me say that one more time.

MR. STARNES: I think our remote court reporter is probably ready to throw something at us, Your Honor.

THE COURT: I'm sure.

All right. So those facts are agreed, and you'll have a copy of all those agreed facts when you go to the jury room as we discussed.

All right. We've already had our opening statements, we'll now jump to our first witness from the government.

Ms. Paisley, please.

MS. PAISLEY: Your Honor, the government calls Darlene Wippert.

COURTROOM DEPUTY: Please raise your right hand.

DARLENE WIPPERT,

called as a witness on behalf of the Plaintiff, having first been duly sworn, testified as follows:

COURTROOM DEPUTY: Please have a seat right over there.

THE COURT: Good morning, ma'am.

THE WITNESS: Good morning.

THE COURT: Would you please state your full name and spell your last name for the record. Pull the microphone a little closer. Thank you.

THE WITNESS: Darlene Wippert, W-i-p-p-e-r-t.

THE COURT: Thank you.

Go ahead, Ms. Paisley.

MS. PAISLEY: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. PAISLEY:

Q. Good morning, Ms. Wippert.
A. Good morning.
Q. May I call you Darlene?
A. Yes.
Q. Darlene, where do you live?
A. Browning.
Q. And is -- is that on an Indian Reservation?
A. Yes, it is.
Q. Which reservation is that on?
A. Blackfeet.
Q. How long have you lived there?
A. Lifetime.
Q. Are you a member of the Blackfeet Tribe?
A. Yes.

Q. And in the home that you live in, have you -- do you live alone?
A. Right now my granddaughter lives with me.
Q. In 2022, did anyone live with you?
A. My son, Shawn.
Q. How many children do you have?
A. I had two.
Q. How old was Shawn in 2022?
A. I think he was 48.
Q. I want to talk to you about when Shawn died, and there's some tissues there if you need them. Do you remember the last day that you saw him alive?
A. Yes.
Q. Did you spend the day with him?
A. Yes.
Q. Can you tell the jury what you were doing that day with Shawn?
A. We went to Cut Bank to get winter tires for my car, and he rode down with me. And when we got done -- well, that was at one o'clock in the afternoon. Then when we got done there, he wanted to get some breadsticks from a Pizza Hut. So he had ordered them before we left at the tire shop, and we went straight there to get the breadsticks. And I gave him the money to pay for the breadsticks because he didn't have any money at all. Then we went home.

Q. Okay. You said one o'clock. How do you remember it was one o'clock?
A. That was the appointment time for my tires.
Q. Oh, okay. That was when you guys -- that's when your appointment was --
A. Yeah --
Q. -- at Cut Bank?
A. -- at Cut Bank.
Q. So do you know what time you got back to the house approximately?
A. Probably approximately -- I'm not -- can't say for sure how long it took to get the tires and pizza and then travel home. So I'd say approximately around four o'clock.
Q. When you got back to the house, was anybody else there?
A. Not that -- when we got there.
Q. Okay. At some point, did anybody else come to the house?
A. Yes.
Q. Who came to the house?
A. Doug.
Q. Okay. Did anyone else come to the house?
A. My grandkids, my granddaughters.
Q. Okay. And who are they?
A. Jayce and Jade.
Q. And you said that Doug came to the house. What Doug is that?

A. Doug Malatare.
Q. Doug Malatare.
How do you know Doug Malatare?
A. He -- he was friends with my son. And whenever anybody came, I'd ask Shawn who was out there because they didn't come in while I was at the house, and he would say Doug.
Q. Okay. So Doug was a friend of Shawn's?
A. Yes.
Q. And he would come to the house, but they wouldn't come inside?
A. No.
Q. Okay. Where would they visit or what --
A. Out in the driveway.
Q. Okay. Out in the driveway.
All right. I'm going to ask you, can you identify or do you see Doug Malatare in the courtroom today?
A. (Indicating.)
Q. Okay. Can you identify him by where he's sitting -- sitting and the item of clothing?
A. He's sitting to the right of me, and I think he's got a --
Q. You can stand up.
A. Okay. Blue ribbon shirt.
Q. A blue ribbon shirt on?
MS. PAISLEY: Your Honor, let the record reflect the defendant -- or that the victim has identified -- or the

witness has identified the defendant.

THE COURT: The record will reflect that the witness identified the defendant.

MS. PAISLEY: Thank you, Your Honor.

BY MS. PAISLEY:

Q. So did anyone else -- so at some point Doug Malatare came to the house and then the granddaughters came to the house.

A. Yeah.

Q. How did the granddaughters get to the house?

A. They -- well, I -- I'm not sure if it was both of them or just the one that was leaving for Bozeman for college.

Q. Oh, okay. Which -- which granddaughter was that?

A. Jade.

Q. Okay. So at some point Jade came?

A. Yeah.

Q. But you're not sure Jayce was there?

A. No, I can't recall if she was there right now.

Q. And at some point Doug Malatare came to the house. Did he come inside?

A. No.

Q. Did you -- how do you know he was there?

A. Shawn was outside. He came in, and I said, "Who's outside?" And he said, "Doug."

Q. Okay. Did you also see a vehicle?

A. I glanced out my -- my kitchen front door and I seen his

car out there.
Q. Okay. Had you seen Doug in that car before?
A. I didn't pay no attention to who was in the car. I just seen the car.
Q. Oh, was -- was it a car that you had associated with Doug in the past?
A. Yes.
Q. Oh, okay. All right. So you don't know who else was in the car?
A. No.
Q. You just saw the car?
A. Yeah.
Q. All right. So -- all right. What happened after that?
A. I was cooking supper.
Q. What were you cooking?
A. I was cooking bola meat and barley and rice soup.
Q. Was there a particular reason you were making that particular dinner?
A. Yes, because Shawn was getting implants for a permanent denture put in, and he had surgery before that day. So I was fixing something that would be pretty much soft that he would be able to chew and eat.
Q. Had he expressed any pain related to the oral surgery?
A. Yeah, he said it hurt. He had medication for that there. He -- he -- I don't know what kind he had actually, but he did

have medication for it.
Q. He had pain medication?
A. Yeah.
Q. Okay. How was -- how was Shawn at dinner that night?
A. Well, when it was ready, I -- I called him to the table. He was downstairs in his room. And he came up, and I told him, you know, supper was ready. And so he got his bowl -- dish out and his plate for his meat.

And he was eating it, and then he kind of choked. So he went running down to the bathroom. When he come back up, he -- I asked him, I said, "What's the matter?"

And he said, "I think I inhaled some of my soup and it choked me."
Q. Okay.
A. So then he had cut his meat. And he had a fork, and he put it up to his -- in front of his face like this here (indicating), and he just stared at it. He didn't put it into his mouth right away. He just sat there and stared at it.
Q. Okay. So he sort of just paused?
A. He -- yeah, just like (indicating) that for a while.
Q. Did he have any -- did he have any trouble staying awake at dinner? Was he struggling with --
A. Well, he got up to get -- I don't know if it was sauce or something for his meat, and he opened the fridge up and he just stood there and looked and said, "Oh, I forgot."

Q. Sort of paused again?
A. Yeah.
Q. Okay. Had that happened in the past? Had you seen Shawn --
A. Yes, I seen that happen --
Q. How --
A. -- with him --
Q. How many times do you think that's happened?
A. Oh, gosh, I can't really recall exactly how many times it -- I just know it --
Q. You'd seen it?
A. -- more than a few.
Q. Okay. All right. So after supper, what -- what transpired? What did you guys do?
A. Well, he -- I don't remember exactly when his daughter came and he was outside. Well, that was earlier then.
Okay. He went down to his room.
Q. Okay.
A. And by the time we ate supper and everything, I imagine it was about -- it was later than four o'clock. It had been a lot later than four o'clock. And so I was watching TV, and he went down to his room. And so around 8:30 to nine o'clock, I usually get ready for bed. And I can hear Shawn snoring --
Q. All right.
A. -- so I thought, okay, well, he's sleeping. So I got ready

for bed and went to bed.
Q. Okay. Just a minute ago you were sort of putting things in order in time. Let me ask you this: Was Jade at the house and Doug's visit, were those at the same time?
A. Yeah --
Q. Okay.
A. -- because he -- they were getting ready to leave, load up the vehicle that she was leaving in to go to Bozeman --
Q. Okay.
A. -- and her dad was outside with --
Q. Okay.
A. -- the vehicle.
Q. And was that time where Jade and Doug were at the house, was that before or after dinner?
A. Before I think.
Q. Okay. That was before dinner.
All right. And so nobody else was there for dinner besides you and Shawn?
A. No, just us two.
Q. Okay. All right. So you went to bed?
A. Yes.
Q. In the morning, did something happen that made you wonder where Shawn was?
A. Yes. I got up, and the light in the hallway in the bathroom in his room was lit up. So I thought, okay, well,

he's up using the restroom or something. And so I went out -- I'm a smoker -- and had my coffee, went out on my deck.

And when I come back in, everything was still the same as when I went out, so I thought I better check and see, maybe he -- you know, see what's happening with him. So I went downstairs and I called him.

He was -- the door was open to the bathroom, so I called him, "Shawn." There was nothing. No response. His dog -- he has a blue healer dog that just followed him continuously, and his dog was on the bed and everything. So I said, "Shawn," again, and I walked in there. He was sitting on the bathroom -- on the...

Q. Okay. So you found him in the bathroom?

A. Yeah. So when he didn't answer me, I went to (indicating) touch him, and there was no response. And when I said, "Shawn," and he -- his head just kind of moved and he was slumped over. His head was into the shower curtain. And when I looked, I seen blood on the shower curtain. So I screamed at him and I hit him in the back, "Shawn, Shawn, wake up," but there was no response.

Q. When you went there, when you saw him in the bathroom, he was on the toilet?

A. Yes.

Q. Okay. And when you touched him to try and wake him and there was no response --

A. No.
Q. -- he then slumped over?
A. Yes, he was slumped over.
Q. At that point, what did you do, Darlene?
A. I -- I don't have no one that lives right next door or anything. My -- rest of my family is out of town, and except for my granddaughter, she was home at their house. And so I called the police department because that was the only number I thought of offhand that I knew of. I called the police department, and I told them my son wasn't responding.
So they got the ambulance and they came right to the house. And I called Jayce, and she came right to the house because she was able to come in the back door. I keep my front door locked.
Q. Okay.
A. So she opened it up for the police and EMTs.
Q. And then they came in and responded to Shawn?
A. And they came in and found Shawn, yeah.
MS. PAISLEY: Your Honor, I have no further questions for Darlene.
THE COURT: Cross-examine.
MS. MUSICK: Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. MUSICK:
Q. Good morning, Ms. Wippert.

A. Good morning.
Q. You observed Shawn speaking to someone in a car that you believe belonged to Doug Malatare outside your home on the day of his death; is that right?
A. Yes.
Q. But you never actually saw the driver of the vehicle?
A. I didn't, no, I just seen the vehicle.
Q. Okay. So you don't know if Doug was actually driving the car or not?
A. Well, Shawn was on the passenger side, so I don't know.
Q. Sure. But you never --
A. I --
Q. -- saw Doug Malatare that day?
A. Not that physically seen him. I just know that that was his car.
Q. Okay. And you described the car to Deputy Sinclair as a smaller blue car --
A. Yes.
Q. -- is that right?
Okay. And do you know if there was anyone else present in the vehicle?
A. I don't. I don't recall because I just happened to glance out like that there, and I seen the car. And I was cooking at the time, so I turned around and went back into my kitchen.
Q. Sure. As far as you know, Shawn and Doug were friends;

right?
A. As far as I know that they were friends. I -- that I thought they were friends.
Q. Sure. But you didn't see Doug give anything to Shawn that day; right?
A. I didn't see anything other than Shawn by his car at the time I looked out.
Q. Okay. And you gave multiple statements to law enforcement officers throughout the course of this investigation; is that right?
A. I gave a couple of them.
Q. Sure. And during those interviews with law enforcement, they were trying to piece together everything Shawn was doing leading up to his death; right?
A. I guess so.
Q. Okay. So a description of what you've been doing that day, who you -- who he had had contact with, does that seem accurate?
A. As far as I can recall.
Q. And you testified earlier that Shawn's daughter, Jade, came to the house that day; right?
A. Jade.
Q. Jade.
And Shawn actually picked her up and brought her to your house; is that right?

A. At the time I didn't know the -- what all -- all was, you know, transpiring with them. But I -- I did see Shawn go get Jade, bring her back, yeah.
Q. Okay.
A. But that's all I was told. So what happened --
Q. And Jade also had a friend that came to the house --
A. Yes.
Q. -- and picked her up?
A. Yes.
Q. Okay.
A. That's who she was going with to Bozeman.
Q. But when you were interviewed by law enforcement, you never told law enforcement about Jade or Jade's friend being at the house that day; right?
A. They were -- no, not at that time, at that initial time, yeah.
Q. Okay. In fact, you specifically told Mike Brown, one of the deputies and the coroner, that it was just you and Shawn at your house that night. Do you remember that?
A. Yes.
Q. And you actually denied that either of Shawn's daughters were at the house. Do you remember that?
A. Not that night. They were there that -- not that night, but Jade, I know, like I said earlier, that she had came, that she was leaving to Bozeman. So I don't know exactly what I

said. I was so traumatized on finding my son --
Q. Sure.
A. -- and being questioned and people coming and going. I don't know.
Q. Okay. Don't you think it was important for law enforcement to know the truth about who was at the house the day Shawn died, though?
A. As far as I can recall, I let them know who was at the house.
Q. Okay. So earlier you described Shawn as looking like he was kind of falling asleep during dinner that night?
A. Right.
Q. Okay. And isn't it true that that isn't the first time that you'd seen him act like that?
A. No.
Q. That's not true or...
A. No, that's not the first time I seen him --
Q. Okay.
A. -- like that.
Q. In fact, you described him as looking like a horse sleeping standing up?
A. Right.
Q. Do you remember that?
A. At one time, yes.
Q. So that wasn't the first time that you believed Shawn had

been using drugs then?
A. Well, I didn't know it was drugs that he was using. I just said, "You're -- you're sleeping like a horse standing up."
Q. Sure. You found marijuana in Shawn's drawer after he passed away. Do you recall that?
A. I recall that after the investigators let me know that that's what they found. I didn't find it until after they went through everything.
Q. Okay. And so since that was after their investigation, the marijuana wasn't seized by law enforcement during the course of their investigation?
A. I don't know what they seized or didn't seize, but I know there was a small amount, very small amount of marijuana there.
Q. Okay.
MS. MUSICK: I have nothing further for you, Ms. Wippert. Thank you.
THE COURT: Redirect.

REDIRECT EXAMINATION

BY MS. PAISLEY:
Q. Ms. Musick asked you whether that was the first time you -- or you had -- whether you had suspected he had used drugs before.
A. Right.
Q. Prior to his death, did you have any knowledge that he was using any kind of illicit substances?

A. No, I didn't know he was using anything. I did ask him at one time, "Are you using anything?"
He said, "No."
So I didn't think anything more of it other than, you know, just noticing some actions, but I didn't know what the actions were from due to me not knowing --
Q. Okay.
A. -- the mannerisms, symptoms, the whatever of any users. Because I was never brought up around them --
Q. So --
A. -- I didn't know them.
Q. -- it was only after you learned of how Shawn died that you started looking back and sort of seeing those behaviors; is that right?
A. Pardon?
Q. It's only after you found out how Shawn died that you started looking back at those behaviors?
A. Yes.
Q. Okay.
MS. PAISLEY: No further questions.
THE COURT: Is the witness excused?
MS. PAISLEY: We're going to retain her at this point.
Your Honor, the government will call Jade Wippert.
COURTROOM DEPUTY: Please raise your right hand.
JADE WIPPERT,

called as a witness on behalf of the Plaintiff, having first been duly sworn, testified as follows:

COURTROOM DEPUTY: Thank you. Please have a seat.

THE COURT: Good morning.

THE WITNESS: Good morning.

THE COURT: Can you, please, state your full name and spell your last name for the record.

THE WITNESS: Jade Hunter Wippert, W-i-p-p-e-r-t.

THE COURT: Will you pull that microphone a little closer please. Thank you.

Go ahead, Ms. Paisley.

MS. PAISLEY: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. PAISLEY:

Q. Good morning, Ms. Wippert.

A. Good morning.

Q. May I call you Jade?

A. Yes.

Q. All right. Jade, how old are you?

A. I am 20 years old.

Q. Where do you live?

A. I live in Browning, Montana.

Q. Who do you live with?

A. My grandma, Darlene Wippert.

Q. How are you related to Darlene?

A. She's my grandma.
Q. Through which side? Your mom?
A. On my dad's.
Q. Who is your dad?
A. Shawn Wippert.
Q. We're going to talk about Shawn Wippert's death, your dad's death. When was the last time you saw your dad?
A. The night that he had passed away.
Q. Okay. At that point, were you living with your grandma, Darlene, or were you living somewhere else?
A. No, I was currently living with my mother.
Q. Where was that?
A. In Browning in Old Low Rent.
Q. So across town?
A. Yeah.
Q. So did you go to that house -- did you go to your grandma's house that day?
A. Yes, I did.
Q. How did that come about?
A. Because I had asked my dad to pick me up at my mom's to bring me to my grandmother's so a friend could pick me up.
Q. Where were you and your friend going?
A. To Bozeman for the Cat and Griz game.
Q. Was that the next day?
A. Yeah, the game happened the next day, but we left that

night.
Q. So you were heading down to Bozeman to watch the game. Did you used to go to school at Bozeman?
A. Yes, I did.
Q. So you root for the Cats?
A. Yes.
Q. So your friend's going to pick you up, and you asked your dad to come get you to bring you to your grandma's. Why did you want to go to your grandma's while you waited?
A. Because I didn't -- it's really hard to explain where my mom lived. So I just -- they had known where my grandma lived prior to that, so it was just easier for the location I guess.
Q. For your friend to pick you up?
A. Yes.
Q. Okay. When did your dad pick you up?
A. I would say around maybe 4:00 to 5:00, around there.
Q. Some time at that point you went over?
A. Yes.
Q. Did you stay at the house for dinner?
A. No, I didn't because they had just ate, and that's when he picked me up, after he got done eating.
Q. Okay. Do you know what they were eating?
A. I don't.
Q. So he came and got you, brought you back to the house. And how long were you at the house?

A. I would say for two to three hours maybe.
Q. Okay. For a couple of hours?
A. Yeah.
Q. At some point, did you -- did your dad go outside?
A. Not that I knew of, but, yeah, eventually he had went outside, and that's how I found out because I was getting ready to leave and he had been outside.
Q. Okay. So when you were getting ready to leave, did you want to see your dad before you left?
A. Well, I thought he was sleeping honestly, so, no, I didn't go down to see him, but eventually I seen him.
Q. Oh, okay. So you didn't go down -- downstairs to say good-bye, but when you went outside you saw him?
A. Correct.
Q. Okay. When you went outside, where was your dad?
A. He was in a vehicle.
Q. Okay. What seat of the car was he in?
A. Passenger.
Q. Okay. Did you see anybody else in the vehicle?
A. Yes, I did.
Q. Did you know the person that you saw?
A. No.
Q. Okay. Could you describe the person that you saw to the jury?
A. He was a taller man and he had long hair, and that's all I

could see because it was dark out.
Q. Was he a young man, old man, something else?
A. Older.
Q. Older. Okay.
Was he Native or non-Native?
A. I would say Native.
Q. So an older man that was tall and had long hair?
A. Correct.
Q. By long hair, do you mean sort of longer above the ears or longer like in a braid or ponytail?
A. It was longer and in a ponytail.
Q. Did you talk to your dad?
A. (No verbal response.)
Q. Can you tell the jury about that conversation?
It's okay. Take your time, Jade.
A. Our conversation went -- he said, "Drive safe," and, "I love you."
Q. Did he -- did he stay in the car for that conversation?
A. Yeah, he didn't open the window. He opened the door.
Q. He opened the door.
A. And he said that he would see me when I got back and that he loved me. And then I had told him: I'm going to get a hold of you and send you pictures, and show grandma -- because her birthday had just passed -- and then you could show grandma the pictures and see what she wants for her birthday, and that I

would get it for her.

MS. PAISLEY: No further questions for this witness.

THE COURT: Ms. Musick, you may cross-examine.

MS. MUSICK: Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. MUSICK:

Q. Good morning, Jade.

A. Good morning.

Q. Do you need -- do you need a few moments to compose yourself?

A. No.

Q. Okay. There are tissues and water if you need them.

A. Yeah, thank you.

Q. So you testified earlier that you were at the house after dinner that night; is that right?

A. Correct.

Q. Okay. How was your dad acting when you were with him?

A. When he picked me up, he said that -- because he had just had went through surgery on his mouth and he said that he was, you know, in pain, and but everything was fine.

Q. Okay. So other than being in a lot of pain, he seemed relatively normal?

A. Yes.

Q. Okay. And you thought that your dad was downstairs in the basement asleep when you were leaving; is that right?

A. Yeah. Yeah, just in his room, because he didn't come out or anything, or not that I knew of.
Q. Okay.
A. I was upstairs watching TV with my grandma.
Q. So you -- when your friend arrived to pick you up, you just went outside to leave and you noticed that your dad was sitting in a car; is that right?
A. Yes, because he had to open the door --
Q. Okay.
A. -- to talk to me.
Q. And you didn't recognize the driver of the vehicle that night; right?
A. No, I hadn't -- I've never seen the guy in my life.
Q. Okay. And isn't it true that you also believed that there was one or possibly even two occupants in the back seat of the car?
A. There was one that I think was in the back of the car.
Q. And you didn't know who that person was either; right?
A. No.
Q. Okay.
MS. MUSICK: No further questions.
THE COURT: Redirect?
MS. PAISLEY: No further questions, Your Honor.
THE COURT: Is this witness excused?
MS. PAISLEY: From our subpoena.

THE COURT: You can step down.

MS. MUSICK: And, Ms. Wippert, you can be released from the defense subpoena as well.

THE COURT: Thank you, Ms. Wippert.

MR. STARNES: United States calls Mike Brown to the witness stand, Your Honor.

Mr. Brown, right this way please, sir. Right up here. She's going to swear you in and you can take a seat over there, sir.

COURTROOM DEPUTY: Please raise your right hand.

MICHAEL BROWN,

called as a witness on behalf of the Plaintiff, having first been duly sworn, testified as follows:

COURTROOM DEPUTY: Thank you. Please have a seat.

THE COURT: Good morning, sir.

THE WITNESS: Good morning.

THE COURT: Would you please state your full name and spell your last name for the record.

THE WITNESS: Michael Brown. Last name is B-r-o-w-n.

THE COURT: Thank you.

Go ahead, Mr. Starnes.

MR. STARNES: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. STARNES:

Q. Good morning, sir. We've talked on the phone before, but

we've never seen each other in person before you came in here; correct?
A. Correct.
Q. I would like you to explain for the jury what do you do for a living?
A. I'm a deputy coroner for the Glacier County Sheriff's Office.
Q. How long have you been a deputy coroner?
A. Seven years.
Q. How long have you been in law enforcement?
A. About eight I guess when all is said and done.
Q. And the additional year, was that also with the Glacier County Sheriff's Office or another law enforcement entity?
A. I was in corrections.
Q. Where?
A. For the -- the facility in Shelby. At the time, it was -- they call it CCA. It was --
Q. Oh, was it the Crossroads Correctional Facility?
A. Correct, yeah.
Q. It's the CoreCivic --
A. That's right.
Q. -- in Shelby?
A. That's what they're calling it.
Q. I want to talk to you about your role as coroner. First of all, anybody that's not familiar with it, please explain what

is a coroner. What does being a coroner mean?
A. A coroner is the -- for us here is the initial investigator that shows up on a death scene to investigate a death, an unattended death of somebody.
Q. And what are you doing for when you -- yeah, well, let's go ahead from there. If you're called out to a scene, not necessarily in this case but in general, what are you doing when you first arrive at the scene?
A. First thing I do is -- when I get to a scene, is I make contact with the first responders, get an initial briefing from them. Then from there I go and assess the scene itself. I work personally from the outside in documenting everything as I assess the scene and with photographs and notes and things like that.
We take -- or I take pictures of anything and everything, because you never know what's going to be relevant. And as I work my way in and ultimately make it to the decedent itself, and I look at kind of a similar -- you know, kind of an outside in perspective, again, we're going to look at the how the decedent presents: You know, what's the body position? Is there anything around the body? Is there items there? What are those items? Things like petechia around the eyes, the face, the mouth. Is there trauma to the body that's obvious or not?
And we also look at, you know, the rigor mortis, the

stiffening of the body after death, as well as liver mortis, which is the pooling of the blood. So when the circulation -- when the heart stops, there's no further circulation of the body. The pool -- the blood's going to settle. Is that consistent with the body position? And then the temperature of the body, the body cooling.

And from there then I go and do my interviews with family, friends, witnesses, kind of get an idea of hopefully at least the last 24 hours so that I can kind of get an idea as to maybe how things went if possible. It's not always available, but we -- we try to figure out as much as we can at the scene and get as much information as we can from as many people as we can -- we can interview.

Q. The let me -- let me stop you there for just a minute --

A. Sure.

Q. -- just so we're all on the same page.

So you come out to the scene. You sort of take an overview of the scene itself?

A. Right.

Q. And looking for certain factors that might help you reach a conclusion about potential causes of death --

A. Correct --

Q. -- is that fair?

A. -- that's fair to say.

Q. And I think you described some of those things you're

looking at.
A. Yeah.
Q. What I wanted to do is just sort of shift your attention, because I think you're about to get into certain areas we're going to talk to here in a minute, but let's just go to November of 2022. Were you called out to be a coroner on a scene at a home in Browning on November 19th of 2022?
A. Yes.
Q. And do you know approximately when you were called out to that scene?
A. A little after 7:00 a.m.
Q. About 7:00 a.m.?
A. Uh-huh.
Q. And who was there when you got on scene?
A. I met with BIA Investigator Kyle Sinclair.
Q. And what was your understanding of what you were walking into? Did you get sort of a brief about what to look for or did you just go in cold?
A. No, I -- yeah, I don't go in cold. I -- I talked to Kyle, and he told me that the decedent had had oral surgery. It was a series of oral surgeries that he was going through, and it was a -- one of a few.
Q. All right. So you knew that the decedent had had oral surgery like some time recently before the decedent passed?
A. Correct, yes.

Q. And did you know where the decedent was located?
A. Yes.
Q. Where was that?
A. In the bathroom.
Q. And were you able to go into the bathroom and observe that scene?
A. Yes.
Q. And were there some photographs that were taken inside the bathroom but where the decedent was?
A. Yes.
Q. So I'm going to show you a couple of these, and we're not going to keep them on very long. They are a little bit graphic. That's for the jury's sake.
I think it's important to your testimony, so I'm going to show you Government's Exhibit 1. This has already been admitted into evidence. Okay. And do you recognize this, sir?
A. I do.
Q. And will you just explain for the jury what it is that you saw?
A. So I entered the bathroom. I saw the decedent. He was slumped over the tub.
Q. And at this point, this was his final condition that you saw him in?
A. Yes.
Q. Let's go to Government's Exhibit 2 please. System is being

a little bit slow here. Do you recognize this, sir?
A. I do.
Q. From Government's Exhibit 1 and Government's Exhibit 2, what information did you collect that was relevant to your investigation as a coroner when trying to determine potential cause of death here?
A. So based on my training and experience, the we call purge, or the fluid that's coming out of his nose and mouth, is pretty consistent with what we've seen before to be an overdose.
Q. Okay. And why is that that -- you said it's the stuff that was coming out of his mouth?
A. Right.
Q. Okay. And what, if anything, about his resting position did the -- you know, what information did you gather from that that was maybe important or relevant to your investigation?
A. Well, his body position could have -- could have meant he was trying to get up. Maybe he was feeling nauseous and throwing up. Kind of -- kind of tough to say for sure, but that would be where I would go with that.
Q. Okay. It didn't look like this body had been moved or anything like that --
A. No --
Q. -- postmortem?
A. -- it was consistent with what I found.
Q. Okay. So I'm going to shift back to what you were just

talking about. So you've seen the body laying there. It looks like it hadn't been moved much --
A. Correct.
Q. -- since the person passed away. And you observed the stuff coming out of the individual's face, and you indicated that that looks like a potential overdose. Why is that?
A. Because the -- the type of fluid that was coming out of his mouth and nose, because it was also blood as well as like a mucousy to kind of indicate that there was some internal trauma, I guess is the best way to kind of put it in layman's terms, that caused that to occur, that trauma.
Q. So something happened inside the body --
A. Right.
Q. -- maybe not necessarily external force being applied to the body?
A. Correct.
Q. Okay. And, in your review of the body, did you see anything else that made you think, okay, maybe this is trauma or some other potential cause of death here?
A. I did not --
Q. Okay.
A. -- find anything that would make me believe that.
Q. All right. So now you're thinking in your mind this is a -- looks kind of like an overdose. What's your next step to try to start determining if that's an actual cause of death

here?

A. So next thing I would do is I'm going to want to -- at this point I'm going to want to schedule an autopsy based on what I'm seeing. So I would -- I talked to Kyle and said this is -- this is what I'm seeing and this is my recommendations. He agreed with me. Next step is to contact the pathologist and to brief the pathologist, in which case Mr. Garchase [phonetic] agreed that an autopsy was appropriate.

Q. Okay. So do you send off for autopsy in every case that you respond to as a coroner?

A. No.

Q. When do you make a decision an autopsy might be appropriate?

A. When it's clear that the cause of death is unknown, if there's a potential for foul play, if there's -- age can play a factor. If they're young, not known to have any kind of health concerns, health issues, things like that, then we would want to go further and try to determine cause of death.

Q. You assessed the -- the body, and you're thinking this could be drug overdose, autopsy would be appropriate here. Did you take any other investigative steps at the home to try to help determine whether or not this could be drugs or maybe something else?

A. Yeah, we look at any medications that are present. We collect all those medications. And if it's a case where we

suspect that's -- drug overdose is part of it, we're going to accurately take into consideration all the medications and their quantities.

Q. Okay. So apart from observing the decedent in the bathroom, did you go look at any other areas of the home?

A. His bedroom.

Q. In the decedent's bedroom.

And I want to go ahead and show you Government Exhibit 4 please -- and this one's. Excuse me, 3. Got ahead of myself.

MS. PAISLEY: Four is coming up.

BY MR. STARNES:

Q. Four. There we go. Do you recognize -- this is Government Exhibit 4. Do you recognize this, sir?

A. I do.

Q. What is this?

A. So it's a dresser in his room, and medications that are on the dresser were all prescribed to the decedent.

Q. And do you see anything else on this dresser that maybe is important to your investigation?

A. There was a powdery substance that -- on the dresser that kind of drew my attention.

Q. Okay. And normally we are able to draw on this, but I think our technology is not working. So will you just describe for the jury where the powder is on this dresser, if you see it in this photograph?

A. It's on the top of the dresser. It's near a couple of other prescription bottles.
Q. Okay. And it's that blue sort of clumpy substance that we see on the sort of --
A. Yes.
Q. -- on the left-hand side of the dresser up kind of up middle by the prescription bottles?
A. Yeah, it kind of appeared to me that it had been crushed up.
Q. Do you see this water bottle says Pure Life on it?
A. Uh-huh.
Q. Next to that is a prescription bottle. What's the thing that's right underneath the prescription bottle?
A. It's a straw.
Q. Okay. So you have a crushed up powder and then a straw that are on this nightstand; is that right?
A. Correct, yes.
Q. And that was in the decedent's bedroom?
A. It was.
Q. Okay. So in this particular case, I think you said you sort of conferred with a medical examiner, a pathologist from the State Crime Lab, and you recommended an autopsy; is that right?
A. Yeah.
Q. And what was the -- what -- did they agree with your

assessment that was probably appropriate?
A. Yes.
Q. So once you make that determination, you get confirmation from the State Crime Lab, how do you get the person from the scene to where they need to have the autopsy done?
A. I mean, in this particular situation, we utilize the funeral service, local funeral home, and they pick up the decedent and they do the transfer for us.
Q. Okay. And then they're the ones that will physically take it to where the state medical examiner's office is?
A. Yes.
Q. And where did this particular individual -- where was the decedent sent?
A. The Crime Lab in Missoula.
Q. Missoula, Montana.
Okay. Are you familiar with body camera?
A. Yeah.
Q. Is it common for officers to be wearing body camera when they respond to the scene?
A. Yes.
Q. And I think we have some for you that we're going to go ahead and play while we have you on the stand.
MR. STARNES: Can we please have Government Exhibit 58, Kalah? Yeah, that's fine. If you'll hit play please.

(Exhibit playing.)
MR. STARNES: Can you pause please?
BY MR. STARNES:
Q. And who is this individual that we're -- that we see in the body cam?
A. Coley Potts.
Q. Is this you that we're --
A. Oh, that's me there. I thought you were talking about -- I'm sorry, but yeah.
Q. Whose body camera is it? Do you know?
A. Yeah, Coley Potts.
Q. And who is Coley Potts?
A. He's a -- he's one of the officers with Blackfeet Law Enforcement.
Q. Okay. So is this you sort of responding to the scene --
A. Yeah.
Q. -- and beginning your investigation?
A. That's me. That's when I first entered the bathroom and I was starting to take photographs and kind of assess what I was seeing.
MR. STARNES: Okay. And we can go ahead and continue from there please, Kalah.
(Exhibit playing.)
MR. STARNES: Pause here for a moment.
BY MR. STARNES:

Q. Who is this individual depicted?
A. Kyle Sinclair.
Q. Special agent with the Bureau of Indian Affairs?
A. Correct, yes.
MR. STARNES: Please proceed.
(Exhibit playing.)
MR. STARNES: And I think we'll go ahead and stop playing that here.
BY MR. STARNES:
Q. To the best of your knowledge and recollection, does this show the rest of your investigation of the scene that night?
A. Yeah. By and large, yeah.
MR. STARNES: Thank you. I have no further questions for Deputy Brown.
THE COURT: Cross-examine.

CROSS-EXAMINATION

BY MR. GALLARDO:
Q. Good morning, sir.
A. Good morning.
Q. I believe that you did a fairly thorough search of Mr. Wippert's room; is that fair to say?
A. Yeah, I believe so.
Q. You looked in his dressers and drawers and things like that?
A. I did, yes.

Q. And part of that search was -- was recorded through -- through a body camera, right, through a few body cameras?
A. Yes.
Q. And in -- throughout your search in Mr. Wippert's room, you and Agent Sinclair found marijuana; is that right?
A. Actually, to be honest, I don't recall collecting marijuana. I didn't collect marijuana but...
Q. Right. You didn't collect it, but you guys found it; right?
A. Yeah, I actually don't recall that.
Q. Okay. We'd like to --
MR. GALLARDO: I believe Defense Exhibit 504 has already been admitted.
MR. STARNES: It has.
MR. GALLARDO: Can we bring up 504?
MR. STARNES: I don't have it electronically.
MR. GALLARDO: We can do it over here.
(Off record counsel dealing with technology.)
THE COURT: It's up now, Mr. Gallardo.
MR. GALLARDO: Okay. Thank you. Bring it to around a minute 14, and if we can just fast forward it to about a minute 14 of the video.
COURTROOM DEPUTY: That's where I started.
MR. GALLARDO: I'm sorry?
COURTROOM DEPUTY: That's where I started, a minute

23.

MR. GALLARDO: And are we able to jump ahead?

COURTROOM DEPUTY: How far?

MR. GALLARDO: About a minute 14.

MS. MUSICK: I believe Mr. Gallardo means 14 minutes not 1:14.

THE COURT: Okay. Thank you.

MR. GALLARDO: Or you could --

COURTROOM DEPUTY: 14:09.

MR. GALLARDO: 14:09 is fine. And there should be some volume on there. You should be able to hear them talk.

(Exhibit playing.)

COURTROOM DEPUTY: I'm not sure about the volume.

MR. GALLARDO: Is it -- is it muted? We could try to pull it up on ours if the volume is --

COURTROOM DEPUTY: Okay.

MS. MUSICK: I don't think the volume is working on yours either; I tried that. We'll just play it on 4 --

MR. GALLARDO: We could just play it from here.

BY MR. GALLARDO:

Q. Officer, if you wouldn't mind just kind of narrating what we're seeing.

A. Okay.

COURTROOM DEPUTY: One second.

(Exhibit playing.)

THE WITNESS: So I'm looking at the labels. I'm referencing the -- the pill and what it says on the pill as to what it says on the label to verify that it's --

MR. GALLARDO: Madam clerk, can we pause it for a minute?

Oh, you can.

MS. MUSICK: It finally worked.

BY MR. GALLARDO:

Q. Okay. So whenever the officer starts to explain, we'll just pause it so that the court reporter can pick it up.

Can you repeat what you were saying?

A. Sure. So on the bottles you're going to have a description of the pill. And what I'm doing there, because of what I saw at the scene, I'm matching the description on the bottle with the pill that was in the bottle. Does that make sense?

Q. It makes sense, yes. Thank you.

MR. GALLARDO: Okay. We'll play it.

(Exhibit playing.)

MR. GALLARDO: Can you pause?

BY MR. GALLARDO:

Q. So do you remember what pills you're referring to there when you're reading off the labels and asking about pain?

A. Yeah, amoxicillin, it's -- that's for an infection. It's an antibiotic.

(Exhibit playing.)

Q. Okay. Did we just hear someone say "marijuana"?
A. You'll have to rewind it; I didn't pick it up.
Q. Right.
(Exhibit playing.)
Q. Okay. Having reviewed the video again, does it refresh your recollections?
A. Yeah, I remembered it was in a -- I guess it was in a baggie. If I recall correctly, THC did not come up on his toxicology report. I don't remember seeing it on that.
Q. Right. And we'll get to the toxicologist later. I'm asking you about this search here.
A. Yeah.
Q. So there was marijuana found in Mr. Wippert's drawer -- dresser?
A. Yeah. Yeah, it looked -- it seems to be, yeah. I just don't recall because I didn't collect it.
Q. Sure. It sounds like somebody said, "Smelled like marijuana." Was that --
A. Yeah, that was my voice.
Q. Okay. Do you recall if it was packaged up, like, how much was in there?
A. I don't. I could -- I could hear the baggie. I just -- so it was probably in a -- like a plastic bag of some kind.
Q. Okay. What happened with the marijuana? Did -- was it just placed back in there?

A. I don't know. It wasn't relevant to my case at the time.
Q. It was wrapped in a plastic bag --
MR. GALLARDO: Or let's -- can we bring up --
MS. MUSICK: Do you want to bring up Exhibit 503?
MR. GALLARDO: You can unplug.
Madam clerk, can we bring up Exhibit 503?
COURTROOM DEPUTY: I think he wanted you to bring it up, but I can do it.
MS. MUSICK: Madam clerk, I apologize, Mr. Gallardo does not have the marked exhibits on his computer. Can we have you pull up Defense Exhibit 503 please?
COURTROOM DEPUTY: Does it have audio?
MS. MUSICK: No audio. It's a photograph.
(Exhibit playing.)
COURTROOM DEPUTY: Is this a correct Exhibit 503?
THE COURT: Video.
COURTROOM DEPUTY: Do you want the --
MR. GALLARDO: No --
COURTROOM DEPUTY: Do you want the --
MR. GALLARDO: -- it should just be a still photo.
COURTROOM DEPUTY: It's 505.
BY MR. GALLARDO:
Q. Okay. We have 503 up and we'll scroll down as far as we can. Officer, down there at the bottom it looks like somebody's holding onto something. Is that -- is that the bag

of marijuana that you all found in Mr. Wippert's room?
A. It's possible.
Q. Is marijuana legal on the reservation?
A. It is not.
Q. Are there any dispensaries there on the reservation?
A. No.
Q. And you conducted a number of interviews in this case?
A. I did.
Q. And you -- you interviewed Darlene that day, Darlene Wippert that day?
A. Yeah. Yes.
Q. She was understandably distraught. And now you asked her who all was at the house. Do you recall that?
A. Yes.
Q. And she said that it was just her and Shawn?
A. I believe so, yeah.
Q. Okay. Did you specifically ask if anybody else was there?
A. I remember -- I remember her saying that she saw a friend of the decedent's there as well earlier.
Q. Okay. And how -- how long did you stay involved in this case in the investigation into Mr. Malatare?
A. On this particular day?
Q. No, on this -- well, on Mr. Wippert -- in investigating Mr. Wippert's death?
A. It took -- it took a few days. I don't recall how many

days, but it did take a few days.
Q. Were you at all involved in a traffic stop relating to Mr. Malatare about a month later?
A. Oh, I don't recall that, but that's certainly possible.
Q. Did agents ever tell you that they found large amounts of marijuana in Mr. Malatare's vehicle?
A. That -- I recall something about that, but I don't remember the day or the date or the specifics about it.
Q. Did you -- did you think that that might -- you might want to -- want to have those agents keep, I don't know, compare marijuana or -- or anything like that?
Did you -- did you think to do any follow-up work on the marijuana side of this?
A. No, because my job is cause and manner of death, and that's going to be a criminal side, and that's not something that I deal with; that's going to be on the investigator side.
Q. Right. Okay. Okay. I'm following you. Give me just a minute.
Thank you, officer, I don't have any other questions, and thank you for your service.
THE COURT: Redirect please.

REDIRECT EXAMINATION

BY MR. STARNES:
Q. All right. Deputy Brown, we heard some questions that focused largely on whether or not there was potentially

marijuana at the scene, and you told Mr. Gallardo that it wasn't relevant to your investigation at that time. Will you please tell the jury why that is.
A. Based on my observations at the scene, I have -- my training, experience has never linked me to an overdose of marijuana that has that kind of reaction. People do utilize it for self-medicating for pain, but in this particular case that wasn't something that I felt was relevant in the moment.
Q. How many -- if you just had to ballpark it, how many drug overdose deaths do you think you maybe responded to in your seven years as deputy coroner?
A. Eight to 12.
Q. Okay. And of those 8 to 12, have you ever seen a marijuana cause of death when you investigated that drug death?
A. No.
MR. STARNES: Can we please have Government Exhibit 4, Kalah?
BY MR. STARNES:
Q. And I believe you told Mr. Gallardo that you didn't collect marijuana at the scene. Did you collect other substances that were at the scene?
A. I collected all the medications that were prescribed to the decedent.
Q. Okay. And do you know if this blue powder that we talked about on the nightstand was also collected?

A. Yeah, that was, but it wasn't collected by me.
Q. But it was collected by law enforcement?
A. Correct, yeah.
Q. Do you know who collected the blue fentanyl powder?
A. Yeah, the -- Investigator Sinclair, did.
Q. Special Agent Sinclair?
A. Sorry. Yes, Special Agent Sinclair.
Q. And it's the same one. He was there with you. He was the guy we saw in these videos?
A. Yes.
Q. All right. I have nothing further for you, sir. Thank you very much.

THE COURT: Is the witness excused?

MR. STARNES: Yes, please, Your Honor.

THE COURT: You may step down.

MR. STARNES: Ready to proceed with the next witness if the court is ready to proceed. United States would call Gavin Lawson to the witness stand.

Right this way, Mr. Lawson.

COURTROOM DEPUTY: Raise your right hand.

GAVIN LAWSON,

called as a witness on behalf of the Plaintiff, having first been duly sworn, testified as follows:

COURTROOM DEPUTY: Thank you. Please have a seat.

THE COURT: Good morning, sir.

THE WITNESS: Good morning.

THE COURT: Would you please state your full name and spell your last name for the record.

THE WITNESS: My name is Gavin Lawson. Spelled G-a-v-i-n, L-a-w-s-o-n.

THE COURT: Thank you.

Go ahead, Mr. Starnes.

MR. STARNES: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. STARNES:

Q. Will you please tell the ladies and gentlemen of the jury where you work?

A. I'm employed at the Montana State Crime Lab.

Q. And what is your role there?

A. I'm a forensic toxicologist.

Q. What does that mean?

A. I test biological fluids such as blood, urine, and vitreous for the presence of drugs and alcohol.

Q. What -- will you describe your education for the jury please? How did you become a forensic toxicologist?

A. A have a bachelor's degree in chemistry with an emphasis in forensic science from the University of Montana. I have gone through the State Crime Lab approved two-year training course. I have audited the Robert -- excuse me -- audited the standardized field sobriety testing course put on by the

Montana Law Enforcement Academy. I have audited the drug recognition expert course put on by the Montana Highway Patrol and NHTSA. I have also taken the Robert F. Borkenstein alcohol course as well as the Robert F. Borkenstein drug course. And then, as of November, I am a board certified toxicologist through the American Board of Toxicology.

Q. How long have you worked at the State Crime Lab as a forensic toxicologist?

A. As a forensic toxicologist, I've been employed since December -- excuse me, March of 2018.

Q. Prior to that, did you work at the State Crime Lab in a different capacity?

A. Yes, in December of 2016, I started as the toxicology technician.

Q. And prior to that, did you also work at the State Crime Lab?

A. Prior to being the toxicology technician, I did an internship at the State Crime Lab.

Q. All right. And are you a member of any professional organizations that relate to the field of forensic toxicology?

A. I am a member of the Society of Forensic Toxicologists as well as a diplomat of the American Board of Forensic Toxicology who I'm board certified through.

Q. And prior to this morning, have you been asked to testify either in court or in depositions in the field of forensic

toxicology?

A. Yes, I have.

Q. How many times approximately?

A. I believe it's more than 30 times now.

Q. And during that testimony, have you been also asked to render your opinion as to the results of forensic examinations in the field of forensic toxicology?

A. Yes.

Q. All right. So I want to talk to you about your role in this case. Were you working at the State Crime Lab at the end of 2022, beginning of 2023 as a forensic toxicologist, the same role that you hold now?

A. Yes.

Q. And were you asked to review certain biological samples for the presence of potential controlled substances as it related to a decedent named Shawn Wippert?

A. Yes.

Q. And will you please tell the ladies and gentlemen of the jury, first of all, how does a sample get to you in order for you to conduct your analysis?

A. Samples come into the lab either hand-delivered by law enforcement officers or they're mailed to the lab. They are either main evidence custodians where they open the kit box, make sure tubes are present, make sure paperwork is in the kit box. Those kit boxes are then picked up by our toxicology

technician who opens the kit box, inspects the seals on the tubes, inspects labels. They then assign each tube a unique FSD barcode so that way we can scan them and track them throughout our testing.

Q. Okay. So you used a couple of acronyms there. What is FSD?

A. Forensic Science Division.

Q. And is that the area of the lab that you work in?

A. Forensic Science Division is the whole lab in general.

Q. The whole lab itself. Okay.

And the lab itself, is it a accredited lab?

A. Yes, it is.

Q. And what does that mean?

A. Accreditation is simply a process where we have our standards and our policies reviewed yearly by an accrediting body.

Q. Okay. So this is an entity that sort of oversees the lab's operations, make sure it's complying with certain protocols?

A. Yes, they check -- we do an audit in some form every year.

Q. Okay. And this is just to make sure the lab is doing what it's supposed to do?

A. Correct.

Q. And -- okay. And have there been any issues with the accreditation or operations of the lab to which you're aware in the last several years?

A. I'm usually more in tune with what's going on in the toxicology section, so I don't believe we've had any real issues come up in the toxicology section. I can't speak for the other sections.
Q. Okay. As far as the section you work in, no issues that you're aware of?
A. Not that I'm aware of.
Q. So samples will typically come into the lab through the mail?
A. Mail or hand-delivered.
Q. And then they're assigned a barcode?
A. Correct. So the main evidence techs assign the FSD, the Forensic Science Division case number, and each tube is given its own unique FSD barcode by the toxicology technician.
Q. Why is that?
A. The barcode allows us to scan them electronically so that way we can document it in our chain of custody.
Q. When you're talking about chain of custody, you mean as the evidence physically moves from place to place to place throughout the lab?
A. That is correct.
Q. Okay. So comes in to the mail, gets assigned a case number and barcode. What's the next step in the testing process?
A. So once the toxicology technician has taken all of their notes, they place those samples in our secure toxicology

refrigerators where they await testing by the other toxicologists. So when I receive the sample, I retrieve it from one of the secure toxicology fridges.

Q. And why are samples typically kept in a fridge?

A. Refrigeration helps the sample not break down over time, and some of the drugs will last longer under refrigeration than others.

Q. All right. And then once you're ready to start actually conducting an examination on a piece of evidence that comes into the lab, do you -- are you the one that retrieves it from the fridge or is that somebody else?

A. When I go to perform testing, I'm the one that retrieves it from the fridge.

Q. Okay. So you pull it out of the fridge. What do you do next?

A. I pull out the sample. I check it to make sure it matches what is on my list for testing. I portion out a small amount of the urine sample. Place it in a tube. Perform the rest of the extraction. Transfer the samples back both physically and electronically in the secure toxicology fridge.

Q. Okay. So in this case you are asked to conduct an examination on urine?

A. Correct.

Q. You can also conduct examination on other biological fluids; correct?

A. Yes.
Q. So we'll sort of stick with urine since that's what you did in this case. But you used the term extraction, so will you please explain what that means for the jury?
A. Yes. So within a urine sample, there are a lot of other compounds that we do not want or that can potentially damage our instrumentation such as like cholesterols, some acids that are produced within the body. So the extraction process simply removing the drugs from the urine matrix, the urine itself, and leaving behind a lot of the things that we don't want within the urine, and then concentrating those drugs down and reconstituting them, or basically rehydrating them in a -- whether it's methanol or water, in a liquid that we would want to inject on our instrumentation.
Q. Okay. So initially when you get the sample, there's a bunch of stuff in it that you're -- it's not going to be relevant to your analysis?
A. Correct.
Q. So you got to get all that stuff out through the process that you just described?
A. Correct.
Q. And then what are you left will with?
A. So after the extraction process, we are left with a residue of what should be the remaining drugs and compounds in the urine that we are looking for at the bottom of a glass culture

tube. We -- for this process in particular, I rehydrated those in methanol, and then I inject the methanol onto the instrument.

Q. Okay. So add liquid back into the thing that you just took all the stuff out of?

A. Correct.

Q. Which you called the residue is what was left; right?

A. Yes.

Q. So you add some liquid back into that. You said it was in the form of methanol?

A. Yes.

Q. Why is that?

A. So methanol has a low boiling point or evaporation point, and so the instrument that I was running on for this analysis was a GC/MS, a gas chromatograph paired with a mass spectrometer, and that instrumentation works by injecting a sample, so in this case it would have been methanol, to vaporize it instantly. So that way what happens is the drugs floats through a column, which you can think of as a big hollow straw. As those compounds move through the column, they separate out. And then when it reaches the detector, the detector analyzes the compounds once they're separated out.

Q. So once you put it into the -- you called it a GC/MS?

A. Correct.

Q. Gas chromatograph paired with a mass spectrometer, did I

say that correctly?
A. Yes.
Q. Okay. So that's a machine; correct?
A. It's an instrument.
Q. Or an instrument. I know when I talked to you before you don't say machine, you say instrument. Sorry.
But that's an instrument -- is it more or less an automated process or is there something you have to manipulate?
A. Once the process is started on the instrument, it's an automated process until it reaches the detector and analyzes those compounds. Once the sample is done running on the instrument, then we must go through what is called a chromatogram. It's basically all of the compounds that -- or all the substances that reach the detector. And we must read through the data and find out what is within the sample.
Q. Okay. So the machine does it's thing, there's some data that's put out, and you have to analyze the data?
A. Correct.
Q. And how do you determine ultimately what substances are in, in this case the urine, that you are putting through the GC/MS machine?
A. So the chromatogram is basically a chart with a bunch of lines on it, a bunch of peaks within the -- on that chart. And so then we go through each peak, and then we look at those peaks and we see if it's a compound that is something we are

looking for or if it's maybe one of the acids that come out just, you know, and endogenous acid or endogenous product that's produced within the body that we're not looking for. And we go through those compounds, and then if we are reporting a compound based off of that testing, it must meet certain criteria in order to report.
Q. So you said your chart essentially is a line that kind of goes up and down, right, it's got mountains and valleys on it like a stop chart or something might?
A. Similar, yes.
Q. Okay. So then how do you equate that to a potential substance that you're trying to determine what's in that urine sample?
A. So when clicking on one of those peaks that we're looking at, the computer is equipped with software, which we call a library. And when the sample reaches the detector, it's fragmented into very specific patterns. Each drug kind of has its own fragmentation pattern.
And so when we're matching up -- when we click on one of those peaks, we match up that fragmentation to what is in the library within our software. And so we have to have a quality match of 80 or better per our policy to call a match.
Q. Okay. So in this testing that you're doing, you get results that are the lines that go up and down more or less, and there's an actual library of known substances that have

their own patterns that you're able to compare the information you get from the testing to what the known pattern is?
A. That is correct.
Q. And determine if they match up within a certain degree of certainty, I think you said 80 or more?
A. Eighty or better is what is stated in our...
Q. Okay. And then you can then reach the conclusion that whatever is in my sample matches this known pattern for this known substance?
A. Correct.
Q. Okay. So is there a known pattern in the library for a substance like fentanyl?
A. Yes.
Q. Is there a known pattern in the library for a substance like marijuana?
A. There might be. For the testing that I was doing, marijuana, THC, is one of the compounds that doesn't extract out.
Q. Okay. What about methamphetamine?
A. That is one of them, yes.
Q. Or other illicit substances?
A. Yes.
Q. All right. So if you then look at the chromatograph for this urine sample and you saw a pattern, you're able to compare that to the library and determine -- or were you able to

determine there were known substances in the urine sample --
A. Yes.
Q. -- that you examined in this case?
And what did you determine was in the urine sample based on the process you described?
A. I detected hydrocodone and fentanyl in the urine.
Q. Okay.
MR. STARNES: And can we please have the tox report? Is that 25? Yeah, Government's Exhibit 25 please.
BY MR. STARNES:
Q. All right. Are you able to see this in front of you, sir?
A. Yes.
Q. And do you recognize this?
A. Yes, I do.
Q. What is it?
A. It is a toxicology report.
Q. Okay. And it looks like there were several different substances that were tested from this decedent?
A. Yes, there were multiple different samples tested.
Q. So you were only asked to do one portion of the test?
A. I only did one portion of the testing.
Q. Okay. And I think you described it as the urine; is that correct?
A. I did. It's listed under the drug screens performed as the urine basic drug screen is the testing that I performed.

Q. And we see your name on this as under the analyst column?
A. Yes.
Q. And you said you detected fentanyl and hydrocodone?
A. That is correct.
Q. Were you asked to look at any other aspect of this particular case?
A. I believe I'm the only one that did the urine basic drug screen, and that is the only testing I performed.
Q. And then once you are done with that testing, what do you do with the results?
A. So once I'm done with the testing, I, in this case, would have documented my results on our toxicology worksheet. The samples for this batch of cases that I ran were -- or excuse me, the QCs for this -- the quality controls for this batch of cases that I ran were reviewed by a toxicologist that did not perform work on the case. They reviewed that data and signed off that my quality control packet passed, so I was able to report the date -- the results for this case.
Then after all the testing for a case is conducted, the case was reviewed by another toxicologist who did not perform work on the case as well and looked through all the data within the case file.
Q. And why did he do that?
A. It's a review process to try and catch any maybe clerical errors or anything that may be written down incorrectly or

transposed from our paper worksheet into our electronic LIM system.

Q. Okay. Stand by, that may be all I have for you.

That's all the questions I have for you, sir. Thank you very much. Defense may have some.

A. Thank you.

CROSS-EXAMINATION

BY MS. MUSICK:

Q. Good morning, sir.

A. Good morning.

Q. So I'd like to refer you to Government Exhibit 25, which is up on everyone's screens. So it's clear from your report that the decedent had a large quantity of fentanyl in his system; right?

A. I simply did the urine fentanyl -- the urine testing. We don't quantitate the drugs in the urine, so I don't know what may have been present in the urine.

Q. I see. So your -- your testing then just notes that there was fentanyl detected in the urine but doesn't actually quantify it?

A. Correct.

Q. And you also testified earlier that your analysis of the urine does not show whether or not marijuana was in the decedent's urine at the time of his death; is that right?

A. The testing I conducted did not look for the presence of

THC or its other compounds.
Q. Okay. And since your testing doesn't quantify the fentanyl, you have no proof how much fentanyl the decedent would have ingested prior to his death; correct?
A. In the urine, I don't know. That would be more of what we do in the blood and the quantity that's -- that was taken from the blood.
Q. Okay. And there's also no way to test, for example, the fentanyl in the residue that you extract from the urine and fentanyl that's recovered at a crime scene to see if they're a match; is that correct?
A. I don't believe so. I -- I don't know. I've never been asked to test the residue from an extract like that before, so I don't know.
Q. Okay. So you wouldn't have conducted any testing of that type?
A. No.
Q. Okay. And so there's no testing that you performed that would have shown the origin of any of these substances identified in the decedent's urine?
A. That is correct. My test simply found that there was fentanyl and hydrocodone in the urine at the time the sample was drawn.
Q. Okay. Nothing further. Thank you.
A. Thank you.

THE COURT: Redirect?

MR. STARNES: No, Your Honor. Thank you.

THE COURT: The witness excused?

MR. STARNES: Yes, please.

THE COURT: You may step down, sir. Thank you.

THE WITNESS: Thank you.

THE COURT: Members of the jury, we're going to take our morning break.

Madam clerk, please escort the jury. We'll start in about 15 minutes.

(The jury left the courtroom, after which the following proceedings were had.)

THE COURT: Please be seated.

Ms. Paisley, I'm really struggling with this text message exchange, so I want to make sure I get this ruling right.

MS. PAISLEY: We do too, Your Honor.

THE COURT: In reviewing the case law, so we have the *Davis* case from the Ninth Circuit saying that's impermissible.

MS. PAISLEY: Well, no, I don't think that's what *Davis* is saying. *Davis* is saying they have to fall within that 804(b)(3) --

THE COURT: Right, evidence of --

MS. PAISLEY: -- and that only two of those. So the problem in *Davis* was that the court entered them under a

completely -- completely the wrong rule, right. The problem with *Davis* is that the court said I'm admitting these as -- as party-opponent statements, and that's how the court admitted 27 text messages.

And on appeal the government said, okay, we're not going to defend the district court's decision to admit those under 801, but they are admissible, and they brought up two reasons. And they said 804(b)(3) that it, you know, showed against -- statement made against penal interest, and then they also brought up that it was context for the defendant's statements which were admissible.

And what the court said -- the Ninth Circuit said was, look, two -- only two of those are arguably against penal interests, and there is no such thing as, like, the context. And the government, while they said they were using it for context, were actually using it for truth of the matter asserted, and you know that because they were arguing in.

But here we are asking to bring these in as substantive evidence. This is -- in the government's position, this is direct evidence of the transaction that led to the fentanyl overdose.

THE COURT: All right. So but let me then go through the rest of the cases so we can have some context. You cite -- you provided me this *U.S. versus Klemis* case from Second Circuit --

MS. PAISLEY: I didn't provide that.

THE COURT: -- or Seventh Circuit, excuse me. I'm sorry. No, I'm sorry, this is -- this is the defense provided it.

Okay. In that case the court conducted plain error review and said, well, it's not -- you know, it was a mistake, but it wasn't -- the -- the defendant failed to object at trial so it isn't -- under plain error review doesn't warrant reversal.

MS. PAISLEY: I'm not -- I'm not as familiar with that case.

THE COURT: You're not familiar?

MS. PAISLEY: With *Klemis*, no.

THE COURT: Then we have *U.S. versus Alvarado* from the Fourth Circuit, and there was a reference that the -- that the victim had purchased heroin from Fat Boy, meaning the defendant, and questioned about whether it violated the hearsay rule and Sixth Amendment. And, again, in that case it was -- and the argument was it was a statement that was adverse to the declarant's penal interest. And, again, this was where the district court allowed an appeal.

Court of Appeals: It was harmless error in light of overwhelming evidence of guilt, but it was -- was error, but nevertheless harmless.

All right. Sorry. And then the other case -- well,

then some older cases, for example, the *U.S. versus Mackin* from the D.C. Circuit, it was in the context of a motion for a new trial. So the contexts are all different.

We're here, a timely raised objection, the government is seeking it in. So, again, for the record, to clarify for me, walk through the exception that applies and how you intend to use this evidence.

MS. PAISLEY: Okay. We're going to use it as substantive evidence to show that Shawn Wippert, well, he reached out to Doug Malatare.

Malatare says, "You looking?" That is a offer. It is telling somebody that they have drugs to sell, and we are going to have testimony from multiple people that can say that is what people who possess illegal drugs for sale tell people to let them know that they're holding and that they can deliver it to them.

THE COURT: And this is -- this is the four messages?

MS. PAISLEY: These are the four messages. "I'll catch up with you later."

THE COURT: Okay. So, yeah, the four bubbles we have on the --

MS. PAISLEY: Yeah.

THE COURT: -- what's the exhibit number please?

MR. STARNES: I marked one as Exhibit 30. Your Honor, may I approach?

THE COURT: Please. Put it on the screen so we can view it all at the same time. It's the bottom one. That's it.

MS. PAISLEY: Yes, this is all.

THE COURT: Okay. And so the blue is whom?

MS. PAISLEY: The defendant. So that statement is coming in no matter what as a party-opponent.

THE COURT: All right. And the green is?

MS. PAISLEY: Shawn Malatare -- or Shawn Wippert.

THE COURT: Okay. "Yeah, I'll be home. I just got off work. I can only afford a half if you can stop by."

MS. PAISLEY: Yes, and we --

THE COURT: This is a negotiation with the --

MS. PAISLEY: This is a negotiation in how much he's wanting to purchase.

THE COURT: Okay. What's the relevance of the last two: "How you doing?" "Hello bro."

MS. PAISLEY: Well, those are defendant's statements, so they come in, but I don't think we need them. I think the contract is complete at the, "Okay."

THE COURT: Okay.

MS. PAISLEY: So you have, "You looking?"

And he says, "Yes." You know, he's saying how much he wants to buy.

And Doug is saying, "Watch for me," meaning he's coming to the house.

And the victim is saying, "Okay."

THE COURT: All right. Go ahead.

MS. PAISLEY: Under -- under 804(b)(3), because Shawn Wippert is deceased, these statements, if they can be corroborated for their trustworthiness, and so in this case we have corroboration, this is an indication that he's going to come to the house at an approximate time, 5:30 p.m. on this specific date. We have witnesses who saw a car belonging to him, and somebody who saw somebody who was tall, old, and with a long ponytail that came to that house shortly after these messages were exchanged. Then we have the fact that he died from fentanyl, and there was fentanyl on his dresser. So all of that corroborates the truthfulness of this statement which is an offer to buy illegal drugs, and that is against his penal interests.

So, therefore, under 804(b)(3), these statements, just these and not the remainder, are admissible. Because at the time that he made them, he knew he was making a statement to buy illegal drugs and he knew it was against his interests. The reason he did it is because he wanted illegal drugs.

THE COURT: All right. Would you please clarify how you distinguish the Ninth Circuit's opinion in *Davis* from the facts here?

MS. PAISLEY: In *Davis* they admitted 27 statements -- 27 messages, only two of which the court of appeals determined

could even remotely be related to drug activity. And one was, "Did you find information about the G spot?" or something like that, which they said was related to a gram of cocaine. And the other one was, "Did you determine a price?" I don't have it -- I have it here. I don't have it, like, the language right in front of me. Here it is.

THE COURT: "Did you get a price?"

MS. PAISLEY: Right, "Did you get a price?"

So neither of those -- what is interesting here, and this is something the Ninth Circuit hit on, was at closing -- you know, so government wanted to say, oh, this is just provided for context that they were hitting home, like, look, this isn't them partying, this is clearly a sell-buy. Well, that's completely -- that is different than what we have here. That is them -- he's just asking about it, right. He's just --

THE COURT: Don't use pronouns. Who's asking?

MS. PAISLEY: In *Davis*, they're just -- he's asking about the status basically. It is not a contract of a buy-sell relationship like this is.

So if I know somebody is -- if Jeff is using drugs and I don't care about his lifestyle, and I say, oh, did you have a, you know, good weekend smoking fentanyl, did you find your fentanyl, or did you, you know, do whatever, that is not against my penal interests. It's really just asking him if he engaged in conduct related to -- against his penal interests.

And that's what the text messages were in *Davis*, and the error came because they admitted all 27 of those.

But when you narrow it to these two messages -- or even really that one, but I think Shawn's acceptance of it, this is a drug transaction. This is a contract to buy illicit drugs and the contract to sell illicit drugs, and that -- that is the statement against interests. And that is why it's like *Paguio* because the statement that was made was against the father's, you know, interest because it could be used just like this. This could be used against Shawn Wippert.

THE COURT: So in *Davis* the court also noted that it couldn't be harmless error because the government conceded -- argued in its closing that it was central to its case.

MS. PAISLEY: And it is central to ours, Your Honor, and we are ready to defend that to the Ninth Circuit because this -- I mean, what's -- what's -- we struggle -- Congress has made the delivery of fentanyl to an individual resulting in death a very serious felony, and here we have direct evidence that the defendant negotiated with the victim that night to sell him half of a pill of fentanyl.

THE COURT: And you'll have witnesses?

MS. PAISLEY: And we'll have witnesses that can explain all of this.

THE COURT: So given what's up here, it's just the language itself, you concede the language requires some

interpretation because it says --

MS. PAISLEY: Yes, and the government --

THE COURT: -- I can only afford a half.

MS. PAISLEY: Sorry. The government concedes the defense can argue --

THE COURT: The victim said I can only afford a half, and you're interpreting the half being half a pill --

MS. PAISLEY: Right.

THE COURT: -- or half a quantity?

MS. PAISLEY: Correct, yes. And I think it's completely fair for defense to argue whatever interpretation they want of those messages with whatever, you know, testimony they can get on the stand about what that half means.

MR. STARNES: Or if they have contemporaneous statements that they want to put in. I don't think they exist, but if have them, they would be then able to put those in under optional completeness.

THE COURT: Okay. Thank you.

Ms. Musick, do you want to respond so you have it on the record before we get into the give and take with the witnesses?

MS. MUSICK: Yes, thank you, Your Honor.

Your Honor, I think the differentiating factor between this case and *Davis* is the fact that in *Davis* when the text message states, "Hey, what's up with that G-spot?" that was

known to the Ninth Circuit, and presumably to the district court, to be a reference to a gram of cocaine. A G-spot equals a gram of cocaine in drug slang.

Within the context of both non-criminal and criminal world, a half can mean anything. It's not like Mr. Wippert said, I can only afford a half of fetty or a half of blue or some of the other known nicknames that this court is aware of for the illicit substance of fentanyl. And that's why I don't think on its face this -- this text message is a statement against penal interest.

And the quote that we provided in our brief -- our supplemental brief that we filed yesterday from both the *Davis* case, and it was quoting *State versus Hoyos*, "To qualify for the exception as a statement against penal interests, the declarant's statements must, in a real and tangible way, subject him to criminal liability."

And the statements, "Yeah, I'll be home; just got off work; I can only afford a half if you can stop by," is not a statement that in any real or tangible way would subject Mr. Wippert to criminal liability. And I think that's the differentiating factor with *Davis*. Because G-spot is a known reference to a nickname for cocaine, a very specific substance. Not even just any drug in the world, but a very specific substance. And I think that that is why that statement would qualify as a statement against interests compared to the

statement that the government seeks to admit today.

THE COURT: All right. So, Ms. Paisley, I am going to provisionally allow this admission. I want a witness to testify as to how this should be interpreted and why it's a statement -- in their view and training and experience, is a statement against penal interest.

MS. PAISLEY: Okay.

THE COURT: Understood?

MS. PAISLEY: Yes, Your Honor.

THE COURT: And your objection is noted for the record, and please object at the time Ms. Paisley seeks to admit it as well.

MS. MUSICK: Yes, Your Honor.

THE COURT: And, Ms. Paisley, I want this redacted, just the four top messages. I don't think the bottom two are related here.

MS. PAISLEY: Well, you mean the bottom two meaning the blue?

THE COURT: "How you doing, bro?" "Hello, bro."

MS. PAISLEY: We can get rid of them. They are defendant's statements, so they're admissible under a different rule.

THE COURT: Okay. Okay. You're right, correct.

MR. STARNES: Just so the records's clear, the provisionally admitted copy, once we redact it, we will offer

it as Exhibit 30.

THE COURT: Thirty, got it.

MR. STARNES: Exhibit 6 is the original one the court is denying just so everyone's got their...

THE COURT: Exhibit 30, that's when you get your radar up and object and get that -- okay.

MR. STARNES: Not offer six, only 30.

THE COURT: All right. Anything else?

MS. PAISLEY: I would note, even the statement in the Ninth Circuit that was quoted, has -- is subject to interpretation as well.

THE COURT: I understand.

MS. PAISLEY: Yeah.

THE COURT: All right. So take a short break. Try to be back here as soon as possible to get going. The jury's been out here for 15 minutes. Okay. Thank you.

(Recess at 11:01 a.m. to 11:13 a.m.)

THE COURT: All right. Mr. Starnes, ready to go?

MR. STARNES: Yes, Your Honor.

THE COURT: Ms. Musick, you ready to go?

MS. MUSICK: Yes, Your Honor, we're ready.

THE COURT: All right. Please bring in the jury.

(The jury entered the courtroom, after which the following proceedings were had.)

THE COURT: Please be seated. Welcome back, members

of the jury. I'm sorry for the delay. We had a couple of legal issues we had to thrash out, so took care of those. We're ready to proceed now.

Mr. Starnes, call your next witness.

MR. STARNES: Thank you, Your Honor. United States calls Scott Schlueter to the witness stand. Butchered that.

SCOTT SCHLUETER,

called as a witness on behalf of the Plaintiff, having first been duly sworn, testified as follows:

THE COURT: Good morning, sir. Would you please state your full name and spell your last name for the record.

THE WITNESS: My full name is Scott Schlueter. Last name is spelled S-c-h-l-u-e-t-e-r.

THE COURT: Thank you.

Go ahead, Mr. Starnes.

MR. STARNES: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. STARNES:

Q. Sir, I noticed when you came in you had a binder of information with you. What is that?

A. These notes comprise the discovery that the Crime Lab gave to counsel.

Q. Okay. So just do me a favor, set that aside. And if there's a point in time where we either need to direct you to look at that or maybe you need to look at that to help refresh

your recollection, let us know before you do that. Okay?
A. Yes, sir.
Q. Before we get going, will you please tell the ladies and gentlemen of the jury what you do for a living?
A. I am a forensic toxicologist.
Q. And explain briefly what that means.
A. So in forensic toxicology, we're tasked with taking samples usually from autopsy, so think blood, urine, but it can be vitreous, it can be gastric contents, and we have a battery of tests that we can do to -- looking primarily for drugs of abuse but other toxins as well.
Q. Just so we're all clear, what is vitreous fluid?
A. Vitreous fluid is the fluid that would be in your eyeball.
Q. Okay. How long have you worked as a forensic toxicologist?
A. I was hired in 1991, so this will be my 34th year.
Q. All at the State Crime Lab?
A. Yes, sir.
Q. And where did you get your degrees?
A. I have a bachelor of science in chemistry degree from the University of Montana.
Q. And what -- are you a member of any professional organizations related to the field of forensic toxicology?
A. I'm a board certified forensic toxicologist, so annually I have to attend a certain amount of technical training. We had to sit for an exam, and we're reviewed -- I believe every five

years we have to go through a background check and -- and just verify our credentials.

Q. Have you authored any publications in the field of forensic toxicology?

A. I have authored a few. It's been a while.

Q. And in your role at the State Crime Lab as a forensic toxicologist there, have you been asked to testify in courts like this or perhaps in depositions in legal matters and render your opinion on substances found in somebody's system and how that may impact a person?

A. Yes, I have. I've had the opportunity to testify before federal court, district court, as well as give testimony in civil litigation.

Q. And just ballpark approximately how many times have you testified in your capacity as a forensic toxicologist?

A. Less than 20 more than 15.

Q. Okay. Were you asked to conduct some examinations on some samples that were sent associated with an individual named Shawn Wippert?

A. Yes, I was.

Q. And was that in or about December of -- December of 2022, January of 2023 that time frame?

A. I believe that that -- yes, that is correct.

Q. Okay. So we heard previously from an individual name Gavin Lawson. Do you know him?

A. Yes, Mr. Lawson is a colleague of mine at the -- at the toxicology lab.
Q. And does he perform roughly the same job that you do?
A. Yes.
Q. Okay. So your role in this case, what samples were you asked to take a look at?
A. So Mr. -- is it pronounced Wippert?
Q. Wippert, yes.
A. Mr. Wippert's samples came to our facility, and I was tasked with looking at the blood for this -- these panels that we do. There was two different panels that I performed, and that's where the report that was generated came from with my signature.
Q. Okay. So before you begin your review, are you given any information about why you're conducting this examination or are you just told here's a blood sample, we need you to test it and tell us what's in it?
A. We receive some paperwork. Oftentimes, however, the history is minimal. However, over the course of our testing, sometimes we receive reports from law enforcement and we do have access to that information.
Q. Okay. And in this case, do you recall if you received any information about why these samples were sent to you? If you don't recall that's --
A. I don't recall any particulars. We do an awful lot of

samples.
Q. Okay. So you indicated that you were asked to look at a certain blood samples. Is this blood from a particular area of the blood?
A. Without looking at the notes, I believe I remember that the samples were drawn by the medical examiner from what's considered a central location, so it might be labeled as heart. And then the samples -- the other two samples were labeled as femoral, which would be on the inside of your thigh there's some large vascularity.
Q. And why might that particular -- those particular areas be ones where the blood is extracted for examination by forensic toxicologists?
A. During the investigation after -- for postmortem investigation, first and foremost you want to be able to get some evidence, and the central cavity is an evidence rich area. So it would be very easy to obtain fluids from that area.
After we pass away, circulation ceases, and it becomes more difficult to get blood from us. However, central cavity evidence often times can be affected by the proximity to our tissues, lungs, liver, heart. And so in the field we like to obtain a sample from a -- what's called a peripheral area. That might be an arm. However, the leg is the location where we usually obtain our samples from.
Q. Okay. And let's do it this way: So, first of all, the

samples that you tested in this case, what process did you put them through?
A. So blood samples cannot just be analyzed as they are. They have to be pretreated, if you will. And what we do is we alter the pH, and then we're able to extract the drugs and toxins from the samples. So we want -- we begin with about 2 mills of blood and we end with about a drop of clear liquid that we're able to then introduce into our analytical instruments.
These instruments use a type of separation technique, and so we're able to see if someone enjoys tobacco or if they enjoy chocolate or if they drink coffee every day or if you have use for ibuprofen or if you have heart medication. So the test is -- is broad enough that we can see drugs of abuse as well as commonly encountered compounds. During the summer months, I see DEET, which is a mosquito repellent, in most blood samples.
Q. And so is there more than one test you might perform on a sample?
A. Yes, we do have a number of tests that we can perform. I performed two of those tests.
Q. And which two tests did you perform in this case?
A. So for pH, in chemistry we think of things being acids and bases, and for drugs there are also acids and bases. So we do an acid preparation to get those compounds, and we do a base preparation to get the other compounds. No testing that is done is fully comprehensive, but it is an attempt to be as

comprehensive as possible.
Q. Okay. So you receive the blood samples in this case. What instruments did you use to test those samples?
A. For my work I primarily use a separation technique called chromatography. We have two different separation techniques. Well, without going into too much detail, one uses a gas phase and one uses a liquid phase, and so you hear gas chromatography and liquid chromatography.
But just remember that it's that separation. I'm able to take these very complex mixtures and get very unique, specific signals for each compound. So I could see maybe that little bit of chocolate still roaming that someone might have or that little bit of nicotine that someone might have or some methamphetamine or some other drug of use.
Q. And in this particular case, after putting it through -- is it gas chromatography or is it --
A. Yes, sir, we begin with gas chromatography.
Q. Once you put it through the gas chromatograph, what results do you determine related to the blood samples you looked at?
A. Without referring to my notes, I believe that what was found on the report we reported ibuprofen and fentanyl.
Q. Okay. And did you sign off on the toxicology report as part of this case?
A. Yes, I did.
Q. And that's already into evidence.

MR. STARNES: Can you please show the witness Government's Exhibit 5 -- 25?

MS. PAISLEY: Twenty-five?

MR. STARNES: Twenty-five, sorry.

MS. PAISLEY: It's up.

MR. STARNES: And let me blow up sort of the lower portion, make this a little bit easier for everyone to see.

BY MR. STARNES:

Q. Okay. Sir, are you able to see that in front of you there?

A. Yes, I am.

Q. And do you recognize that report?

A. Yes, I do.

Q. Is this the report that you contributed to the authorship in this case?

A. Yes, it is.

Q. And will you please explain to the ladies and gentlemen of the jury what the results were of your analysis in this case?

A. Sure. So as you can see, we have the lines, and you can see Mr. Lawson's work right above his work. I have indicated -- there's my name as the analyst, the compound fentanyl at 8.9 nanograms per mill.

That LC/MS/MS goes toward that liquid chromatography that I just mentioned, and then the femoral blood is the sample that we discussed earlier.

The second line reads ibuprofen, and that is only detected.

There's not a number there if you'll notice, and that the instrument that is attributed to that analysis is the GC, so the gas chromatography, also from the same sample, that inner leg thing, and then I'm listed as the analyst.

Q. And why do we have a number under the result column for fentanyl but not for any of the other compounds that were tested here?

A. The laboratory only gives a quantity for a finite number of compounds. Those compounds are compounds that our user agencies expect and request those numbers from us, so therefore fentanyl is a compound that our user agencies want to know exactly how much is there. And the user agency might be a medical examiner, it might be a coroner, it might be a law enforcement officer.

And, in regards to the other three, in the urine analysis we do not provide any level of quantitation. Urine is considered to be a compartment that we're about to eliminate the sample so that it doesn't -- we don't think of that sample as still being affecting your body.

And in regards to the ibuprofen, the reason why the quantitation was not provided is simply because we don't routinely. Ibuprofen is a very common compound that everyone uses. We -- we quantitate it upon request and we note if the level gets -- we can actually visualize, in a separation technique, you can see the signal intensity. And so if the

level gets to be high enough, then we can have conversations with law enforcement and say I actually think this is significant, this might be -- someone may have been taking too much acetaminophen, we need to send this out and get a level.

Q. Okay. So now I just want to take a step back from your results here for a minute and just talk to you generally about fentanyl. Are you familiar with how fentanyl interacts with the body?

A. Yes.

Q. Okay. And will you please explain how fentanyl is normally metabolized?

A. Yes. So as with any substance, any compound that you may be introduced, it has to become absorbed and then has to distribute into your body, and your body begins to metabolize it and then you eliminate. That happens with your morning coffee, it happens with your prescription heart medication, and that certainly happens with a compound like fentanyl.

And so once fentanyl is absorbed, your body recognizes it that it does not belong there and begins to use techniques to eliminate it. And one of the techniques that it uses is converts fentanyl into a tablet called norfentanyl which is more easily excreted from your body.

Q. Okay. And so where might you see norfentanyl show up if you were doing some testing? Where would you expect to see that?

A. I expect to see norfentanyl in both the blood and most certainly in the urine just due to the nature of our bodies and that that metabolism is ongoing. It's nothing you can control or stop.

However, there is a lot of variation from person to person. So if you took a dose and I took a dose, our bodies would probably -- you might process it very quickly, I might process that drug very slowly, but metabolism is occurring.

Q. Okay. So if we were to see something like norfentanyl in the blood or the urine, what might that indicate to you as a toxicologist?

A. That would indicate that you had had fentanyl and have -- I believe that within roughly, the average person, in about three hours you take half of your dose of fentanyl and you change it into the norfentanyl, and that process continues until you finally eliminated it.

Q. And in this case we don't see any norfentanyl or other metabolite of fentanyl; is that correct?

A. That's correct. However if I may?

Q. Yep.

A. As with any testing, there's going to be a limit of detection. So for fentanyl and for norfentanyl, our limit of detection is .5 nanograms per mill, which is considered a very, very small amount. However, our testing doesn't go down to zero. Our testing doesn't go down to zero for any of the

compounds that we analyze.

So what we would like to -- for clarification, what we would like to say in these regards is that norfentanyl was not detected. I know that's a nuance, but in a way it's saying it could have been there at a level less than our lower limit of detectability, which was the .5.

Q. Okay. So if we saw norfentanyl on these results, we don't obviously, but if we did, would that indicate that somebody had used fentanyl and began metabolizing that longer ago versus a short time ago?

So I guess the question I'm getting at is: I don't see norfentanyl in here. Can you reach any conclusions about whether or not this was a recent ingestion of fentanyl prior to this person passing away or was it a lengthier ingestion or you don't know?

A. In my experience in the cases that I've analyzed, norfentanyl tends to be about 10 to 30 percent of the parent compound unless you're an individual who -- fentanyl is used often for people that are suffering from cancer or other debilitating pain. In those instances, it's kind of interesting, because the norfentanyl and the fentanyl actually almost become the same level over time, and that just is a nuance of that compound. But in instances where people are not routinely taking fentanyl, it seems more likely that the parent is -- or the metabolism is about 10 to 30 percent of the

parents' concentration.
Q. And then you mentioned something there that people with cancer take fentanyl. So is fentanyl -- does it have a medical application?
A. So, yes, fentanyl most certainly has medical application. And for the better part of my career, people were given fentanyl when they were suffering severe pain that could not be managed in any other way. So I think that most people have had a loved one in their lives and they know that fentanyl is prescribed that way, and it still is today.
Q. Yeah, and that -- probably should have touched on this earlier, but what does fentanyl do? What's it's purpose?
A. Fentanyl is a synthetic opioid. What does that mean? So when you think of morphine or codeine, these are compounds that are from nature, if you will, from a plant called poppy. And people discovered ways to change that compound a little bit and became -- there were compounds called semisynthetics, other drugs like oxycodone and hydrocodone.
Then there was another group of drugs that are fully synthetic opioids. Fentanyl is an example of a fully synthetic opioid. So it has -- it is not from the plant, the poppy. It is completely human designed and manmade, and is significantly more potent than those other compounds.
Q. So there's a legitimate manufacturing process for fentanyl. It's made by a pharmaceutical company I assume?

A. Yes, it is.
Q. Is there a difference between the type of fentanyl you could go get at a hospital or a clinic to treat something like cancer and the fentanyl that you see people buying on the street?
A. So, as a toxicologist, we do not analyze the tablets and the powders and the liquids that law enforcement is sending into the chemistry area. However, through my training, we often discuss some of the other compounds that are found in illicits, so street-purchased drugs. And whereas in a prescription form you could assure that it would be of the utmost purity -- if you were given a fentanyl prescription by your doctor, there would be fentanyl and only fentanyl for an active compound. If it was a tablet, there might be a binder. If there was a liquid, there would be water, whatever liquid that would be in.
However, with illicit drugs, it's always -- it's the gambit. It could be another drug that you knew. It might be acetaminophen, caffeine. It might be another drug of abuse. It seems like when the drug's illicitly manufactured, the individuals are highly creative, shall we say, in how they put these powders together and these liquids together.
Q. So if I bought a fentanyl pill off the street, it could have almost anything in it?
A. Yes.

Q. And that's certainly different than what I would be getting if I got it from a pharmacy or at a hospital or some other --
A. Yes.
Q. I want to turn back to your results here, and this number this 8.9 nanograms per milliliter. Does that have any significant to you as to that level? What does that mean?
A. Fentanyl has a huge range of intersubject variation. That has to deal with tolerance. So some people can handle and can -- tolerance I think is something everyone is familiar with, and it's not just in, you know, how many drinks you can have. It actually is true for all drugs.
So you would expect to see a wide range of fentanyl quantitations in people. However, in general -- and there is a huge overlap. So you would expect therapeutic levels if someone were taking it because they're being treated for cancer, to be on the magnitude of maybe 1 or 2 nanograms.
If you were being anesthetized for a procedure, fentanyl is used in that sense. If you were going in to have maybe some upper gastrointestinal work done or maybe a minor surgery, the anesthesiologist probably might give you fentanyl. Your levels would usually be less than five. They would be monitoring you very, very closely, because at those levels you can begin to have respiratory problems. You may be given some assistance. And above that range, we start to see people succumb to some of the negative effects of fentanyl.

Q. And is there a range where fentanyl is determined through books and literature and the folks that have studied this that there is a certain level that is considered to be lethal, where if it's at or above that level somebody might be susceptible to passing away from fentanyl use?
A. There's a huge overlap, and it's incredibly frustrating, and it does go back to tolerance. It also goes towards something that we haven't talked much about. But when samples are drawn from a cadaver, they don't -- they don't always accurately reflect what the levels were at the time of death, so we have only our experience to draw from. In my experience, an average level of fentanyl in our deaths in Montana is around 8 to 12 nanograms on average.
Q. So would this be within the lethal limit of fentanyl?
A. This -- this is certainly in that range for -- and for illicit use it's problematic. If you were under the care of a physician, if your anesthesiologist was watching you, you might be able to attain this level and be okay.
Q. But if you're just at home taking it from a pill you got off the street, going to be a problem?
A. This could be very dangerous, yes. One of the mechanisms -- mechanisms that fentanyl has is it reduces your body's ability to sense if you need to breathe. And so even in the operating room at 5 nanograms of fentanyl, you might -- your breathing may become so shallow that you're not getting

adequate oxygen and may cease almost entirely. And so at home without someone watching over you, a level -- this level of 8.9 could be expected to result in someone's respiratory depression and death.

Q. The last thing I want to ask you about is the method of ingesting fentanyl. So is there more than one way that somebody can get fentanyl into their system?

A. Yes.

Q. And what are those types of ways?

A. It -- I mentioned earlier this idea of absorption. With any compounds that you take, absorption could be -- I also mentioned mosquito repellent. So our bodies can absorb toxins through our skin. We can certainly absorb toxins upon ingestion. You could breath compounds in, but really you can imagine eyes. Any contact at all is a way for someone to potentially expose themselves to a compound.

I believe, however, commonly these compounds are injected, smoked, snorted. And the reason being is that, again, with that absorption distribution, the desire is to experience the positive effects as quickly as possible. So those routes would enable the compound to get into your system quicker versus if you, say, rubbed it on your skin.

Q. So, for example, if somebody snorted a quantity of fentanyl, would that get into their system quicker than if they took it by mouth and it had to be digested by the stomach --

A. Yes.
Q. -- and that process?
Thank you very much, sir. Hold on one second.
No more questions for you. The defense may have some.
THE COURT: Cross-examine please.
MS. MUSICK: Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. MUSICK:
Q. Good morning, sir.
A. Good morning.
Q. All right. So I'm going to direct you to Government's Exhibit 25 that we have on our screen here. And so it's my understanding that the decedent had 8.9 nanograms per milliliter of fentanyl in his femoral blood at the time of death; is that right?
A. That's correct.
Q. But just based on your analysis of the femoral blood, you can't tell how much fentanyl he would have -- the decedent would have needed to ingest to reach that number; is that correct?
A. That is correct.
Q. Okay. And that has to do with what you testified to earlier about how illicit fentanyl could have different substances in it, it could have different potency, all of those different factors; is that right?

A. Yes.
Q. Okay. So it would be different if we were in a hospital setting and there was a very particular amount of fentanyl that was administered to a patient versus street drugs?
A. Yes.
Q. Okay. And so the decedent could have ingested a number of fentanyl pills to get to 8.9 nanograms per milliliter; right?
A. Yes.
Q. Okay. And there's no way to tell from your toxicology analysis what the source of the fentanyl in the decedent's blood was; is that right?
A. That is correct.
Q. Okay. And so, for example, if there was fentanyl that was recovered from a crime scene and it was tested by the State Crime Lab, the other chemists that you talked about earlier that do the drug testing and everything, you can't actually do any sort of comparison with your testing of the blood to see if fentanyl A is the same as fentanyl B in the decedent's blood; is that right?
A. That is correct.
Q. Okay. So, in other words, there's no way to know where the fentanyl in Mr. Wippert's body came from at the time of his death?
A. There is no way to tell.
Q. Okay. And I'd like to direct you to the bottom line of

this pop-up that we have where it states, "No confirmatory cannabinoid testing was conducted." That would refer to marijuana; correct?
A. Yes. There are some synthetic versions, but yes, cannabinoids are --
Q. Am I pronouncing it --
A. -- marijuana, yes.
Q. Am I pronouncing it correctly?
A. Yes --
Q. Is it cannabinoids --
A. -- you are.
Q. -- versus cannabinoids?
A. Either.
Q. Okay. So the gist of this, though, is that the blood was not tested for marijuana; is that correct?
A. A -- yes, that's -- yes, that is correct.
Q. Okay. So we don't know if Mr. Wippert had marijuana in his bloodstream at the time of his death?
A. No, we do not.
MS. MUSICK: Nothing further.
THE COURT: Redirect.
MR. STARNES: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. STARNES:
Q. Sir, I'm just purely curious. In studying literature and

looking at this, is there a lethal quantity of marijuana that can be in somebody's system?

A. Toxicologists are trained to say that there's -- there was a famous quote that said, "Everything is a poison. The dose determines the poison."

So I understand counsel's question, and the answer is I am not aware of a lethal amount of tetrahydrocannabinol, which is the active ingredient in THC. However, the toxicologist in me worries.

Q. Fair enough. Thank you very much. I have no further questions.

THE COURT: The witness excused?

MR. STARNES: Yes, please.

THE COURT: You may step down, sir. Thank you.

MS. PAISLEY: Your Honor, the United States called Aldo Fusaro.

COURTROOM DEPUTY: Please raise your right hand.

ALDO FUSARO,

called as a witness on behalf of the Plaintiff, having first been duly sworn, testified as follows:

COURTROOM DEPUTY: Thank you. Please have a seat.

THE COURT: Good morning, sir.

THE WITNESS: Good morning.

THE COURT: Would you please state your full name and spell your last name for the record.

THE WITNESS: Sure. My name is Dr. Aldo Fusaro. The last name is F-U-S-A-R-O.

THE COURT: Would you mind pulling that microphone down. Thank you.

Go ahead, Ms. Paisley.

MS. PAISLEY: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. PAISLEY:

Q. Good morning, Dr. Fusaro.

A. Good morning.

Q. Dr. Fusaro, where are you currently employed?

A. I'm employed at the Forensic Science Division.

THE COURT: I'm sorry, sir. Would you pull the microphone closer to you; I'm sorry.

THE WITNESS: I'm sorry.

BY MS. PAISLEY:

Q. In the Forensic Science Division at the Montana Crime Lab?

A. Right --

Q. Okay.

A. -- as part of the Montana Department of Justice.

Q. And how long have you been there?

A. Six years, six and a half years.

Q. What is your role at the -- at that forensic division?

A. I'm one of the deputy medical examiners there.

Q. And what is the role of a medical examiner?

A. We determine cause and manner of death on cases that come under our jurisdiction.
Q. Can you explain to the jury what your educational background is and sort of what led you to become a path -- a medical examiner?
A. I did my undergrad at Grinnell College in Grinnell, Iowa. I went to med school at Des Moines University in Des Moines, Iowa. My residency in -- sorry. My residency in pathology at Rush Presbyterian St. Luke's Medical Center in Chicago. I did a fellowship in forensic pathology at the Cook County Medical Examiner's Office in Chicago.
Q. And so all of this training to become a pathologist, how long have you been serving as a pathologist?
A. About 27 years.
Q. During that time, have you testified in state or federal courts?
A. State, not much federal.
Q. Not much. How many approximately trials or depositions do you think you've done?
A. In federal court?
Q. No, just in total.
A. Oh.
Q. Ballpark.
A. A hundred, 200 at the most.
Q. In those experiences with those proceedings, have you been

asked to render your opinion about the cause or manner of death --
A. Yes.
Q. -- in the case?
Okay. In this particular case, were you -- did you examine the body of Shawn Wippert? Were you asked to investigate that?
A. Yes.
Q. How -- do you recall how that came about?
A. Not specifically, no. But in cases like this, they come across as the jurisdictional case, meaning the coroner that ordered the autopsy wanted us to look at it. So we look at it.
Q. Does -- is it routine for the coroner to confer with you whether you think it's appropriate to have an autopsy?
A. Sometimes yes; sometimes no.
Q. And if either the coroner determines it's appropriate or if you together determine it's appropriate, how does the body -- what happens with the body?
A. Usually the coroner or funeral home that's contracted with that coroner brings that body in and puts it in the cooler in Missoula.
Q. And as you -- what is the -- what is the procedure that you're going to be doing with this body? What's it called?
A. Well, it's an autopsy, and it starts with the external examination of the body, including the clothes if they're available. We chart the external surfaces of the body looking

for evidence of natural disease, evidence of injury, et cetera.

And then we open the body via a Y-shaped incision that connects shoulder to shoulder, meets in the midline and goes down to the pubic bone. All the body is then opened and all the organs are removed, again, looking for evidence of natural disease, evidence injury, et cetera, taking pictures as needed, drawing tox as needed, toxicology specimens. After that -- oh, and the head also.

And then after that, the organs are returned to the body. The body is sewn up and it goes to a funeral home. And everything that I dictated and noted on body diagrams gets transcribed into a report.

Q. And do you form an opinion about the cause of death based on that information as well as other indicators?

A. Yes.

Q. Okay. Is one of those indicators -- do you get information from law enforcement that -- that responded to the scene of the death? Do they ever supply information to you?

A. Yes, they do. I'm not sure if they did in this particular case. The coroner might have.

Q. Okay. And then you said that you might draw specimens for toxicology. Do you rely on other tests by other scientists in your determination of the cause of death?

A. Sure. But in this case I think it was mainly the tox.

Q. Okay. So you -- but you do rely on testing of

toxicologists in determining your --
A. Oh, sure.
Q. -- opinion about the cause of death?
A. Yes.
Q. All right. So in this particular case, did you see any external signs of trauma?
A. I don't believe I had any noted.
Q. Okay. And did you see any obvious cause of death -- or how do you -- how do you come to a determination about the cause of death and how did you in this particular case?
A. He had evidence of natural disease. He had hypertensive disease and he had coronary artery disease. So his heart was a little enlarged, and he had blockages in his coronary arteries. That being said -- so I held the case until the toxicology came back. And when it came back, it showed that he actually -- he had a high level of fentanyl.
Q. Of fentanyl?
A. Yes.
Q. Okay. You said a high level. Are -- what is considered a high level and how do you come to that determination?
A. Well, basically I go into the books and look.
Q. Okay.
A. Not to be snide or anything, but I still look at the books.
Q. But there's a reliable authority that determines or --
A. Sure.

Q. -- classifies whether or not something is --
A. Sure.
Q. -- a high level?
A. Uh-huh.
Q. Is there a toxic level and also a lethal level?
A. There are toxic levels and lethal levels, and there is a range between those two. So if the toxic level is here and lethal level is here, there's some overlap. And so he, I would consider, in that overlap area, meaning it's toxic but it could be lethal too.
Q. Okay. So in this particular case, the toxicology and the -- and the quantifiable amount of fentanyl in his system indicated to you that that was likely lethal in this case?
A. That's correct.
Q. Okay. And so is that the opinion that you came to that what -- what opinion did you come to about cause of death?
A. My opinion is that he died as a result of an acute fentanyl intoxication, which matches with the clinical. They gave clinical information that he had become more and more sleepy and then eventually passed out.
Q. Okay. So when you come to your opinion, you're also analyzing whether that's consistent with what people were seeing before the death?
A. Absolutely.
Q. Okay. So in -- in that -- so your toxicology report, were

you relying on the examinations by Dr. -- not doctor -- toxicologists Schlueter and Lawson?
A. Yes.
Q. Okay. So if I show you what's been admitted as Government's Exhibit 25, is this the toxicology report that you had -- that you received the information from?
A. Yes, it is.
Q. Okay. Thank you.
All right. So there was fentanyl in both his blood and urine according to this report; is that your understanding?
A. Yes.
Q. All right. And you came to the determination that it was the acute fentanyl intoxication that caused the death. Can you determine, based on your autopsy, where that fentanyl came from?
A. No.
Q. Okay. Just that it was fentanyl?
A. It was fentanyl.
Q. Okay. So you don't have any information about where that fentanyl came from?
A. I can't say who gave it to him.
Q. Okay. So with -- you said it matches to the clinical information. Are there -- are there physical signs on a body that -- that the death might have been caused by an overdose or an acute intoxication? Can there be signs?

A. Yes, clinically, like I said, this matches where he became increasingly sleepy before he finally passed out. Also, there -- and in some cases opioids cause pulmonary edema, which is the frothy fluid that exits the mouth and nose after they die. So that was there too. It's there with other things too, but it's consistent with an overdose.
Q. Okay. Would you see that at the time that you conducted the autopsy or would the pulmonary substance be not visible at that point?
A. It may or may not. It was -- it was present at the scene investigation.
Q. We're showing you what's been admitted as Exhibit 2. Is that consistent with what you've described as an opioid overdose -- overdose?
A. Yeah, I don't know if the jury's seen that yet, but -- but photograph -- or Government Exhibit No. 2 shows this frothy material along with mucous and purge material exiting the nose and mouth as he's leaned over the bathtub.
Q. And that is consistent with an opioid overdose?
A. It's -- it's consistent -- it's pulmonary edema.
Q. Edema. Okay. Which is -- which is consistent --
A. Consistent with.
Q. It's evidence of pulmonary edema, and opioid overdose could cause pulmonary edema?
A. Perfect.

Q. All right. Okay. So fentanyl, you don't know where it came from. Can you tell by the tests that you did in this case -- or by your examination in this case, can you tell how the fentanyl was consumed?
A. No.
Q. Are you familiar with different ways that fentanyl can be consumed?
A. Yes.
Q. Can you name a few of the ways that fentanyl can be consumed and describe them for the jury?
A. They can be insufflated, that's what we call it, snorted. It can be put in the rectum. It could be on a fentanyl patch that could be scraped and smoked. It could be patches where somebody just puts a lot of them on their body. The patch could be eaten. There are a lot of ways. There are a lot of ways.
Q. Are the ways that you've described the normal ways or the various ways that illicit fentanyl can be consumed?
A. Depending on the form that they get when they buy it.
Q. Well, you said like putting multiple patches on a body at one time.
A. Yes.
Q. Can fentanyl be swallowed and consumed orally?
A. Sure.
Q. Is that how -- how is it meant to be consumed in a

pharmaceutical way, like, a fentanyl pill?
A. Well, it's either -- either patches or pills generally.
Q. Okay. How are the pills pharmaceutically as prescribed by a doctor generally supposed to be consumed?
A. Orally.
Q. By swallowing them?
A. Yes.
Q. All right. When a body digests fentanyl orally, what is the process by which the fentanyl is absorbed in the body and how does -- how do the various organs sort of interact with that fentanyl?
A. So the body -- fentanyl is ingested. It goes through the stomach and into the small bowel. The pill dissolves, and the drug, the active drug, the fentanyl gets absorbed. So that goes into the venous return of the small bowel. So all the -- all the return from the small bowel goes back to the liver.
So that would have been a large amount of fentanyl goes through the liver and gets metabolized, at least somewhat, and then it goes out the other end, and then it goes back to the heart and lungs and up to the brain, and that's -- that's where you get an overdose. That's called the first pass effect. So in the first pass, it goes through the liver and then gets passed out to the rest of the body.
There are several ways that that can be gotten around, meaning if you inject the drug, if you put it under your

tongue, if you put it in your rectum, all those circumvent the first pass effect because they're going right into the bloodstream. So in this case, if he either insufflates it, snorts it, or takes it orally, it could have a varying effect on his level.
Q. So hypothetically if somebody wanted to get more effect from a fentanyl pill, in those two -- or in those two instances that you just mentioned, snorting would have a higher effect or better high than taking it orally?
A. Faster. Faster and higher.
Q. A faster effect. Thank you.
All right. How does fentanyl -- we've talked about how it passes through the body. How does it affect our bodies physically? And when somebody receives a toxic to lethal dose, how does that cause death?
A. Like, most all the other opiates, it has an analgesic effect, meaning it takes away pain, and after that it's a sedative. So they've used that as a sedative in procedures. Now, you're being monitored when you're given fentanyl in a clinical setting so they don't give you too much. But if you are given too much, you can become somnolent and eventually go to sleep, and then eventually your brain stops remembering to make your body breathe, and so then you stop breathing. And if you stop breathing then, of course, you die.
Q. So when somebody goes through that process and their body

stops breathing, do they -- is it -- is it a sudden effect or is it sort of slower?
A. No, it happens over time. And, again, this has to do with the route of administration and how much they took, but generally it's slower. So in this case I don't know if everybody knows the clinical information, but he was observed to be increasingly sleepy before he was found, and that would be consistent with an opioid ingestion.
Q. The jury heard testimony earlier that he was found on the toilet and non-responsive. Would that be consistent with an opioid overdose as well?
A. That's kind of the end result of it.
Q. Okay. Also, you talked about the different mechanisms by which -- by which somebody could consume. What's the fancy word for snorting?
A. Insufflating.
Q. Insufflating. I don't know that one. Is it i-n-s- --
A. Yeah.
Q. How do you --
A. I-n-s- --
Q. -- spell that?
A. -- s -- oh, S -- I'll write it down for you.
Q. Okay. Well, the court reporter will probably --
A. Oh, she needs that.
Q. I don't think she needs to know. She might know actually.

But, okay, so insufflating is the word for snorting a drug up the nose?
A. Yes.
Q. Okay. We're going to show you what's been admitted as Government's Exhibit 4. We heard testimony from a witness earlier that this sort of cylinder thing in the middle in front of the pill bottle was a straw and that this blue powder was some kind of crushed blue powder. Would that be consistent with your knowledge of how somebody insufflates?
A. Yes. Yes, it would.
Q. Okay. Thank you. All right.
MS. PAISLEY: No further questions for this witness.
THE COURT: Cross-examine.
MS. MUSICK: Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. MUSICK:
Q. Good morning, sir.
A. Good morning.
Q. I guess we're creeping into the afternoon now.
A. Almost.
Q. So after you conducted your autopsy on the decedent, and having not found any major physical conditions that would have naturally caused a death, you waited to receive the toxicology reports to know more; is that right?
A. That's right.

Q. Okay. And so you reviewed the toxicology reports to arrive at the opinion that Mr. Wippert died of acute fentanyl intoxication; is that correct?
A. Yes.
Q. Okay. And those results indicated that he had a level of fentanyl in his system that range -- could range from the high end of toxic through the lethal levels; is that right?
A. Yes.
Q. And you testified earlier that you can't tell where that fentanyl came from; is that right?
A. No. No, I can't.
Q. So, in other words, you couldn't test the decedent's blood and then also test the fentanyl that Ms. Paisley just showed you on the dresser to determine if they were a match?
A. I asked toxicology about that once, and they told me that -- I said, "Isn't there some kind of a fingerprint that you can deduce from drugs to say that's this fentanyl and not that fentanyl?" But they said no.
Q. Okay.
A. So fentanyl is fentanyl according to them.
Q. Fair enough, sir.
And the concentrations in illicit fentanyl can vary widely; is that right?
A. Sure.
Q. So one pill could have a low quantity and one pill could

have a very high quantity?
A. Yes.
Q. Okay. And all people will have a different rate of absorption and distribution and metabolism and excretion of fentanyl; right?
A. Yes.
Q. And so along those same lines, when you see the toxicology reports for the decedent and you see that he has this toxic to lethal range of fentanyl in his system, it's also impossible to tell how much fentanyl he would have ingested to get to that 8.9 nanograms per milliliter; is that right?
A. Yeah, that's called back-calculating. Toxicologists can do that. If you pay them enough, they can do that, but I don't.
Q. Okay. And so kind of in layman's terms, what might be a lethal level of fentanyl for one person could just be a toxic level for another person; is that right?
A. Sure. And it has to do with a bunch of other things too.
Q. Sure.
A. For example, is he used to taking it, because that -- that's a big factor.
Q. Sure.
And when you analyzed the body of the decedent, you noted in your report that there were no discernible pill fragments in the stomach; is that right?
A. Yes.

Q. And so that would be indicative of the decedent ingesting the fentanyl somehow other than orally?
A. It could be. Remember when you take a pill and it hits the stomach, it dissolves. And so by the time I get it, the body's been laying around for a while, and so it's going to dissipate.
Q. Okay.
A. So I may not see it.
Q. Okay. But in this case, along the lines of what you were just discussing with the government in Government's Exhibit -- I believe it was 4, the photo of what appears to be a straw and some crushed powder, that would be consistent with the decedent snorting; is that right?
A. Yes.
Q. Okay. I'm not even going to try to pronounce the fancy word.
A. I can't -- I can't even spell it, so you're off the hook.
Q. Okay. And that -- snorting would be consistent with illicit drug use rather than just pain management; is that right?
A. Yes.
Q. Okay. And the decedent's femoral blood was not tested for any concentration of marijuana; is that right?
A. I don't believe so. I don't have the report in front of me but...
Q. Okay. And is that just because marijuana would not have

contributed to the cause of death, so there's no need to test for it?
A. No, I don't believe it would.
Q. Okay. But because he wasn't tested for it, we don't know if it was present in his bloodstream or not, or I guess in his body?
A. Well, if he screened negative, they wouldn't have attempted to quant it. So they screen it first. And if it comes up positive, then they go ahead and they quant it, meaning quantify it. But if it's not there, they don't -- don't bother; it's not there.
Q. But if they don't test for it, we just don't know; is that right?
A. Could I look at the -- the report?
MS. MUSICK: Could we see Government's Exhibit 25?
BY MS. MUSICK:
Q. So I'd like to direct your attention to the bottom line where it states no confirmatory cannabinoid testing was conducted.
A. That's correct.
Q. So that's indicative of it not being tested; correct?
A. That's -- that's indicative of it not being quantified. So it could still be there, but they just didn't quantify it. Either it was not detected, that's option A I suppose. Option B is that it's maybe present but it's so low that they can't

quantify it.

For example, the hydrocodone at the bottom line there, it's present. It's detected, but they can't quant it because the level is too low. There's a level that's below the lab's ability to quantify something, and if that's -- if that's the case -- and cannabinoids are kind of a pain in the butt from what they told me -- then they can't quantify it. They don't.

Q. Likely the reason they wouldn't have quantified it is because it wouldn't have contributed to the death; is that right?

A. I don't know that they're necessarily into finding out what the cause of death is. That's my job. Theirs is to find if it's there.

Q. I see. No further questions. Thank you.

THE COURT: Redirect?

MS. PAISLEY: No, Your Honor. Thank you.

THE COURT: The witness excused?

MS. PAISLEY: He is, Your Honor.

THE COURT: You may step down, sir. Thank you.

THE WITNESS: Thank you.

THE COURT: Members of the jury, we're going to take our lunch break.

MS. PAISLEY: We have -- oh, we have a short...

THE COURT: You have a short -- you want to do a short witness?

MR. STARNES: Should be pretty short.

THE COURT: We'll do one more witness. Promised me it will be very short. I wanted you to eat lunch, but we'll let them do it.

MS. PAISLEY: Now you have to be short.

MR. STARNES: I know.

The United States calls Jaynell Davis to the witness stand.

COURTROOM DEPUTY: Please raise your right hand.

JAYNELL DAVIS,

called as a witness on behalf of the Plaintiff, having first been duly sworn, testified as follows:

COURTROOM DEPUTY: Thank you. Please have a seat.

THE COURT: Good afternoon.

THE WITNESS: Hi.

THE COURT: Please state your full name and spell your last name for the record.

THE WITNESS: Jaynell Davis.

THE COURT: How do you spell your last name please?

THE WITNESS: D-a-v-i-s.

THE COURT: Thank you. Can you scoot up to the microphone?

Go ahead, Mr. Starnes.

MR. STARNES: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. STARNES:
Q. Good afternoon, ma'am. So we met before. We spoke in my office yesterday; is that correct?
A. Yes.
Q. Okay. And I just have a few short questions for you. A little bit about your background before we get going. Where do you currently live?
A. In Bozeman.
Q. And what do you do for work?
A. I work at a assisted living.
Q. And what do you do there?
A. I work with the elderly.
Q. Okay. And did -- were you in school before that?
A. I had my nursing degree, but I got that in 2017.
Q. 2017.
Okay. And where were you living in the fall of 2022 and maybe early 2023, that time frame?
A. In Browning.
Q. And is that your home originally?
A. Yes.
Q. And were you somebody that was using drugs at that time?
A. Yes.
Q. When did you start using drugs?
A. I started using meth in 2019 and then fentanyl in 2022, around that time.

Q. Sitting here today, are you sober?
A. Yes.
Q. When was the last time you used?
A. October of last year, October 27.
Q. Okay. So you've been sober for 10 months or so?
A. Yes.
Q. So I just want to ask you a little bit about your time in Browning, Montana. So you said you began using methamphetamine?
A. Yes.
Q. At some point did you begin to use other drugs as well?
A. Yes, fentanyl.
Q. Fentanyl.
When did that start?
A. In around 2022, around that time.
Q. So how long do you think you were a user for until then?
A. To -- like drugs per se?
Q. Uh-huh.
A. For a while, since 2019.
Q. Okay. So several years prior?
A. Yes. Yes.
Q. So were you generally familiar, at the time that you were using fentanyl in particular in the Browning area, how much a pill costs back then?
A. Yes, $50.

Q. $50 a pill?
A. Yes.
Q. And what types of quantities could you get fentanyl in?
A. Just depends on how much money I had.
Q. Okay. So --
A. Like you --
Q. Sorry. If I wanted to get a large quantity, like let's say I want wanted to get 50 pills --
A. Yeah.
Q. -- how would I go about doing that back then?
A. Going to the drug dealer.
Q. Okay. So you'd have to find somebody that had it?
A. Yeah.
Q. How would you know who was holding?
A. Just get a hold of different people on Facebook, ask around.
Q. Okay. And when you would go to ask somebody that you thought might have something to sell to you, would you use the words methamphetamine, fentanyl or --
A. No.
Q. -- whatever else --
Why not?
A. Just because it -- I didn't want to put the -- that -- the words, I guess, the actual drug words. I say, "I'm looking. Who has?"

Q. Those are the types of words you would use?
A. Yes.
Q. "I'm looking. Who has?"
A. Yes.
Q. And what does that mean?
A. Just looking for drugs, for fentanyl, for --
Q. Okay. What if somebody had let's say fentanyl --
Sorry, this train's going in the background, so if you can't hear me, let me know.
Let's just stick with fentanyl for a minute. So if somebody had fentanyl and they were looking to sell it --
A. Uh-huh.
Q. -- were you ever involved in that situation?
A. Say again; sorry.
Q. So if somebody had fentanyl, they were looking to sell it, did you ever encounter that scenario where somebody was -- they had something and they were --
A. Yes.
Q. -- going to sell it to people?
A. Yes.
Q. How many times?
A. On multiple times.
Q. Multiple like more than ten?
A. Yes.
Q. More than 20?

A. Uh-huh.
Q. More than 50 maybe?
A. Maybe, yeah.
Q. And what would they -- what types of things would they say to let people know that I have something I'm willing --
THE COURT: Mr. Starnes, wait one second.
MR. STARNES: I'm sorry, train's getting louder and louder.
THE COURT: All right. Our court reporter is facing challenging circumstances today coming to us from Kansas, so we don't want to add the extra challenge of the Burlington Northern Railroad passing through here.
Go ahead, Mr. Starnes.
MR. STARNES: Apologies for that, madam court reporter.
BY MR. STARNES:
Q. Ma'am, I'll just repeat the question. So you had been talking to us about a scenario where somebody had drugs and they were willing to sell. How might they tell people that we're looking to buy if they had something to sell?
A. "Are you looking?"
Q. That was the --
A. "Are -- "
Q. -- common phrase?
A. Yes, uh-huh.

Q. And then what -- they would do this on Facebook?
A. Yes.
Q. Did anybody ever actually use the words methamphetamine, fentanyl, or whatever else it was?
A. Not -- not really, not -- maybe ran into that a couple times, but people didn't like to use it that way.
Q. Okay. Bear with me. That may be the only question I have for you. One second.
A. Okay.
Q. Sorry, she reminded me. There are -- are there different ways -- amounts of pills that people can buy at once?
A. Yes.
Q. So what's the most common one that you would buy?
A. A half a one.
Q. A half. Why is that?
A. Because they were so much and I -- like I said, they were $50, so I would mostly -- most the time have $25 for half a one.
Q. Okay. So 50 for a whole, 25 for a half. Is there a smaller quantity than a half?
A. Yes, I could usually get a quarter piece because --
Q. How much was that?
A. -- sometimes, like I said, just the amount is a lot. And when you're using, you don't come by money as much. So quarter piece would be 10-15 dollars.

Q. Okay. Would that be enough to get you high?
A. No, but it would take the edge off.
Q. Okay. What about more than a pill, could you get more than one pill at one time?
A. Yes.
Q. And would you pay $50 per pill if you were getting more than one?
A. Yeah, $50 per pill.
Q. Okay. What if I wanted to get, like, a hundred?
A. Like just depends on the dealer if the dealer has a hundred.
Q. Okay. And would they cut me a better price per pill if I was getting more?
A. Yes.
Q. Is there a name given to a quantity of a hundred pills?
A. A roll.
Q. A roll.
A. (Nodding head.)
Q. And is there a name given to a quantity of a thousand pills?
A. A boat.
Q. What's half a boat then?
A. I'm not sure. I just know the boat and roll.
Q. Maybe half?
A. Maybe half, yeah.

Q. All right. Hold on one second.
If you were going to purchase the normal amount that you would get, a half of a pill of methamphetamine [verbatim], what is the language that you would use in order to set up that transaction?
A. "Can I get a half?"
Q. "Can I get a half?"
A. Uh-huh.
Q. Okay. Thank you. I have no further questions.
But stand by, the defense may. Thank you.
A. Okay.
MR. GALLARDO: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. GALLARDO:
Q. Ma'am, first off, congratulations on your sobriety. Sounds like you're doing well.
A. Thank you.
Q. It sounds like when you were active, this was back in 2022-ish?
A. Yes.
Q. Okay. Were there -- were you out in Browning, Montana?
A. Yes.
Q. Were there a lot of people selling fentanyl back then?
A. Yes, quite a few.
Q. And did I hear you right in saying that you -- you

purchased half a pill at a time?
A. Yes.
Q. And did you say that a quarter of a pill wouldn't even get you high?
A. No, it would just take the edge off because when you're -- when I was in my addiction, I'd get really sick. So whatever I could get, and quarter piece would take the edge off.
Q. Okay. Is that about how much you would -- you would ingest at a time, a quarter of a pill?
A. I'm not -- if I had -- yeah, at the time. Just depends on if I had enough money that day, or how much money I had that day depending on how much I would ingest.
Q. Okay. And you said $50 a pill?
A. Yeah. Yes.
Q. I mean, if you had a lot there, how much -- what's -- what's a user amount for you back then in 2022?
A. Like I said, it differed every time depending on if I had the money or depending on I -- are you asking me the most I've used?
Q. No. No, just the average. It sounds like it varies?
A. Yeah, it does vary.
MR. GALLARDO: All right. Thank you. I don't have any other questions.
THE COURT: Redirect?
MR. STARNES: One -- one line here real quick.

REDIRECT EXAMINATION

BY MR. STARNES:

Q. Just following up. So you mentioned that a quarter pill wouldn't be enough to get you high but it would take the edge off?

A. Yes.

Q. Would a quarter or a half a pill help with pain if you had pain of some kind?

A. Yes.

Q. And how is that?

A. Just because of the -- the feeling, I guess, it gives you, the amount I guess.

Q. Okay. Thank you.

MR. STARNES: No further questions, Your Honor.

THE COURT: Is the witness excused?

MR. STARNES: Yes, please, Your Honor.

THE COURT: You may step down then. Thank you.

Mr. Starnes, you'll be calling no more witnesses before lunch.

Members of the jury, we'll take our lunch break. Please be back here at 1:30. We'll start and go until I said around five o'clock today. Don't discuss the case with anyone. Don't let anyone else discuss the case with you. Don't do any research. No TikTok, please. We'll see you back here at 1:30, thank you.

(The jury left the courtroom, after which the following proceedings were had.)

THE COURT: All right. Please be seated. My law clerk is handing out the proposed verdict forms. I don't think that's much to debate about. You have the jury instructions. We'll talk about those more this afternoon and tomorrow. I think -- we have jury instructions.

MS. MUSICK: Helen passed out proposed ones earlier.

THE COURT: Eighteen is whether Mr. Malatare chooses to testify. Nineteen, I don't know if we have any particular witnesses who would qualify for that instruction. I noted objection by the defendant to No. 12. And is 11, is that the one we're thinking about adding?

So take a look at those in particular and we'll try to work out any objections to 18 -- or to 12, excuse me, regarding the conduct that satisfies the first count.

All right. Any questions?

MS. PAISLEY: Your Honor, given the foundational testimony we just heard, we would just ask the court to agree to the admission of 6, when -- the foundation for how he got those text messages, the redacted --

THE COURT: And is -- who's going to testify to that?

MS. PAISLEY: Kate Donohue with the FBI.

THE COURT: Thank you.

MS. PAISLEY: She's the one that did the extraction.

THE COURT: Okay.

MS. PAISLEY: I think we heard the testimony regarding that specific language referring to fentanyl trafficking.

THE COURT: All right. So, Ms. Musick.

MS. MUSICK: We maintain our objection to --

THE COURT: Okay. All right. I'll allow --

MS. MUSICK: -- I think it's 31 now --

MR. STARNES: Thirty.

MS. MUSICK: -- or 30.

THE COURT: I will allow the four bubbles from that text message exchange to be admitted as Exhibit 30 as evidence of the -- Mr. Wippert's putting himself -- it's against his penal interests to testify to that. As the government argues, it shows -- it exemplifies a drug transaction being consummated.

MS. PAISLEY: I think the analogy I would use was if he were arrested for possession of half a pill of fentanyl, these statements would be used as substantive evidence to prove that what he did, you know, to prove that possession and how he got it. And so in the same way, that's the penal interests.

We now have a redacted without the last -- the last two are still unredacted. My understanding is Mr. Gallardo was okay with those last two if the four are coming in.

THE COURT: Is that all right, Mr. Gallardo?

MR. GALLARDO: We --

MS. PAISLEY: Just checking that's --

THE COURT: Okay. All right. Okay. And to clarify, distinguished from *Davis*, we're only talking about two statements from the victim here. And I think the statements argument put his penal interest at issue, and also all the context statements have been -- or the logistical statements have been deleted here. And this is not, I believe, central to the government's case as the government argued in *Davis* in its closing, so I would encourage you, Ms. Paisley, not to make this central to your case.

MS. PAISLEY: It's definitely a key piece of our evidence.

THE COURT: It is, yes, okay.

MS. PAISLEY: It's a key piece of our evidence, and that's why we're fighting so hard to get it in.

THE COURT: Understand. All right.

MS. PAISLEY: And Mr. Starnes has the redacted one if the court would like to see it versus --

THE COURT: All right. I'll trust if the parties agree to it.

All right. Anything else before we break?

MS. PAISLEY: No, Your Honor. Thank you.

THE COURT: Ms. Musick, anything else?

MS. MUSICK: No, Your Honor.

THE COURT: 1:30 please and we'll -- next -- as we

start getting longer breaks, we'll look at jury instructions maybe tomorrow morning. I don't think there's a whole lot in dispute.

Thank you, counsel.

(Recess at 12:27 p.m. to 1:35 p.m.)

(Proceedings had outside presence of the jury.)

THE COURT: Good afternoon, counsel.

Ms. Paisley, ready with your next witness?

MS. PAISLEY: Yes, Your Honor. I just wanted to clarify Exhibit 30 hasn't been -- you've indicated your --

THE COURT: Yes, I've not admitted it yet.

MS. PAISLEY: -- the foundation is waived as to the slang, but I'll lay the foundation as to how he got the text messages through the next witness. Okay.

THE COURT: Ready to go, Ms. Musick?

MS. MUSICK: Yes, we are.

THE COURT: Please bring in the jury, madam clerk.

(The jury entered the courtroom, after which the following proceedings were had.)

THE COURT: Please be seated. Welcome back, members of the jury. Hope you had a nice lunch.

No one spoke to anyone else about the case or had anyone approach you about the case? Did any research? All right. Seeing no hands, I'll assume you've complied with the court's rules. Thank you very much.

We're going to continue now with the government's case.

Ms. Paisley, please call your next witness.

MS. PAISLEY: Your Honor, the government calls Kate Donohue -- or Katherine Donohue.

COURTROOM DEPUTY: Please raise your right hand.

KATHERINE DONOHUE,

called as a witness on behalf of the Plaintiff, having first been duly sworn, testified as follows:

THE COURT: Good afternoon.

THE WITNESS: Good afternoon.

THE COURT: Please state your full name and spell your last name for the record.

THE WITNESS: Katherine Donohue, D-o-n-o-h-u-e.

THE COURT: Thank you.

Go ahead, Ms. Paisley.

MS. PAISLEY: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. PAISLEY:

Q. Good afternoon, Agent Donohue.

A. Good afternoon.

Q. Agent Donohue, where are you currently employed?

A. By the FBI up in Shelby, Montana.

Q. What are your duties with the FBI in Shelby, Montana?

A. We primarily work violent crimes on the Blackfeet Indian

Reservation.
Q. How long have you been in the Shelby office?
A. Almost four years.
Q. Prior to that -- or how long have you been with the FBI?
A. Eight years.
Q. And what is your role with the FBI? Are you a special agent?
A. Yes.
Q. And where was your previous office before you came to Shelby?
A. I was in the Pittsburgh office.
Q. And there what were your primary duties?
A. I worked primarily crimes against children.
Q. In your work both in Pittsburgh and in Shelby as well as through your training, do you have experience with accessing digital resources or accessing digital evidence?
A. Yes.
Q. Does that include capturing information off of cell phones?
A. Yes.
Q. What are -- what is the primary way of retrieving information off of a cell phone?
A. We use technology called Cellebrite.
Q. Can you explain to the jury what the Cellebrite does?
A. Cellebrite, you basically hook your -- hook a cell phone up or a tablet up to your computer with the Cellebrite

application, and it extracts the data from your cell phone basically.
Q. And how many -- is this -- what is this -- what's the sort of layman's terms of that, doing that process? Is there a term that law enforcement uses for that?
A. Like an official term?
Q. Or what's the term -- what does phone dump mean?
A. Just an extraction basically on the cell phone, it just takes what's on your phone. If I was going to look through it on your physical device, it could manipulate things like the data on your device, where so instead we hook it up to Cellebrite and extract the data. And we can go through it that way without manipulating anything on your actual device.
Q. Okay. So it's to capture sort of at the time that the device was turned off or seized by law enforcement what -- what was on that; is that right?
A. Yes.
Q. Okay. So were you asked to do an extraction for the victim's phone in this case?
A. Yes, I was.
Q. For Shawn Wippert?
A. Correct.
Q. And you extracted it. Did you find a stream of text communications between Shawn Wippert and the defendant in this case, Doug Malatare?

A. Yes.
Q. Did you extract that and provide it to law enforcement?
A. I did.
Q. To the prosecution team?
A. Yes.
Q. I want to show you what's been marked for identification as Government's Exhibit 30. It should pop up for your screen, Agent Donohue. Do you recognize this?
A. Yes.
Q. And how do you recognize this?
A. This is a conversation I provided to you.
Q. And is this from the conversation between Shawn Wippert and the defendant Doug Malatare?
A. Correct.
Q. And is this for the days -- the day around the time that he died?
A. Yes, I believe so, yes.
Q. Based on what you understand?
A. Yes.
MS. PAISLEY: Government would move for admission of what's been marked as Government's Exhibit 30.
MR. GALLARDO: We renew our objection.
THE COURT: All right. Objection is overruled. I'll admit Exhibit 30.
MS. PAISLEY: Government moves to publish, Your Honor.

THE COURT: Please publish, madam clerk.
BY MS. PAISLEY:
Q. Okay. The jurors should be seeing what's on your screen now. Can you orient them?
I see two different colors there. Can you orient them to whose text messages belong to which phone?
A. Yes. So the blue messages showing up on the screen would belong to Doug Malatare and the green ones are Shawn Wippert's.
Q. Of this conversation, can you, please, read for the jury what the first message from Doug Malatare is?
A. Yes. "Catch up with you a little bit, bro. You looking?"
Q. And what is Shawn Wippert's response to that?
A. "Yeah, I'll be home. Just got off work. I can only afford a half if you can stop by."
Q. Okay. To what -- what is Doug Malatare's response to that?
A. "Watch for me."
Q. And what does Shawn Wippert respond?
A. "Okay."
Q. All right. These are marked by dates and what -- a time in UTC. Are you familiar with what UTC is?
A. Yes, but I -- sorry.
Q. You don't know the conversion?
A. No.
Q. Okay. So you're not sure what time those text messages came?

A. No, ma'am.
Q. All right.
MS. PAISLEY: No further questions for this witness.
THE COURT: Cross-exam.
MR. GALLARDO: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. GALLARDO:
Q. Good afternoon, agent.
A. Good afternoon.
Q. Do you roughly know about -- you probably have no guess as to the time conversion we're talking about if we're -- if we're wanting Mountain Standard Time?
A. I apologize, I do -- I did not convert those, and I don't know.
Q. Okay. And are these all the -- the exchanges -- or I guess the last exchanges between the decedent and Mr. Malatare?
A. Yes, that was on -- on Shawn Wippert's phone, yes.
Q. Okay. So there was nothing else?
A. Correct.
Q. Okay. Can you explain a little bit of your background? Have you ever done any drug investigation, law enforcement related to that?
A. I -- no, not that I have been a case agent on.
Q. Okay. All right. Give me just a minute.
Ma'am, how long have you been with the FBI?

A. Eight years.
Q. Eight years?
A. Yes, sir.
Q. And what did your -- what do your duties typically consist of? What kind of cases are you on?
A. Primarily violent crimes.
Q. Okay. This is not a violent crime. How did you get into -- on this case?
A. Yes, so I -- because I have the Cellebrite, the BIA asked me to extract the cell phone for them.
Q. Okay. So you're the Cellebrite POC or the systems expert on that?
A. I extract cell phones for our office or the agents surrounding ours, but there is another Cellebrite in -- up in that area as well.
Q. Okay. And in that second legible -- that green line there we see words, "Yeah, I'll be home. Just got off work. I can only afford a half if you can stop by." We don't know what that half is sitting here today, do we, what they're referring to?
A. I -- I don't. I could speculate, but I don't know, sir.
Q. And, I mean, sitting here today, is there -- based on this alone, I mean, do you see any crime being committed?
Would either of these individuals -- could they be charged with a particular crime just based on this alone in your

experience?
A. Based off of just these text messages?
Q. Yes.
A. No. No.
Q. Okay. All right. Thank you. I don't have any other questions.
THE COURT: Redirect?
MS. PAISLEY: No further questions.
THE COURT: Witness excused?
MS. PAISLEY: Yes, Your Honor.
THE COURT: You may step down. Thank you, ma'am.
Ms. Paisley.
MS. PAISLEY: Your Honor, the government calls Cameron Pavlicek.

CAMERON M. PAVLICEK,

called as a witness on behalf of the Plaintiff, having first been duly sworn, testified as follows:

COURTROOM DEPUTY: Thank you. Please have a seat.
THE COURT: Good afternoon, sir.
THE WITNESS: Good afternoon, Your Honor.
THE COURT: Please state your full name and spell your last name.
THE WITNESS: Cameron Michael Pavlicek, P-a-v-l-i-c-e-k.
THE COURT: You can tilt that microphone up. Thank

you.

Go ahead, Ms. Paisley.

MS. PAISLEY: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. PAISLEY:

Q. Good afternoon.

A. Good afternoon.

Q. What is your position and who do you work for?

A. So I work for the Montana Department of Justice Division of Criminal Investigation assigned to narcotics out of Billings. My current role is a agent, but my role at the time of this case was the regional agent in charge.

Q. So should I call you Agent Pavlicek; is that your title?

A. Yes, ma'am.

Q. Agent Pavlicek, so you work with the Division of Criminal Investigations?

A. Yes, ma'am.

Q. What does the Division of Criminal Investigations do and what is the scope sort of of your duties?

A. Again, we're the narcotics bureau, so our office is primarily organized crime, dangerous drugs, gun violations, anything that would involve an undercover, murder for hire, things like that.

Q. And how long have you been an agent with DCI?

A. Approximately eight and a half years.

Q. In that approximately eight and a half years, how long have you been in the narcotics bureau?
A. All of it.
Q. All of it.
Did you have law enforcement experience before you came to DCI?
A. Yes, ma'am.
Q. Can you outline that for the jury?
A. Yeah. So I was a patrol officer for the Mile City Police Department for roughly four and a half years, and then I was also a military police with the Montana National Guard, and I've had that for about 15 years total.
Q. And through both the military and in Montana, what's been the training and -- and education you've received to be an agent with the DCI?
A. So for the Army obviously I went through basic training and military police officer school, and then for Montana I started out with the Montana Law Enforcement Academy. I currently hold an advanced post certificate, so I've had hundreds of hours of training ranging in everything from basic drugs, undercover school, clandestine laboratory trainings, marijuana eradication trainings, managing informants, surveillance, that kind of thing.
Q. You mentioned informants, can you explain to the jury the role that informants play in your narcotics investigations and

how they're used?
A. Yeah. So it varies, but informants are extremely important for what we do. None of us are necessarily active drug users or in the drug world, so we use the information that they can provide to us to further investigations.
Q. I want to ask you about a man named Adam Fixel. Do you know who that is?
A. Yes, ma'am.
Q. And who was Adam Fixel?
A. Adam Fixel, at the time I met him, was the target and suspect of a -- of his own narcotics investigation where he was a primary suspect in it.
Q. And can you tell the jury sort of how -- how you came to be involved with Fixel, and, you know, how your investigation went with him?
A. So it started with a jail interview. A woman was in jail in Wheatland County, which is Harlowton, Montana, and she wanted to provide information for hoping to receive consideration for her charges.
So we went to the detention center there. I interviewed her, and she gave information about multiple people that she had been purchasing dangerous drugs from, meth and fentanyl, and one of the individuals that she mentioned was Adam Fixel.
Q. And did law enforcement interdict Adam Fixel with any kind of drugs?

A. We did.
Q. How did that happen?
A. With the help of the informant, we were able to introduce an undercover through text messaging that Adam Fixel believed was someone looking to acquire I believe it was a pound of meth and either 1,000 or 2,000 fentanyl pills. So we placed the order with Adam Fixel. He lived in Spokane Valley area, Washington, and he was coming to Montana to deliver those drugs to us where we pulled him over. Subsequently got a search warrant for his vehicle, found the dangerous drugs, and then interviewed him while he was in the holding cell at the detention center in Superior, Montana.
Q. When you interviewed him, did he provide information that incriminated himself regarding drugs?
A. Yes.
Q. Okay. Where is Adam Fixel today?
A. I believe he's deceased according to what we've found online. And also I tried to get a hold of him to let him know of this trial, and I got a response back, a text message, saying, "Hey, don't call this number again; Adam -- Adam's dead."
Q. And do you know when Adam died?
A. It would have been approximately -- it was a week prior to me being notified of this trial, so probably two or three weeks ago.

Q. So but you talked to Adam about his drug trafficking. Did he tell you who he was trafficking drugs to?

MR. GALLARDO: Objection, hearsay.

MS. PAISLEY: 804(b)(3), Your Honor, his statements.

THE COURT: Overruled. Go ahead.

BY MS. PAISLEY:

Q. Did he tell you about him trafficking drugs into Montana and to whom he was trafficking drugs?

A. Yes, ma'am.

Q. Okay. Did he provide any information about a person relevant to this investigation or to this trial?

A. Yes, ma'am.

Q. Can you tell the jury what -- who he described and what he told you?

A. He -- he said that the individual was named Doug. He didn't know his last name. He was -- he lived on the reservation. He described him as approximately 50 to 60 years old, male, and that he would normally purchase two boats at a time, which I know is 2,000 pills. A boat is a thousand pills. So he would buy 2,000 pills at a time. He would come up every one or two weeks. Adam said on one occasion he came and delivered to the reservation to Doug, and then he provided a phone number for Doug.

Q. Okay. I want to show you what's been preadmitted as Government's Exhibit 27 please. Do you recognize this?

A. Yes, ma'am.
Q. Can you tell the jury what this -- what this picture is?
A. That is -- I took -- I took a photograph off of Adam Fixel's phone for the phone number that he knew belonged to Doug that he had previously communicated previous transactions with Doug.
Q. Okay. And the contact number is listed there. What's the name that he ascribed to Doug?
A. Montana Boss.
Q. Okay. Did he tell you why he used that term?
A. Because he was told by Doug that he had some form -- some sort of tribal, like, government -- I think he called him a tribal elder. Or Adam's interpretation was that Doug was some kind of high-ranking person for the tribe, so he called him Montana Boss.
Q. Okay. Did Adam tell you how he came to be acquainted with Doug?
A. Yes, ma'am.
Q. How did he come to be acquainted with Doug?
A. Adam explained that Doug went down to -- which I didn't know this at the time, but apparently if you drive to Spokane and go to 7-Eleven after 11:00 p.m. and flash money, people with drugs will come meet you. So he said he got a phone call from a friend, "Hey, there's a Native American guy down here who's got thousands of dollars and he's looking for pills."

And so Adam said he went down to 7-Eleven and met Doug, and they did their first transaction and exchanged information for future transactions.

Q. Okay. So -- so Adam let you take pictures of his phone. I want to show you pages -- the next page of this.

MR. STARNES: Hold on.

(Off record dealing with technology.)

BY MS. PAISLEY:

Q. All right. Is this a picture that you took?

A. Yes, ma'am.

Q. Is it of that conversation?

A. Of a conversation between the --

Q. Of a --

A. Yes, ma'am, of a previous transaction he had done.

Q. Okay. Can you explain for the jury, when you're taking this picture of Adam Fixel's phone, who is blue and who is gray in this picture?

A. So blue would be Adam Fixel and the gray would be Doug Malatare.

Q. Okay. Can you read -- what is that first message? It's kind of cut off at the top. What does that first message from Doug Malatare say?

A. Yeah, so Doug's saying, "Wondering if you're able to make a trip here maybe Friday."

Q. To which Adam responded?

A. "Possibly. Do you have money you're trying to spend?"
Q. And then what is -- what is the defendant's response to that?
A. He says, "How much for a half boat goes?"
And, "500 for one half."
Q. Okay. And to your knowledge, as a drug investigator for eight and a half years, what does half a boat mean?
A. So a full boat is a thousand pills. A half boat would be 500 pills.
Q. Okay. What was Adam Fixel's response to the defendant's inquiry?
A. Adam Fixel's response is, "One half boat is five rolls." So roll is a hundred pills.
Q. Okay.
A. So it's almost like Adam's explaining how much a roll and a boat is to Doug.
Q. Okay. Where is the rest of that message? You said half a boat is five rolls.
A. "LOL, that is 1,500."
Q. Okay. So at that point what is the price per pill that he is negotiating?
A. So 500 pills for $1,500 would equate to $3 a pill.
Q. What is Adam's next response?
A. "For half boat I want and you will charge me 1,500."
Q. Okay. I'm sorry, is that -- is that Mr. Malatare's

response? Sorry, there was a message --
A. Oh, yes, okay, I'm sorry.
So Adam says, "300 a roll. If I have to bring it to you, I want 400 a roll."
Q. Okay. To which the defendant responds?
A. "For half boat I want and you will charge me 1,500."
Q. Okay. And Adam's response?
A. Adam states, "If I have to bring it to you, it will be 2,000."
Q. Okay. And what's the message right below that --
A. "If you come to me, it will be 1,500."
Q. Thank you.
To which the defendant responds?
A. "Okay. All I want is one half boat and one roll. That's 2,400 you charge me."
Q. To which Mr. Fixel responds?
A. "Yes, sir."
Q. All right. We'll go to the next page. Some of it's repeated, so we're going to find the, "Yes, sir."
Okay. All right. So I think that repeated message, "Okay, all I want is half boat and one roll, that's 2,400 you'll charge me."
To which Adam responds, "Yes, sir."
What is -- what is the defendant's next text?
A. "Okay. And you will come Friday."

Q. To which Adam responds?
A. "If you want, I can come today."
Q. And what is the defendant's response to that?
A. He says, "Okay. Sounds good, to Browning."
Q. And is there -- are there more texts related to this? Did you take any more pictures? Did you take a third picture of the text streams?
A. If it's in the case file, I did, yes. Yes, ma'am.
Q. I want to show you another page, what's also the same exhibit just the fourth page. Okay. Do you recognize this?
A. Yes, ma'am.
Q. Okay. Can you review it on your screen and then tell me what they're talking about in your interpretation as -- as a drug investigator?
A. Yes, ma'am. Yeah, so Adam Fixel is communicating with Doug there's a discrepancy on how many pills he received.
Q. Okay. And do we know when this was? I guess there's a date on it.
A. It looks like from the photo that I can see November 29th.
Q. At what point did you become involved investigating -- I guess was this the first time that you had heard Doug Malatare's name?
A. Yes, ma'am.
Q. Okay. And Adam Fixel didn't give you a last name, did he?
A. No.

Q. Okay. So he provided you a first name, a description, a location. You said he went to Browning and he gave you a phone number?

A. Yes, ma'am.

Q. We'll exit out of that real fast.

What did you do with that information?

A. Well, the first thing we did -- well, there's a number of things we did. We can run that phone number through a law enforcement portal. There's several different portals that you can use. My personal favorite is one called ZetX, which is now owned by a company called LexisNexis. This is a very common company that law enforcement uses to look at people's personal identification, addresses, prior jobs, relatives, things like that.

So ZetX offers a service where I can type in a phone number, and hundred percent of the time it tells me who that phone carrier is, and maybe like 50 or 70 percent of the time it will actually give me a name associated with that phone number. Sometimes they have that information; sometimes they don't. But we need to know the phone carrier if we're going to write a search warrant down the road. But I ran that phone number, and it came up to Doug Malatare.

Q. Did you talk to -- at that point, did you talk to any other law enforcement agencies about Doug Malatare?

A. As soon as we confirmed the phone number matching what the

informant's telling us and it is a service provider that we know we can execute a phone ping on, that's when I would have called DEA, and Billings specifically, because we knew there was going to be tribal affiliation, and those cases are high priority for FBI, DEA. And so we were going to work -- we wanted to work with them knowing that this was a reservation related case. So I called Stacy Zinn who was the supervisor of DEA in Billings at the time, and she referred me to DEA agents in Missoula to call.
Q. And when you contacted them, were they familiar with the name Doug Malatare?
A. Yes, ma'am.
Q. What's a license plate reader?
A. A license plate reader, we call them LPRs. They are -- various different entities have them, like Department of Transportation, some state agencies, certain areas of border crossings from state to state. But on various highways, we'll automatically take pictures of vehicles as they cross to certain areas that have these cameras set up. We call these LPRs.
Q. Can you run a portion of a license plate to see if it hits on any of these LPRs?
A. Yes.
Q. And because it's just a picture, could it respond to -- correspond to different potential license plates?

I mean, if one state issues a license plate with the same three numbers and another state license, can it distinguish between those or can it just say those three numbers are showing up?
A. It will show us a picture of the plate. And as we look at the plate, we can differentiate that's a Texas plate or Montana plate or Arizona plate. So you type in the numbers, and it will show you any license plate that's issued that it took a photo of. They're not always from Montana, but it will show you a list that you can go through and view and look at the -- the images and tell what state that plate was from.
Q. Okay. In this particular case, so your investigation is around December of -- when was this investigation?
A. It would have been early December.
Q. Of which year?
A. I believe that would have been 2022.
Q. Okay. And from your information from Adam Fixel, how long did Adam say he'd been supplying this Doug?
A. I'd have to go back and refer to the -- the search warrant or the notes. I don't recall that off the top of my head, but I do remember it was multiple occasions.
Q. Okay. Was it over -- do you recall if it was over a period of months or like a year?
A. It would have probably been just months. I don't think it would have been quite to a year.

Q. Okay. So with -- with this license plate reader -- well, through your investigation, did you associate any license plates or vehicles with Doug Malatare?
A. Yes, we did.
Q. Okay. Did you run that plate through a license plate reader database to determine whether or not it had been picked up on any particular roads that might have been of investigative interest?
A. Special Agent Murphy with DEA would have been the one that first informed me of the LPR reading.
Q. Okay. Was that information consistent with the information you had been provided by Adam Fixel?
A. Yes.
Q. Okay. So what route -- if somebody were hypothetically trafficking drugs to and from Spokane to Browning, what would the general route be?
A. Depending -- I'm not sure from the reservation specifically, but they're obviously going to be -- they can take the Hi-Line or take I-94 westbound.
Q. Okay. So -- and into -- through Idaho into Washington?
A. Yes, ma'am.
Q. So you mentioned a ping warrant. What is a ping warrant?
A. So a ping warrant is basically if I have enough probable cause to request from a judge the authority to submit a warrant to the phone company. So in this case it was Verizon. I apply

for a search warrant from a judge, which the judge either agrees or doesn't agree that there's enough probable cause we can ping their phone.

What that means is I'm going to submit that warrant to Verizon directly, and every 15 minutes Verizon is going to send me an e-mail that gives me the grid coordinate of where that person's phone is pinging.

And it's not exact. Each ping -- some pings will be within 3 meters. Some pings will be within a thousand meters. The actual e-mail that they will send you will tell you, like, an accuracy. Like, hey, this is accurate up to 3 meters or this is accurate up to a thousand meters. That's based on cell phone towers for that specific area. The more rural you are, the more radius we have to work with. But every 15 minutes we are going to get a location, GPS coordinate, based on where Doug's phone currently was.

Q. So you did obtain a warrant in this particular case?
A. Yes, ma'am.
Q. The -- I mean, DCI?
A. Yes, ma'am.
Q. So was there a point where the investigation saw Mr. Malatare moving west?
A. You mean on the phone ping?
Q. Yeah, on the phone ping.
A. Yes, ma'am.

Q. Okay. And what did that indicate to you?
A. That he was going to be traveling to Washington to pick up drugs.
Q. Okay. Can you tell the jury, do you know -- do you know approximately when that was?
A. I can refer to the -- the investigative report, but I believe it would have been, like, mid-December.
Q. Mid-December?
A. Yes, ma'am.
Q. So -- so investigators noticed that the phone is moving west. You believe that this means he's likely going on a supply run or going to acquire fentanyl?
A. Yes.
Q. What do you guys do next?
A. We coordinate with DEA, say, "Hey, we're pinging Doug's phone. Looks like he's heading to Washington. We're going to wait until he starts heading" -- just put everybody on alert, "Hey, when he starts heading back east towards Montana, we're going to set up somewhere to have a traffic stop done so that we can seize his vehicle and attempt to retrieve the fentanyl from inside the car."
Q. And I want to ask you some basic questions. We saw those text messages. You told us what a boat meant, and you said a boat meant a thousand fentanyl pills. Was any of that terminology common to marijuana to your knowledge?

A. No, never.
Q. Okay. Is marijuana ever referred to in rolls or boats or half boats?
A. Absolutely not, no.
Q. Okay. At any point, did Adam Fixel mention trafficking marijuana?
A. No. No.
Q. So we've heard testimony earlier about the reservation and fentanyl. Are you familiar with sort of drug prices back in 2022?
A. Yes, ma'am.
Q. Okay. Generally speaking, where is fentanyl cheaper?
A. The closer you get to the border of Mexico, the cheaper it gets. Our source locations for Montana commonly aren't necessarily by the border, but Oregon, Washington, California, Arizona.
Q. And do you know the approximate price on the Blackfeet Reservation in 2022 one fentanyl pill would go for?
A. I knew that reservations were substantially higher, and that during this time period the most I had ever heard was on the Fort Peck Tribes, and that was $100 or $120 per pill, but 40 to 60 was probably a more realistic per pill.
Q. All right. So you mentioned that you put -- you put everybody on notice because this ping warrant shows Doug Malatare is driving west. You suspect it's for a drug pick up.

What happens next?
A. We watched the pings until they end up in Yakima area, which was specifically what Adam had informed me. "Hey, if he's not going to get pills from you, where is he going to go?"
Adam told me, "Well, he goes to Yakima."
So we saw the phone in Yakima, and I remember feeling excited because, okay, he's definitely picking up. Let's get everybody read and let's get a game plan for when he starts heading back towards Montana where we're going to get him pulled over and who's going to be involved and things like that.
Q. And what agencies did you communicate with?
A. FBI and DEA.
Q. Okay. And at some point, did you gather with their task force in a location?
A. Yes.
Q. Where was that?
A. That would have been on the -- at the Blackfeet Reservation Police Department. That's where we -- well, first, we started at the FBI office, and then we -- he drove us -- we all drove there.
Q. Okay. And so when you moved to Blackfeet Law Enforcement offices, who all was there? You were there with DCI?
A. There was a lot of people. There was me, myself, Agent Spraggins, who I was his supervisor and I was actually training

him at the time, he was there. Agent Murphy was there. There was another FBI agent there. And then there was quite a few tribal policemen was there as well as members from their drug task force in that area.

Q. And did you come up with a plan to interdict those drugs?

A. We did.

Q. And what was the plan?

A. The plan was -- they had informed me -- I'm not from that area, had never been up there before -- that there's basically one route where he would be coming back onto the reservation, and they were -- they wanted to stop him on the reservation. So they set up right on the edge of the reservation towards I think that's Glacier National Park. And as we're watching the phone pings come closer and closer --

Q. You waited?

A. We waited.

Q. All right.

A. Yep.

MS. PAISLEY: No further questions for this witness.

THE COURT: Cross-examine?

MR. GALLARDO: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. GALLARDO:

Q. Good afternoon, agent.

A. Good afternoon, sir.

Q. Few quick questions for you. You mentioned a man named Adam Fixel. Do you remember when he passed away, when you got word?
A. I think it was -- it would have been a week -- a week prior to when I was notified of this trial. So I think he would have passed away three weeks ago.
Q. Do you remember how he passed away?
A. There's no statement on his obituary online. It just shows photos of him. And the person who had texted me back on his phone didn't want to talk with me.
Q. So it sounds like you had spoken with Mr. Fixel directly. Was it in person or was it over the phone?
A. You mean our first encounter, sir?
Q. Yes.
A. It was in person.
Q. Okay. And how many meetings did you have with him?
A. In person?
Q. Yes.
A. Just -- just the one.
Q. Just the one.
Were there other meetings over the phone or did you call or text?
A. A few, yes.
Q. Okay. Do you happen to still have those texts around?
A. I might but they weren't -- Doug was not the only person

that Adam was giving us information on, so it's -- they were related -- it wasn't just Doug that we were speaking with Adam about.
Q. Okay. And when you spoke with Mr. -- Mr. -- is it Pixel or Pexel?
A. Fixel.
Q. Fixel. Okay. Fixel.
Did he have immunity at -- was immunity extended to him at all?
A. It's not really how it works with us. We don't make any guarantees or promises. He was providing us information in hopes for a consideration.
Q. Okay.
A. So it wasn't like immunity, but that is his motivation for giving us this information, because obviously he is -- himself, he is in trouble, and he doesn't -- he wants to give us information to help his own case.
Q. Okay. So he was -- he was sort of putting himself out on a limb by speaking? He was subjecting himself to some sort of criminal --
A. Oh, yes, sir. Yes.
Q. I'm just --
A. Yeah.
Q. So I'm going to circle back to price differences. It sounds like in -- I mean, roughly around the reservations here

reasonably between 40 and 50 a pill; is that -- is that fair to say?
A. Yes, sir.
Q. And what about Yakima, Washington, how much -- how much is a pill up there? I mean, how much would a pill cost?
A. Obviously, as with anything, depends what you're going to pay -- or how many you're going to buy at once. The more you buy, the cheaper the pill gets. But it was my understanding that a pill in Yakima was probably $6 a pill versus Spokane was cheaper.
Q. Okay. So short story, a person can save a lot of money by going to Washington and getting, you know, higher quantity of pills --
A. Yes, sir.
Q. -- than purchasing them locally here?
A. Yes, sir.
Q. Okay. All right. Well, I don't have any other questions for you, sir. Thank you.
THE COURT: Redirect?
MS. PAISLEY: No, Your Honor. Thank you.
THE COURT: Is the witness excused?
MS. PAISLEY: He is.
THE COURT: You may step down, sir. Thank you.
THE WITNESS: Thank you.
THE COURT: Mr. Starnes.

MR. STARNES: Thank you, Your Honor. The United States calls Eric Denney to the witness stand.

Right this way, sir. Step up there and she'll swear you in.

COURTROOM DEPUTY: Raise your right hand.

ERIC DENNEY,

called as a witness on behalf of the Plaintiff, having first been duly sworn, testified as follows:

COURTROOM DEPUTY: Thank you. Please have a seat.

THE COURT: Good afternoon, sir.

THE WITNESS: Good afternoon.

THE COURT: Please state your full name and spell your last name for the record.

THE WITNESS: Eric Dalton William Denney, D-e-n-n-e-y.

THE COURT: Would you scoot up for the microphone?

Go ahead Mr. Starnes.

MR. STARNES: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. STARNES:

Q. Good afternoon, sir.

A. Good afternoon.

Q. Will you please tell the ladies and gentlemen of the jury where you currently work.

A. I work in Fort Belknap on the Indian Reservation there.

Q. What do you do?

A. I'm a law enforcement officer for them.
Q. Tribal police officer?
A. Yes, sir.
Q. How long have you worked for Fort Belknap?
A. About a month and a half.
Q. Prior to working for Fort Belknap, had you ever worked in law enforcement?
A. Yes, I worked for Blackfeet Law Enforcement Services.
Q. When do you think you first started with them?
A. I started in 2019 of August.
Q. August of 2019?
A. Yes, sir.
Q. And when did you end your time at Blackfeet Law Enforcement?
A. August 2023.
Q. Okay. So four years?
A. About that, yeah.
Q. And why did you leave Blackfeet Law Enforcement?
A. I was terminated.
Q. Why is that?
A. For alcoholism and AWOL.
Q. And AWOL, is that like missing work when you're supposed to be there?
A. Yes, sir.
Q. At that time when you were dismissed from Blackfeet Law

Enforcement, were you having alcohol issues in your personal life?
A. Yeah.
Q. When do you think those started?
A. The beginning of 2023, early months of 2023.
Q. Okay. So February-March, maybe somewhere in there?
A. Yeah, around February-March, yeah.
Q. Okay. Prior to that, did you have any struggles with alcohol that you can recall?
A. No.
Q. Okay. I want to take you back to December of 2022. Were you working as a tribal police officer for the Blackfeet Law Enforcement Services in December of 2022?
A. Yes.
Q. And were you struggling with any alcohol issues at that point in time?
A. No.
Q. Okay. Were you involved in a traffic stop of an individual named Doug Malatare?
A. I was.
Q. And do you know when approximately that was?
A. The 18th of December.
Q. Okay. And where did that stop take place?
A. Just outside of East Glacier.
Q. Okay. And what road?

A. Highway US-2.
Q. US Highway 2.
And this was -- was it -- it was just outside of East Glacier. Was it before you get into East Glacier if I was coming from the western part of the state --
A. Yes --
Q. -- into --
A. -- just right before.
Q. Just before you got to East Glacier or after you got to East Glacier?
A. Before East Glacier.
Q. Before East Glacier, okay.
And do you know approximately what time the traffic stop took place?
A. 03:35.
Q. And why did -- were you the one that initiated the traffic stop?
A. Yes, sir.
Q. Why did you initiate the traffic stop?
A. Drug Investigator Harwood, he informed me earlier that night that he was working with DCI and the DEA, and Mr. Malatare was supposedly coming back with a large amount of fentanyl.
Q. Okay. So other -- the drug investigators working a drug investigation in which this guy named Malatare, Doug Malatare,

is a suspect?
A. Yes, sir.
Q. So they wanted you to find a reason to pull him over?
A. Yes, sir.
Q. And did you find a reason to pull Mr. Malatare over that evening?
A. I did. I pulled him over for speed. He was traveling 55 miles an hour in a 45 mile per -- mile per hour zone.
Q. Okay. And the weather that night, do you know what the weather was like?
A. It was cold, snowy. I believe the wind was blowing as well.
Q. Were you wearing body camera that night?
A. I was.
Q. And was it running at various points during the traffic stop?
A. Yes, it was.
Q. So when you have a traffic stop that starts -- we'll come back to the body cam in just a minute. When you have a traffic stop, what's the first thing you do once you get a vehicle pulled over? How does that typically go?
A. I give dispatch my location and vehicle license plate.
Q. Okay. And once you've done that, what happens next?
A. I make contact with the driver, ask for driver's license, proof of insurance.

Q. And that's standard operating procedure?
A. Yes, sir.
Q. And is that what you did in this case?
A. Yes, sir.
Q. And when you got to -- which side of the vehicle did you approach?
A. I made a driver's side approach.
Q. Driver's side?
A. Yes, sir.
Q. And did you make contact with the driver?
A. I did.
Q. And do you see the person that was driving that vehicle in the courtroom here today?
A. Yes.
Q. Okay. Will you please --
Hold on just a minute. There's a train coming by. Both the judge and the court reporter are going to throw things at me if I don't shut up for a minute. So...
THE COURT: At the same time, Mr. Starnes, we're getting less than circumstantial evidence here, I've not been outside, I don't know if it's raining, but I hear a noise up on the roof that's awfully loud.
MR. STARNES: You're welcome to draw that inference, Your Honor. The law makes no difference between those types of evidence.

May I proceed?

THE COURT: Please do.

BY MR. STARNES:

Q. Officer Denney, you told us you were able to identify -- or seeing the person driving the vehicle you pulled over that night in the courtroom?

A. Yes, sir.

Q. Will you please indicate where that individual is located by pointing to that individual and identifying an article of clothing that individual was wearing?

A. Over there. I can't see his clothing because --

Q. If you need to stand up, you can, sir.

A. He's wearing a blue shirt with white and black stripes across his chest.

Q. Will you say that into the microphone please?

A. He's wearing a blue shirt with white and black stripes across his chest.

MR. STARNES: The record will reflect the witness has identified the defendant as Mr. Malatare.

THE COURT: The record will reflect.

BY MR. STARNES:

Q. All right. So did you ask for Mr. Malatare's license and registration?

A. Yes.

Q. Did he provide those to you?

A. Yes.
Q. What did you learn by looking at those documents?
A. He was Doug Malatare. The driver was Doug Malatare.
Q. Is that the same individual your understanding the drug task force was looking for that night?
A. Yes, sir.
Q. And so what happens next in this encounter?
A. I asked Doug to step out of the vehicle.
Q. Why?
A. At that time I was getting -- DCI and DEA were going to do an interview, conduct an interview with him.
Q. Okay. And were there any other law enforcement officers on scene at this point?
A. There was. There was Canine Officer Skunkcap.
Q. Okay. And was the intent to have a dog sniff -- sniff the vehicle?
A. Yes, sir.
Q. Okay. So I'm going to stop you right there.
MR. STARNES: And I want to pull up Government Exhibit 7 if I could please, Kalah.
BY MR. STARNES:
Q. And we're going to go ahead and play this.
(Exhibit playing.)
Q. You see this item that he's handling there?
A. Yes, sir.

Q. What is that?
A. It's like a fanny pack I believe, a small bag.
Q. He's reaching into that particular bag to pull out the license and registration?
A. Yes, sir.
Q. Okay.
MR. STARNES: Can we resume please?
(Exhibit playing.)
BY MR. STARNES:
Q. Just so we're all clear, you were asking him if there was something in the vehicle at that point?
A. Yes, sir.
Q. What was that thing you were asking about?
A. Marijuana roach.
Q. A roach?
A. Yes, sir.
Q. And that's just a bit of a --
A. A cigarette or marijuana cigarette.
Q. Okay.
MR. STARNES: Kalah, resume please.
(Exhibit playing.)
BY MR. STARNES:
Q. What are we -- what are you doing at this point in time?
A. I'm just making sure Mr. Malatare doesn't have any weapons that could harm me or the assisting officers.

Q. Is that fairly standard operating procedure?
A. Yes, sir.
MR. STARNES: Please proceed.
(Exhibit playing.)
BY MR. STARNES:
Q. Okay. So Mr. Malatare is now out of the vehicle. What's going to take place next in the order of events?
A. I go back and give dispatch his information and check with the -- if he has a valid driver's license or any active warrants.
Q. And did he at that point?
A. He did possess a valid driver's license. He didn't have any warrants.
Q. Okay. And we heard mention that there was a canine that was on scene. Is there going to be a sniff search that takes place?
A. Yes, sir.
Q. Did that, in fact, happen?
A. Yes, sir.
Q. How long after this?
A. Just shortly after.
Q. Just shortly after?
A. It was during while I was actually running his information.
Q. Okay. So that took place while you're back in the car running the information to confirm if there's any warrants,

make sure the driver's license --
A. Yes, sir.
Q. All right. So now I would like to -- well, were you -- did you become aware of the results of the canine?
A. Yes, Officer Skunkcap advised that the dog alerted -- his canine alerted on the vehicle.
Q. You said it alerted on the vehicle?
A. Yes, sir.
Q. So when that happens, what's the next step in the investigative process like this?
A. Search the vehicle or apply for a search warrant.
Q. Okay.
MR. STARNES: Can we, please, have Government Exhibit 10? And if we could go ahead and play that one please.
(Exhibit playing.)
BY MR. STARNES:
Q. Okay. So there we see Mr. Malatare roadside. What did you just say to him?
A. I informed him that the dog alerted on his vehicle.
Q. Okay. So now you're going to then go to the next step of the process to try to search the vehicle?
A. Yes, sir.
MR. STARNES: Let's go ahead and play.
(Exhibit playing.)
BY MR. STARNES:

Q. What is that noise that we're hearing?
A. The clacking noise?
Q. Yeah.
A. I believe it's my keys slapping my body cam.
Q. And was it windy that night?
A. Yeah.
Q. Okay.
MR. STARNES: Go ahead and hit play.
(Exhibit playing.)
BY MR. STARNES:
Q. Do we hear somebody asking about a wallet?
A. Yeah, Mr. Malatare requested to grab his wallet out of the vehicle.
Q. And did you give him permission to do that?
A. I did.
MR. STARNES: Play please.
(Exhibit playing.)
MR. STARNES: Pause there.
BY MR. STARNES:
Q. All right. So we hear you say, after looking in this bag, to place your hands behind your back?
A. Yes, sir.
Q. Why did you tell Mr. Malatare to place his hands behind his back?
A. When I looked in the bag, there was several small blue

pills in the bag.
Q. And what did that indicate to you?
A. Due to my training and experience, I identified them as fentanyl.
Q. And were they loose in the bag or in a separate sort of container package within the --
A. Oh, I can't recall if they were separately or packaged.
Q. There was another item in the video where you open up the bag. It's sort of a round-looking deal that you kind of picked up, looked at, and put it back in. Do you know what that is?
A. Marijuana candy.
Q. And what -- what significance, if any, did that have to you?
A. It's possession of drug paraphernalia on the reservation.
Q. Okay. And at that time at least, and maybe still, I don't know, but at that time was it a crime to possess drug paraphernalia, even marijuana paraphernalia, on the Blackfeet Indian Reservation?
A. Yes, sir.
Q. Okay. So at this point Mr. Malatare is placed into custody on suspicion of this drug offense; is that right?
A. Yes, sir.
Q. What happens to him after that?
A. I walk him back to my patrol unit, read him his rights, and place him in the back seat.

Q. Okay. And is he then taken down to a jailhouse somewhere?
A. He was transported to dispatch I believe.
Q. Okay. What about his -- the vehicle, do you know what happened with that?
A. The vehicle was transported to dispatch as well.
Q. Okay. And what was the purpose of taking the vehicle to dispatch?
A. Drug Investigator Harwood was applying for a search warrant at that time.
Q. Okay. So the intent would then be to let's get the vehicle down to where we can search it and -- get a warrant and search it?
A. Yes, sir.
Q. Stand by for me for just one moment.
Okay. I don't have any further questions for you, Officer Denney, but the defense might. Just sit tight please.
THE COURT: Cross-examine please.

CROSS-EXAMINATION

BY MS. MUSICK:
Q. Good afternoon, Officer Denney. How are you?
A. Good. How are you doing, ma'am?
Q. I'm doing well. Thank you.
So, Officer Denney, there were three other occupants in the vehicle that night; correct?
A. Yes, ma'am.

Q. Okay. And the bag that you opened when you observed the pills inside, that was just a small quantity of pills; is that right?
A. Yes, ma'am.
Q. And is that consistent with just a user amount rather than a distribution amount?
A. Yes, ma'am.
Q. And it's pretty common for people to bring pills from Washington into Montana; isn't that true?
A. Yes, ma'am.
Q. And is that because the pills are so much cheaper in Washington than they are here in Montana?
A. Yes, ma'am.
Q. And is it fair to say that pills here in Montana are roughly 40 to $50 per pill?
A. Yes, ma'am.
Q. And over in Washington, they might be closer to, say, $5 a pill?
A. Yes, ma'am.
Q. Okay. And the more you buy, the cheaper they are?
A. Yep.
Q. Okay. Were you involved at all in the search warrant search of the vehicle?
A. I was at the building, yes.
Q. Okay. So are you aware that there was a large quantity of

marijuana located in the vehicle as well?
A. I -- I don't recall. I'm sorry, ma'am.
Q. That's okay. Nothing further.
THE COURT: Redirect.
MR. STARNES: No. Thank you, Your Honor.
THE COURT: Is this witness excused?
MR. STARNES: Yes, please.
THE COURT: You may step down, sir. Thank you.
Mr. Starnes.
MR. STARNES: Thank you, Your Honor. The United States calls Aron Skunkcap to the witness stand.
If you'll step right up here, she's going to swear you in. Just right up here.
COURTROOM DEPUTY: Have you raise your right hand.

ARON SKUNKCAP,

called as a witness on behalf of the Plaintiff, having first been duly sworn, testified as follows:
COURTROOM DEPUTY: Thank you. Please have a seat.
THE COURT: Good afternoon, sir.
THE WITNESS: Good afternoon.
THE COURT: Would you please state your full name and spell your last name for the record.
THE WITNESS: Full name is going to be Aron Skunkcap. My last name is S-k-u-n-k-c-a-p.
THE COURT: Thank you.

Go ahead, Mr. Starnes.

MR. STARNES: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. STARNES:

Q. Good afternoon, sir.

A. Good afternoon.

Q. Will you please tell the ladies and gentlemen of the jury currently where you work?

A. I'm currently a deputy sheriff for the Choteau County Sheriff's Office. I've been working there since June 17th and still to this date.

Q. And did you work in law enforcement prior to joining the Choteau County Sheriff's Office?

A. Yes, I worked in Browning. I was patrol corporal and also canine handler. I believe I was hired on in Browning around December 2020 until June 17th, where I switched to the Choteau County Sheriff's Office.

Q. And so were you working for Blackfeet Law Enforcement in December of 2022?

A. Yes.

Q. When did you become canine certified?

A. I became canine certified approximately a month before that. I believe it was in November when I went to Warren, Ohio and attended a 120-hour course Tri-State K9 University.

Q. Okay. So I just want to talk to you a little bit about

your experience in how you actually work a dog out in the field. So, first of all, are you still a canine handler now that you're with Choteau County?
A. I'm not.
Q. Okay. You had to give that up when you moved -- you made the transition from Blackfeet to Choteau?
A. Yes.
Q. Okay. What type of dog did you have when you were working as a canine handler?
A. I had a Belgian Malinois.
Q. And when did you first -- well, what was the dog's name?
A. Evie [phonetic].
Q. Evie.
When did you first meet Evie? Like when did she first get assigned to you?
A. When I arrived in Warren, Ohio, I don't recall the exact date. I arrived on a Sunday. Class started on a Monday. And it was Sunday night when I met Evie and bonded with her for a few hours that night before she was released to house with me for the time being.
Q. Okay. Is there a point in time in the training where the dog sort of becomes yours and you kind of go everywhere together?
A. Yep. That started when I met the dog Sunday night. Dog went back to the house that I was placed in to reside at the

time for the training.
Q. Okay. And you said that there was -- this was a 120-hour course. What does that course consist of generally?
A. Course consists of, well, Monday through Friday. It's narcotics training and tracking and article searches.
Q. And is the dog trained to detect certain odors?
A. Yes, my dog was trained in detecting five odors: cocaine, heroin, fentanyl, methamphetamine, MDMA.
Q. MDMA?
A. Yes.
Q. Okay. And how does a -- generally let's just describe the process of a search. So not necessarily this case but just in general, if you had your dog with you and you were going to search this courtroom, how -- what does that look like?
A. Well, first, I would get my child -- dog a chance to calm itself due to the dog. It's trained to work, so it has a hard work drive. So she's constantly moving. That process is called breaking. So I give her a moment to calm herself outside. I'll bring her in the room, and then I will present an object or tap on a countertop, and she'll conduct her search that way. And I'll follow alongside her all the way around the room. If she misses things, then I will redirect her back and point out that object and let her search it.
Q. So you have a signal you give the dog and it tells the dog it's time to sort of start working?

A. Yes.
Q. And as the dog is doing its search, it's working and sniffing, what is it that you're looking for as the handler?
A. I'm looking for a change of behavior, which basically is the dog increasing its free think in searching for an odor if it comes across an odor.
Q. And then if your dog detects one of the scents that it's trained to detect, how do you know that?
A. Be the change of behavior that she'll search harder, which is change of behavior, again, increase the breathing. She will go up and down to where the odor is coming from. And when she pinpoints the strongest portion of the odor, she'll sit.
Q. And so sitting is to tell you this is sort of where I smell one of these scents the strongest?
A. Yes.
Q. Now, prior to the search that we're going to talk about in this case, had you used Evie in the field before?
Apart from your 120 hours of training, was there an occasion for you to use her in the field to conduct the search?
A. No, I just got back from Ohio and I was having time off for being gone for a month prior to this incident.
Q. Okay. So the incident that we're getting ready to talk about, this would have been the first sort of real world application for you and Evie to run this?
A. Yes.

Q. And were you involved in the search of a car belonging to an individual named Doug Malatare in December of 2022?
A. Yes.
Q. And how were you first called to the scene?
A. I was notified by Sergeant Harwood, who is our lead drug investigator, the vehicle that's possibly carrying a large amount of narcotics, and basically wanted me ready to assist if need be.
Later on that night, Sergeant Denney made a traffic stop. I was advised of the vehicle. So I responded to Sergeant Denney's location. Sergeant Denney requested that I deploy my canine.
Once the driver's out of the vehicle, deployed my canine. I started with back of the vehicle, worked my way from the back of the vehicle around the passenger side to the driver's side. And I believe I was on my second cycle back around to the driver's side is when my dog had an odor change, circled back down and indicated on the back -- or the driver door.
Q. Okay. And were you wearing body camera that night?
A. Yes.
Q. Were you able to capture this particular search with your body camera?
A. Yes.
MR. STARNES: Can we please have Government Exhibit 8? As soon as that's ready, play that.

(Exhibit playing.)

BY MR. STARNES:

Q. We just heard you tell the officer that was there something, "Have them come away from the vehicle."

A. Yes.

Q. Why did you tell him that?

A. Mainly because dogs are unpredictable. Usually if someone's standing right up next to the vehicle, it can deter her from actually doing her job and focus more on him than the car.

Q. Okay. So removing distractions?

A. Yep.

Q. Okay. Perfect.

MR. STARNES: Resume please.

(Exhibit playing.)

BY MR. STARNES:

Q. And what did we see?

A. The dog sniffing by the driver side of the vehicle.

Q. And what does that tell you?

A. That she indicated.

Q. Okay. What do you do after this? Once the dog is done with its indication, what's the next step for you as the handler?

A. So after this, usually in my training, I can either praise her off or reward her. In this instance I believe I praised

her off and put her back in my patrol unit.
Q. And then did you communicate to anyone else that the dog had alerted on this car?
A. Yes, I believe I had notified Sergeant Harwood.
Q. Okay. So you're no longer working with dogs but you're now working for Choteau County Sheriff's Office. What shifts are you working these days?
A. Right now we work 12-hour shifts. It just varies. Sometimes I'm on nights; sometimes I do the day shift.
Q. And did you have to work last night at all?
A. No.
Q. Okay. The night before?
A. The night before, yes.
Q. Okay. Thank you, sir. No further questions.
THE COURT: Cross-examine?
MR. GALLARDO: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. GALLARDO:
Q. Good afternoon, officer.
A. Good afternoon.
Q. Did your -- did your testimony -- did that summarize the extent of your involvement in this -- in this stop? Was there anything else you did? Any searches or interviews?
A. The only thing I did after the stop, once I put my dog away, was I did transport an elderly female to the police

department. Shortly after that, I transported her to her residence. That's -- that was my only involvement in this case.
Q. Okay. And -- what elderly female are we talking about?
A. I didn't catch her name.
Q. Okay. Was she inside the vehicle?
A. She was.
Q. Was there anyone else inside the vehicle?
A. I believe there was another individual as well.
Q. Okay. In addition to Mr. Malatare?
A. Malatare was out of the vehicle when I got --
Q. Okay. Okay. So it was three people traveling in that vehicle that day from your understanding?
A. From my understanding.
Q. Okay. All right. Well, if that's the extent of it, I don't have any other questions. Thank you.
A. Uh-huh.
THE COURT: Redirect?
MR. STARNES: No, Your Honor.
THE COURT: The witness excused?
MR. STARNES: Yes.
THE COURT: You may step down, sir. Thank you.
THE WITNESS: Thank you.
MS. PAISLEY: Your Honor, the government calls Sheldon Meineke.

COURTROOM DEPUTY: Please raise your right hand.

SHELDON MEINEKE,

called as a witness on behalf of the Plaintiff, having first been duly sworn, testified as follows:

COURTROOM DEPUTY: Thank you. Please have a seat.

THE COURT: Good afternoon, sir. Would you please state your full name and spell your last name for the record.

THE WITNESS: Sheldon Meineke, M-e-i-n-e-k-e.

THE COURT: Thank you.

Go ahead, Ms. Paisley.

MS. PAISLEY: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. PAISLEY:

Q. Good afternoon, Mr. Meineke.
A. Hi.
Q. May I call you Sheldon?
A. Yes.
Q. Sheldon, are you a member of a federally recognized tribe?
A. Yeah, Blackfeet.
Q. Okay. Where did you grow up?
A. Browning.
Q. Did you live there for most of your life?
A. Yep.
Q. Okay. We see that you're in custody. What are you in custody for?

A. Right now?
Q. Yeah.
A. Marshal hold.
Q. It's a marshal hold --
A. Yeah.
Q. -- that's why you're here?
Did you have state charges previously?
A. I was in treatment.
Q. Okay. You were in treatment?
A. Yeah.
Q. And then we brought you here?
A. Yes.
Q. Okay. Where you going next?
A. Back to treatment.
Q. Okay.
A. Sober living.
Q. Sober living?
A. Yeah.
Q. So you're moving into the sober living?
A. Yes.
Q. Okay. Do you have -- are you a convicted felon? Do you have a felony?
A. Yes, 2003.
Q. 2003?
A. Yeah.

Q. Okay. So do you know who Doug Malatare is?
A. No, but I heard of him.
Q. You heard of him?
A. Yep.
Q. Did you have an opportunity to meet him at some point a couple years ago?
A. Yes, and I -- it was either in December 31st or January 1st of 2023.
Q. Okay. So it was either December of '22 or '23?
A. Yes, ma'am.
Q. Where did you meet Doug Malatare?
A. In black -- BLES, Blackfeet Law Enforcement, Browning.
Q. In the jail?
A. Yes.
Q. Okay. So you were in custody in the Browning jail and you met Doug Malatare there?
A. Yes.
Q. Did you share a cell with him? Did you guys -- were just --
A. Yeah, we were staying in the same room --
Q. You were in the same --
A. -- in the same cell --
Q. -- room.
A. -- across from one another.
Q. Okay. At some point while you guys were in custody in

Browning, did he tell you why he was in custody?
A. Yes, he did.
Q. What did he tell you?
A. He said he got caught with 800 -- 800 pills of fentanyl.
Q. He said -- did he say where he was bringing them from?
A. Washington.
Q. Okay. Did he tell you what he was doing with them?
A. The conversation was that he bought them for $2 a pill in Washington, and he was going to distribute them on the reservation for 50 to $60 a pill.
Q. Okay. Did he -- and he told you that's why he was in custody?
A. Yes, that's what he told me he was in custody for.
Q. Did he tell you anything about his being caught with the pills that was -- that sticks in your mind?
A. He told me that there was a dog on the reservation, and he was going to take him to court or something because that's the officer that found the pills in his car.
Q. Okay. So he mentioned that there was a dog at the stop?
A. Yes.
Q. And that's how he got caught?
A. Yeah, I don't remember the dog's name though there, but he had a name for it, so I don't know.
Q. Oh, he mentioned the name?
A. Yeah, he mentioned the name of the dog. I can't remember

what the name of the dog was though.
Q. Okay. But he told you he brought 800 pills back from Washington?
A. Yes. And he got stopped somewhere between Kalispell and Glacier.
Q. Coming back. Okay.
And that he was buying them in Washington for $2 and he was going to sell them on the reservation for 50?
A. Yes, 50 to 60.
Q. Fifty to 60?
A. Yes.
Q. Would you say he was -- what was his demeanor when he was telling you this? How was -- how was he acting?
A. I -- to me it seemed like he was bragging about it to me. I'm -- that's his story. It -- he came off to me, so.
Q. You took it as bragging?
A. Yeah.
Q. Okay.
A. And I just -- I don't deal with that kind of stuff, so I don't...
Q. Fentanyl wasn't --
A. I wasn't -- I wasn't too happy about it, yeah.
Q. You weren't happy about it?
A. Killing our people on our reservations.
Q. Do you have a family member that deals with fentanyl?

A. Yes, I do.
Q. Okay. All right. And do you see that Doug Malatare in the courtroom?
A. I -- I really couldn't recognize him if I did.
Q. Okay.
A. I just know he's older.
Q. It's been a couple years?
A. Yeah.
Q. But he told you his name --
A. Yes.
Q. -- when you were in custody?
A. Yep.
MS. PAISLEY: No further questions.
THE COURT: Cross-exam?

CROSS-EXAMINATION

BY MS. MUSICK:
Q. Hello, Mr. Meineke. How are you today?
A. I'm great.
Q. I'm sorry, what was that?
A. I'm great. I'm doing all right today.
Q. Good. So you were in jail at the time that you met; is that right?
A. Yes.
Q. And you slipped the jail staff a note letting them know that you wanted to snitch on some folks to try to get out of

jail; is that right?
A. No, not in Browning. I was in Glacier County when I talked to Matt Connelly [phonetic].
Q. Okay. Do you recall doing an interview with Special Agent Alex Prostko?
A. Yeah, that was in Glacier County, not -- not in -- back in tribal jail. It was in Glacier County. I got moved from Blackfeet jail to Glacier County jail --
Q. Okay.
A. -- the following week after New Year's.
Q. Okay. So I guess I'm wanting to ask you about your interview that you did with law enforcement when you -- when you told them about Doug Malatare. That was in the interview with Special Agent Alex --
A. Yes.
Q. -- Prostko --
A. Yes.
Q. -- from the FBI?
A. Yes.
Q. Okay. So you had been moved from point A to point B --
A. Yes --
Q. -- by the time --
A. -- yes --
Q. -- you had --
(Court reporter interruption.)

THE COURT: Wait for Mr. Meineke to answer.

Mr. Meineke, you wait for a second before counsel finishes her question.

Thank you. Go ahead.

MS. MUSICK: I apologize, madam court reporter.

BY MS. MUSICK:

Q. So, Mr. Meineke, during the course of your interview with Special Agent Prostko, you were originally telling him about a number of different individuals, not Doug Malatare; right?

A. Yes, I was.

Q. Okay. And it was actually Special Agent Prostko who asked you if you knew who Doug Malatare was. Do you recall that?

A. Yes, I do.

Q. Okay. And so Doug Malatare wasn't originally the person that you necessarily planned to snitch on; is that right?

A. No, I wasn't -- I -- his name was brought up, so I -- I just repeated what he told me up there in jail. So...

Q. Okay. And -- and the information that you repeated to Special Agent Prostko, that was just information that Doug told you when you two were in the jail together?

A. Yes.

Q. Okay. Did Doug tell you that he was a heavy fentanyl user?

A. No, he didn't say nothing about that using fentanyl at the time.

Q. Okay.

A. He said he was dealing it; that's all.
Q. And because you have family who have had issues with fentanyl --
You're not a fentanyl user --
A. No.
Q. -- correct?
A. Never used fentanyl in my life.
Q. Okay. So you've never purchased fentanyl from Doug Malatare?
A. Never.
Q. Okay. Thank you.
THE COURT: Redirect?
MS. PAISLEY: No, Your Honor. Thank you.
THE COURT: The witness excused?
MS. PAISLEY: He is.
THE COURT: You may step down, sir. Thank you.
Why don't we take our afternoon break now.
MS. PAISLEY: Yes, Your Honor.
THE COURT: Members of the jury, about 15 minutes please. No discussing the case yet.
(The jury left the courtroom, after which the following proceedings were had.)
THE COURT: Please be seated. How many witnesses do you have left?
MS. PAISLEY: We have three, Your Honor.

THE COURT: Three. Who are those?

MS. PAISLEY: Brendon Wild Gun, Jesse Harwood and Bill Murphy.

MR. STARNES: Your Honor, those are largely to talk about exhibits that have been admitted, so they'll probably be fairly short.

THE COURT: Okay. So we start at 3:15. What time we done? Four o'clock?

MS. PAISLEY: 4:15 possibly.

MR. STARNES: Depending how long Mr. Gallardo or Ms. Musick would like to go.

THE COURT: So, Ms. Musick, do you have witnesses available today if we need them?

MS. MUSICK: Your Honor, we had them come tomorrow morning. We were not anticipating being finished with the government's.

THE COURT: All right. We've had a long day today. You have how many witnesses approximately?

MS. MUSICK: Just two, and they will be very brief.

THE COURT: Depending -- probably finish up after the government's case today. You file -- discuss Rule 29 motion if needed. And then if necessary we'll talk about some jury instructions, and send the jury home in the meantime. Start tomorrow morning with, if necessary, Ms. Musick's case, and then the close and arguments in the morning.

MS. MUSICK: Yes, Your Honor. Thank you.

THE COURT: Okay. All right. We'll take up jury instructions -- I feel like only a couple at issue. We'll take those up later today. Thank you.

(Recess at 3:00 p.m. to 3:17 p.m.)

(Proceedings had outside presence of the jury.)

THE COURT: Ready to go, Ms. Paisley?

MS. PAISLEY: Yes, Your Honor.

THE COURT: Ms. Musick?

MS. MUSICK: Yes, Your Honor.

THE COURT: All right. Please bring in the jury, madam clerk.

(The jury entered the courtroom, after which the following proceedings were had.)

THE COURT: Welcome back, members of the jury. We're ready to continue with the government's case.

Ms. Paisley.

MS. PAISLEY: Thank you, Your Honor. The government calls Brendon Wild Gun.

COURTROOM DEPUTY: Please raise your right hand.

BRENDON WILD GUN,

called as a witness on behalf of the Plaintiff, having first been duly sworn, testified as follows:

COURTROOM DEPUTY: Thank you. Have a seat.

THE COURT: Good afternoon, sir. Will you please

state your full name and spell your last name for the record.

THE WITNESS: Brendon Wild Gun. First is B-r-e-n-d-o-n. Last is Wild Gun, W-i-l-d space G-u-n.

THE COURT: Thank you.

Go ahead, Ms. Paisley.

MS. PAISLEY: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. PAISLEY:

Q. Officer Wild Gun, what do you do for a living?

A. I'm a police officer on the Blackfeet Reservation.

Q. Okay. And how long have you been an officer with Blackfeet Law Enforcement?

A. I just -- a little over two years.

Q. Over two years?

A. Yeah.

Q. Okay. And what is your role? Are you patrol, investigations, something else?

A. I'm a patrol officer.

Q. Patrol officer?

A. Yes.

Q. Okay. What was your training to become an officer -- a patrol officer with Blackfeet Law Enforcement?

A. A 12-week course at Montana Basic Academy in Helena.

Q. Okay. So you got your basic law enforcement there. It was 12 weeks?

A. Yes.
Q. During the course of that, what do they teach you?
A. Various things and such as like DUI training, drug recognition. We took the -- for the drug, we took a 40-hour training with DCI.
Q. Okay. And so -- and you've been patrol with Blackfeet Law Enforcement. Is there another name for Blackfeet Law Enforcement, like an acronym that you use?
A. BLES.
Q. BLES. Okay.
So you've been with BLES, or Blackfeet Law Enforcement, for two years. Do you generally work days, nights? Does it change?
A. Changes. Whatever they schedule. Whatever the scheduling is.
Q. Whenever the schedule is?
A. Yeah.
Q. Sort of whenever things are needed?
A. Uh-huh.
Q. Are you -- are you familiar with a case involving Doug Malatare?
A. Yes, ma'am.
Q. What was your involvement -- or how did you become involved in that case?
A. That night they did their thing, and I was sitting in the

officer's room doing reports when Investigator Harwood approached me, asked if I would participate in a search. I said, "Yes." They did all their -- everything, their photos, stuff like that. That's when the search started.

Q. Okay. So you were asked to participate in a search?

A. Yes, ma'am.

Q. What were you searching? What was the item you were searching?

A. It was a vehicle.

Q. A vehicle.

And what were you searching for?

A. Apparently narcotics.

Q. Narcotics. Okay.

I want to show you what's been admitted as Government's Exhibit 21. All right. Do you recognize this?

A. Yes.

Q. Okay. Was this the vehicle that you were searching?

A. Yes, ma'am.

Q. Where is this picture taken?

A. In the BLES garage.

Q. Okay. And so you participated in this search?

A. Yes, ma'am.

Q. Did you find anything relevant to this investigation?

A. You mean in the vehicle?

Q. Yes.

A. Yes, ma'am.
Q. What did you find?
A. A large amount of pills.
Q. Okay. And where were those pills located?
A. They were -- well, I started on the back driver's side.
Q. Okay.
A. And they were located in the -- there's an armrest on the back seat, and those were in -- the armrest was up. When I pulled the arm rest down is when it -- I noticed.
Q. So they were folded into the car?
A. Yes, they were concealed.
Q. Okay. So they were concealed between the armrest.
Is it sort of like an armrest that comes down from between the two back seats?
A. Yes, it sits right in the center of the back seat.
Q. Okay. And you found them secreted behind that?
A. Yes.
Q. I want to show you what's been admitted as Government's Exhibit 11. Do you recognize this?
A. Yes, ma'am.
Q. And can you tell the jury what is depicted in this picture?
A. These are identified to me as what they -- well, in training was what I was told they were on the street is they're identified as -- they call them Skittles, but they're original like a fentanyl.

Q. Oh, okay. So is that because they're multicolored?
A. Yes.
Q. Oh, so this -- there's a street name for these -- this type of fentanyl?
A. Yes, ma'am.
Q. They're called Skittles, okay.
So is this where you found it? Is this an accurate depiction of where you found the drugs?
A. Yes, ma'am.
Q. All right. And what did you do with those drugs?
A. Stopped and approached Investigator Harwood. He put the marker there and took a picture.
Q. Okay. All right. And I want to show you what's been admitted as Government's Exhibit 12. And do you recognize this?
A. Yes, ma'am.
Q. And what is depicted in this one as well?
A. The same pills from the center console in the back.
Q. Who was sort of orchestrating the search? Who was sort of in charge of the search?
A. I was just aware of Investigator Harwood, and he had, I believe, DEA, DCI there.
Q. Okay. So but it was -- do you know if it was a Blackfeet Law Enforcement search warrant?
A. Yeah, I believe so.

Q. Okay. So --
A. I can look at the search warrant, but I believe it was.
Q. But it was Investigator Harwood who seemed to be directing that?
A. Yes.
Q. Are you familiar with -- with Doug Malatare?
A. Yeah, I know of him.
Q. Do you know what he looks like?
A. Yes.
Q. Do you see him in the courtroom?
A. (Indicating.) Sitting over there.
Q. Can you identify him by color or item of clothing?
A. Do you mind if I stand up?
Q. You can stand up.
A. Blue ribbon shirt.

MS. PAISLEY: Okay. Your Honor, I'd ask the record reflect the witness identified the defendant.

THE COURT: The record will reflect.

MS. PAISLEY: I have no further questions for Officer Wild Gun.

THE COURT: Cross-examine.

CROSS-EXAMINATION

BY MS. MUSICK:

Q. Good afternoon, sir.
A. Hello, ma'am.

Q. So just to recap, the pills that you recovered from the vehicle during the search warrant search were in the back seat; is that right?
A. Yes.
Q. And Mr. Malatare was the driver of the vehicle; correct?
A. I'm aware, yes, he was.
Q. And were you aware that there were also three other occupants of the vehicle?
A. Yes, but I don't remember their names.
Q. Sure. But so if there were four people seated in a sedan-style vehicle, that means two would have been in the back seat; correct?
A. Uh-huh.
Q. And so there actually would have been two people that were sitting closer to where the pills were located in the vehicle?
A. Yes, ma'am.
Q. Okay. And when you conducted the search warrant search on the vehicle, isn't it true that there was also a large quantity of marijuana that was located in the vehicle?
A. I don't remember. I only just went to that portion, and then that's all I've done in the search warrant.
Q. Okay. Nothing further.
A. Thank you, ma'am.
MS. PAISLEY: No redirect, Your Honor.
THE COURT: Witness excused?

MS. PAISLEY: He is, Your Honor.

THE COURT: You may step down, sir. Thank you.

THE WITNESS: Thank you.

THE COURT: Go ahead.

MR. STARNES: Thank you, Your Honor. United States calls Jesse Harwood to the witness stand.

COURTROOM DEPUTY: Please raise your right hand.

JESSE HARWOOD,

called as a witness on behalf of the Plaintiff, having first been duly sworn, testified as follows:

COURTROOM DEPUTY: Please have a seat.

THE COURT: Good afternoon, sir.

THE WITNESS: Good afternoon, Your Honor.

THE COURT: Please state your full name and spell your last name please.

THE WITNESS: Jesse Harwood. Sorry. H-a-r-w-o-o-d.

THE COURT: Thank you, sir.

Go ahead, Mr. Starnes.

MR. STARNES: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. STARNES:

Q. Good afternoon, sir. Will you please tell the members of the jury where you work.

A. Blackfeet Law Enforcement Services.

Q. What is your role there?

A. Currently I am the captain of patrol as well as drug investigator.
Q. What do your duties entail?
A. I maintain day-to-day patrol, make sure they're working order, make sure my patrol staff is -- the schedules are covered, as well as work drug offenses on the Blackfeet Reservation and surrounding.
Q. When did you first start working drug offenses for Blackfeet Law Enforcement?
A. I made the full-time switch to drug investigator in 2021, around there.
Q. And did you have some involvement with drug cases prior to that?
A. Yes. My entire career I've had a passion for working drugs. I was trying to make myself available for trying to work as much drug cases as I could.
Q. Okay. And in December of 2022, did you become aware of the investigation into Doug Malatare?
A. I did.
Q. And how did you first learn about that?
A. Agent Prostko. I'm also a TFO, task force officer, with the FBI. I'm part of the Safe Trails Drug Task Force. Agent Prostko was kind of the TFO coordinator, so he kind of advised me of that. And I've been working -- I worked closely with the DEA, Special Agent Murphy.

Q. Okay. So let's just talk a little bit about this, because we've sort of heard about this throughout the trial but I don't know if we've explained it. What is a drug task force?
A. A drug task force is just members of different agencies that are assigned to one area. So myself, I work with a deputy from Glacier County, the FBI, DEA, DCI, his. Just all kinds of different municipalities that are combined to help combat drugs.
Q. Does it involve -- it involves both federal, state and local entities; is that right?
A. Yes.
Q. Lots of acronyms on the drug task force up in your neck of the woods?
A. Oh, yes, they love acronyms.
Q. So you were working as part of the drug task force up there in December of 2022?
A. Yes, sir.
Q. And were you present at the scene when the traffic stop took place on Doug Malatare?
A. Yes, sir.
Q. And then did you have oversight over the search of Mr. Malatare's vehicle?
A. Yes, sir.
Q. So let's talk about that. Where did the search of the car take place?

A. It took place at our dispatch center, which is located in Browning inside the garage there out of the elements.
Q. Okay. And how long after the traffic stop did the search take place?
A. Two -- hour and a half to two hours.
Q. Oh, it was the same day?
A. It was the same day. We stopped the traffic -- vehicle. My officers made their arrests and their detainments, and then we transported the vehicle where it was secured in the garage, and I worked with Agent Prostko on the search warrant.
Q. And we've heard that name, Agent Prostko. Who is he?
A. Alex Prostko, he works with the FBI. He was -- used to be stationed at the Shelby residence office there. He was tasked with working drugs from the FBI. He moved to Quarter Lane to work still with the FBI, just in a different office now.
Q. Just different assignment?
A. Yeah.
Q. He's moved on?
A. Yeah.
Q. Okay. So he was present. You were also present for the search of his vehicle?
A. Yes, sir.
Q. And we've previously heard testimony from Brendon Wild Gun -- Officer Wild Gun. Was he present for the search as well?

A. Yes, sir.
Q. All right. So I want to talk to you about that search and some items that were found. What was your role during the search?
A. Photographs.
Q. Okay. So we have a number of photographs that have already been admitted into evidence, so I just want to show you a few of these.
MR. STARNES: Can we please start with Government Exhibit 13?
BY MR. STARNES:
Q. Do you recognize this, sir?
A. Yes, I do.
Q. What do we see here?
A. This is a duffel bag that was pulled from the back seat of the vehicle.
Q. Okay. And what is this No. 3 placard? What is it showing?
A. My apologies, that's a digital scale.
Q. Okay. And why would that be relevant to you as a drug investigator?
A. Commonly they are found with drug dealers. They weigh out the amounts, the weights of drugs that they're going to sell.
Q. Okay. So if they have a large quantity and they're going to break it into smaller quantities --
A. They will weigh into smaller quantities.

Q. -- they will use a scale?
A. Yes, sir.
Q. Tear that out.
Let's go to Exhibit 14 please. Just a little bit of a delay, so bear with us here.
All right. What do we see here?
A. It's going to be the same duffel bag, and it looks like it's a roll of ones, American currency.
Q. The duffel bag, where was that pulled from?
A. I believe it was the back seat of the vehicle.
Q. Okay.
MR. STARNES: Can we please go to Exhibit 15?
BY MR. STARNES:
Q. What do we see here?
A. It's the same duffel bag, different pocket, and a different roll of money.
Q. Is it common to see money rolled up like that?
A. I commonly don't keep my money like that. I keep it in my wallet. I've seen it when they have large amounts like that.
Q. Okay.
MR. STARNES: Can we please go to Government's Exhibit 16?
BY MR. STARNES:
Q. What do we see here?
A. It is the name of individuals that I've known from around

Browning, locals.
Q. And where was this pulled from?
A. It was pulled from the vehicle.
Q. Do you know where?
A. I cannot recall.
Q. You can't recall, but it was inside the car somewhere?
A. Yes, sir.
Q. Why did you choose to photograph this piece of paper?
A. Just to know the names in case I ever came across them again as potential users or distributors or co-conspirators of types like that.
Q. How many drug cases do you think you've been involved in since you started primarily doing drug investigations for Blackfeet?
A. Oh, gosh, maybe close to 30.
Q. Okay. And have you, prior to this search, encountered a list of names like this before in a drug investigation?
A. Yes.
Q. But you say it's common, uncommon? What do you think?
A. Common. I normally see it when they are -- they usually write down names. It's so they can remember, you know, who owes them. A lot of times drug dealers are known to front people narcotics. So they'll write their name down and how much they fronted them and how much they owe, so they'll keep a record of how much somebody owes them.

Q. Let's explain that scenario. What is fronting?
A. Fronting is giving somebody -- say I have fentanyl to give, but you don't have the money. But I know you and I trust you, so I'm going to give you 15 pills. So you owe me that money whether you -- you can go use it or, you know, go sell it, whatever you do, but you owe me that money. So I give you that money pro bono -- the drugs pro bono.
Q. You give them up front?
A. Yes.
Q. Expectation is payment will be made on the back end?
A. Yes.
Q. Okay.

MR. STARNES: Can we please have Government Exhibit 17?

BY MR. STARNES:
Q. All right. What do we see here, sir?
A. Here we see the pills, combination of the pills that were pulled from the vehicle, which is -- I believe Officer Wild Gun called them Skittles. They're known on the street as Skittles because they're multicolored, as well as three bags of pills that were pulled from Mr. Malatare's bag that he attempted to take out of the vehicle during the traffic stop. The money on the left were also out of the wallet from Mr. Malatare, and then the roll of cash.
Q. And that's from that black duffel bag --

A. Yes.
Q. -- that you talked about?
MR. STARNES: Can we please have Government Exhibit 18?
BY MR. STARNES:
Q. And what do we see here?
A. That is close up of one of the larger bags of fentanyl.
Q. And this is a part of the quantity that you testified came out of the bag that Mr. Malatare was holding?
A. Yes, the Pendleton bag that he tried to take at the traffic stop.
MR. STARNES: And if we can please have Government Exhibit 19.
BY MR. STARNES:
Q. What do we see here?
A. Just a close-up of the money that was taken.
Q. And the last one is Government Exhibit 20 please, and what do we see here?
A. Just an overfill -- overview of the fentanyl that was seized.
Q. Okay. So we -- I believe you testified that after the traffic stop the vehicle was transported to a location where it could be searched. What happened with Mr. Malatare? Where did he go?
A. Him and the occupants were brought to BLES as well where

they were attempted to be interviewed by Sergeant Denney and Bill -- Agent Murphy.
Q. Okay. The other occupants of the car, did any of them speak with -- with law enforcement?
A. I cannot say they did. I wasn't in the office. I was doing the search warrant.
Q. And do you know if Mr. -- no, I'll leave it at that.
Were you able to do any research on Mr. Malatare's car, the car that was being driven that night?
A. As far as?
Q. As far as who it was registered to?
A. Yes.
Q. Were you able to determine who that vehicle was registered to?
A. Mr. Malatare.
Q. Finally, do you know Doug Malatare? Would you recognize him if you saw him?
A. Yes, sir.
Q. Do you see him here in the courtroom today?
A. I do, sir.
Q. Will you please indicate where he is located by pointing to him and describing an article of clothing that he's wearing?
A. Yes, sir. He's seated over there, blue shirt with a ribbon across his chest.
MR. STARNES: And the record will reflect Officer

Harwood has identified the defendant as Doug Malatare.

THE COURT: Record will reflect.

MR. STARNES: I have no further questions for you, but defense might.

THE COURT: Cross-examine.

CROSS-EXAMINATION

BY MS. MUSICK:

Q. I apologize, are you Captain Harwood or Sergeant Harwood?

A. At the time I was sergeant. I got promoted to captain.

Q. Now you're captain?

A. Yes, ma'am.

Q. Captain, you hadn't intercepted any other shipments of drugs from Washington to Montana by Mr. Malatare prior to December 17th; correct?

A. No.

Q. And so since you hadn't intercepted them previously, you had never recovered any other drugs from Mr. Malatare prior to that date; right?

A. Correct.

Q. Okay. And so no one would have ever tested any drugs that came from Mr. Malatare prior to that date; is that right?

A. Yes.

Q. And there were also three other occupants in the vehicle that night; is that true?

A. Yes.

Q. Okay. And Mr. Malatare was the driver of the vehicle?
A. Yes.
Q. Okay. And so the other three occupants would have been in the front passenger seat and then two in the back seat?
A. I believe so.
Q. Okay. Do you know where the location of the pills that are referred to as Skittles, do you know where those were located in the vehicle?
A. Yes, the Skittles were located in the back seat as -- in a armrest that folds down in between the two.
Q. Okay. So in between the two rear passengers?
A. Yes, ma'am.
Q. Okay. And the duffel bag that we just saw photos of in the government's exhibits, you testified that that was also located in the back seat?
A. I believe so.
Q. Okay. And that bag contained the -- the scale that we saw a photo of as well --
A. Yes.
Q. -- correct?
Okay. Isn't it true that pills are usually sold by a number quantity rather than a weight?
A. Uh-huh, yes.
Q. Okay. But on the flip side of things, marijuana is actually usually sold in a weight, like, it could be a half of

an ounce or a full ounce or any number of --
A. Yes.
Q. -- quantities?
A. Yeah.
Q. Okay. So that would probably be something that a scale would be used for rather than pills?
A. Potentially, yes.
Q. Okay. I'd like to direct you to Defense Exhibit No. 500, which has been previously admitted and --
Oh, it was there for a second and then it went away. There we go.
Can you see the exhibit, sir?
A. Yes, ma'am.
Q. Is this the marijuana that you recovered from Mr. Malatare's car during the search warrant search of the vehicle?
A. Yes, ma'am.
Q. Okay. And marijuana is not federally legal in Montana -- or sorry. It's not federally legal in the whole country; right?
A. Yeah.
Q. Okay. And so that means that it's still illegal to possess it within the boundaries of an Indian Reservation?
A. Yes.
Q. Okay. I'd also like to direct you next to Defense

Exhibit 501. And do you recognize this document, sir?
A. Yes, I do.
Q. Okay. What is this document?
A. It is a report I typed after the search warrant.
Q. Okay. And could you, please, read -- under No. 3, could you, please, read what that -- what that says?
A. One small jar containing marijuana seized to be destroyed.
Q. Okay. And then again under No. 8, what does that state?
A. One larger jar containing marijuana seized to be destroyed.
Q. And so if the marijuana was destroyed, then that means it was never tested; right?
A. It -- I believe it's still in our evidence, yeah.
Q. Okay. But it has not been tested at this point?
A. No.
Q. Okay. Thank you. Nothing further.
THE COURT: Redirect?
MR. STARNES: Briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. STARNES:
Q. Officer Harwood, is it common to test marijuana when it's found in a drug investigation?
A. No.
Q. Why not?
A. I mean, marijuana is marijuana. I mean, it's pretty -- pretty well-known I guess. I've been a cop since 2012 and come

into a lot of contact with it.
Q. Lots of contact with marijuana, but it's rarely tested?
A. Yeah.
Q. How often are people -- well, have you ever been a part of a federal investigation involving marijuana?
A. Never.
Q. If you were to encounter marijuana and that's all you found, what's the normal operating procedure that you might engage in?
A. It would depend on the amount. If it's a larger amount, myself -- I can't speak for my officers. Myself, depending on the amount, if it's a larger amount, I would charge them tribally for possession of marijuana.
Q. Okay. And there's a whole tribal process where somebody could be charged in tribal court with that sort of violation but --
A. Yes.
Q. -- have you ever submitted a case for federal prosecution involving marijuana?
A. No.
Q. Okay. Do you know if my office would even accept such a case?
A. No, I -- I've had discussions when I had 10 pounds, but nothing -- not even close, so...
Q. Okay. So thank you. I have no further questions.

THE COURT: Is the witness excused?

MS. PAISLEY: Yes, he is, Your Honor.

THE COURT: You may step down, sir. Thank you.

Mr. Starnes.

MR. STARNES: Thank you, Your Honor. United States called Special Agent William Murphy to the witness stand.

COURTROOM DEPUTY: Raise your right hand.

WILLIAM T. MURPHY,

called as a witness on behalf of the Plaintiff, having first been duly sworn, testified as follows:

THE COURT: Good afternoon, sir.

THE WITNESS: Good afternoon, Your Honor.

THE COURT: Will you please state your full name and spell your last name for the record.

THE WITNESS: William Thomas Murphy, M-u-r-p-h-y.

THE COURT: Go ahead. You can slide that back just a little. Thank you.

THE WITNESS: Yes, sir.

MR. STARNES: No problem projecting.

DIRECT EXAMINATION

BY MR. STARNES:

Q. All right. Good afternoon, sir. Will you please tell the ladies -- I think we've introduced you, but if you'll just explain to them what you do for a living?

A. I'm a special agent with the Drug Enforcement

Administration currently assigned to Missoula, Montana posted duty office.
Q. And how long have you worked for the DEA, sir?
A. Since July of 1996.
Q. And are you a special agent?
A. I am.
Q. Where did you go to receive training to become a special agent?
A. It's the FBI/DEA academy grounds in Quantico, Virginia, located on the Marine Corps base.
Q. How long is that course?
A. Seventeen weeks.
Q. When is the last time you were at the academy at Quantico?
A. I was there this past May, June, July and August and arrived back here a week ago. I was out training potential new agents that might graduate and get to the field.
Q. Okay. So I want to take you back to December of 2022. What were your duties with the DEA at that point in time?
A. Working a case. I had been contacted by DCI SA -- or Agent Pavlicek. Before that was aware of a potential car coming back. I worked with the FBI and the BLES closely up there at Glacier County, part of their drug task force, even though I'm removed in Missoula.
Q. Okay. An we heard testimony from everybody pretty much involved in the stop that night; is that fair to say?

A. Yes, sir.
Q. I'm not going to reset all of that with you. I'm just going to ask you a couple of follow-up questions. What happens with drug evidence once evidence is seized in a particular case? So what's the normal course of action?
There's a -- some sort of drug stop, drug investigation, drugs are seized by a law enforcement entity, what tends to happen with those? What's the process?
A. It's a two-person process, chain of custody. Once they're seized, they're placed into an evidence bag. It is sealed, and then at some point it will be shipped to the DEA lab out in Pleasanton.
Q. Is that in California?
A. Yes, sir.
Q. And is it common for drugs to be sent in the mail to the lab so they can be tested?
A. Yes, it is.
Q. And what happens -- how do you find out the results?
A. So they get submitted to the lab. You send the form with it to say that these particular drugs need to be tested, and then a return form will come from the lab that will tell you -- give you the exhibit number. It will tell you the number of units. It will break it down. As far as pills go, it will be, like, a number of pills, and then it will, up on top, quantitatively tell you what it is, and it will also give it to

you in grams.
Q. Okay. And we heard the court read some instructions before we got into testimony this morning about a stipulation of how evidence moved from it being collected, to the lab, to the lab testing it. Do you recall that?
A. Yes.
Q. And is that consistent with what you've been -- through your training and knowledge know to be the way that drugs are tested?
A. Yes, sir.
Q. Okay. I want to show you a couple of exhibits that have been already admitted in this case. Let's start with Exhibit No. 22, Government Exhibit 22.
MR. STARNES: And, Kalah, if you kind of zoom in on the top half of this please. Go down. Go down. A little bit more. A little bit more. Yeah, right about there.
BY MR. STARNES:
Q. All right. Are you able to see that, Special Agent Murphy?
A. Yes, sir.
Q. What are we looking at here?
A. You're looking at a return form. It's giving me that exhibit number on the far upper left-hand corner 1B1. The substances, let's just call that fentanyl. The net weight would be 52.574 grams plus or minus 3/100ths.
Go down to details, it's the same thing again except that

they'll give you the number as units. So in this case this would be the Skittles, the multicolored tablets, I believe. It would be 476. They arrived to the lab in a plastic bag. The form obviously tablet. The reserve weight, so that's the reserve weight after removing it from a bag. That would be 51.929.

And then the analysis below, they'll do a sampling instead of testing every tablet. In this case they say nine units tested of the 476, and 95 percent positive that it was fentanyl, that at least 70 percent of the other units left would have also been positive for fentanyl.

Q. Okay. And this is the multicolored Skittles that were --

A. The multicolored bag, yes.

Q. Okay.

MR. STARNES: And if we could please go to Exhibit 23, I'm going to have you zoom in that sort of same area please.

BY MR. STARNES:

Q. And do you recognize this one?

A. Yes, sir.

Q. And what is this for?

A. This would be the bag of blue and white fentanyl tablets. Everything will be the same here: exhibit number, fentanyl, net weight at the top. The exhibit details gives you number of units, 173 total. It arrived in a plastic bag. Reserve weight 17.6, that's going to be the unit's gross weight.

So what I missed on the first one, I apologize, that's my mistake, in exhibit -- in exhibit details where it says gross weight on the top, that would be the sealed evidence bag, the bag that contained the pills and the pills all in one. So that's the gross weight.

They separate this stuff out. The package inner plastic bag I mentioned before, that's the bag that had the pills. Then you go over a tablet, and then the reserve weight would be just your pills.

Q. So just the pills themselves: no bags, no packaging, no evidence tape, none of that?

A. Correct.

Q. Okay. And in this case the blue and white pills, that was the weight of those -- tested weight of those pills?

A. 17.6 grams.

Q. Okay. And the last one I'd like to show you is Exhibit 24 please.

MS. PAISLEY: Did you say this?

MR. STARNES: Twenty-four. In that same area just the top part there.

BY MR. STARNES:

Q. All right. And what do we see here, sir?

A. I see fentanyl, but it just comes back as residue, which means it's not a pill. It could be residue left on whatever was sent in as Exhibit 1.

Q. Okay. And in this case the residue was from what?
I'm testing your memory of the instruction this morning.
A. Yes, you are.
Q. So do you recall that the BIA collected an item of evidence that was submitted to the lab in relation to --
A. Yeah, this was -- my apologies. This was taken off the dresser of the residence of Shawn Wippert.
Q. Okay. So this would be the residue left over from the testing --
A. Yeah.
Q. -- of that substance?
And what was that substance identified by the DEA as?
A. Fentanyl.
Q. I have no further questions for you, sir. Thank you very much.
A. Yes, sir.
THE COURT: Cross-examine?

CROSS-EXAMINATION

BY MR. GALLARDO:
Q. Agent, how are you doing this afternoon?
A. Fine. Thank you.
Q. All right. You don't -- didn't want to take a stab at pronouncing the scientific term for fentanyl?
A. I know my limits, sir.
Q. All right. We don't have any questions for you. Thanks.

A. Thank you.

THE COURT: Redirect?

MR. STARNES: No, Your Honor. Thank you.

THE COURT: This witness excused?

MR. STARNES: Yes, please.

THE COURT: You may step down, sir. Thank you.

MR. STARNES: May we have one moment to confer?

THE COURT: Yes, sir.

MR. STARNES: Thank you.

MS. PAISLEY: The United States rests, Your Honor.

THE COURT: All right. Thank you.

Members of the jury, we have some legal matters to address now, and I don't want to waste your time waiting in the jury room for us if it might take 20 minutes or so. It's late in the day, so we're going to break for the day.

And tomorrow morning the defense has a chance to put on their case. I'm expecting a couple of witnesses. And after that we'll do the closing arguments and -- final instructions first and then closing arguments and you'll start deliberating.

Why don't you be here again 8:30 tomorrow, and I think we'll have you deliberating by about ten o'clock I would think. So please have a nice evening. Don't discuss the case with anybody. Don't let anyone talk to you about it, and don't do any research on the Internet. Have a nice evening. Thank you very much. And bring -- bring your notes please to the jury

room.

(The jury left the courtroom, after which the following proceedings were had.)

THE COURT: Please be seated. So, counsel, I have to say that you have shattered my record for most witnesses in one day: fifteen. Thank you for the concise direct examination and cross-examination.

Though, Ms. Musick, do you have any motions?

MS. MUSICK: Yes, Your Honor. I would move, under Rule 29, for a motion for -- a motion for --

THE COURT: Would you sit down please?

MS. MUSICK: -- directed verdict.

THE COURT: Sit down; the court reporter needs the microphone.

Go ahead.

MS. MUSICK: Your Honor, the evidence that's been presented by the government today does not establish beyond a reasonable doubt that Mr. Malatare is guilty of either counts set forth in the indictment.

I'll start with Count 1 just since that is the first one charged and was the first one presented today. There was no evidence that was presented by the government today that Doug Malatare was making trips to Washington to obtain drugs prior to the death of SW, or Mr. Wippert, and all of the government's experts agree that there was no way to do a

comparison test between the fentanyl in his blood and urine and the fentanyl residue that was found on the dresser in Mr. Wippert's home.

And so there's no evidence establishing that -- that that fentanyl that was found on his dresser was even fentanyl that caused his death or contributed to his death for that matter. We don't even know if that's the same fentanyl that was in his system, just that that substance did, in fact, test positive for fentanyl.

THE COURT: Ms. Musick, you heard the testimony about it's almost impossible to do a fingerprinting of a particular drug and trying to find it if it's an autopsy -- after an autopsy that way.

MS. MUSICK: Yes, Your Honor.

THE COURT: How would the government ever prove one of these charges?

MS. MUSICK: Well, yes, Your Honor, their burden is beyond a reasonable doubt, and I think we've cast reasonable doubt on the source of the fentanyl in Shawn Wippert's home that day. No one ever saw Doug Malatare give anything to Mr. Wippert.

Mr. Wippert's mother testified that she didn't even see Mr. Malatare there. She just saw a car that she knew to be associated with Mr. Malatare.

Ms. -- younger Miss Wippert, Jade Wippert, testified

that she didn't recognize the individual that was driving the vehicle, just that he was a larger man with -- older with long hair and a ponytail, and so we don't necessarily know whether or not that was Doug Malatare driving the vehicle.

Ms. -- Ms. Jade Wippert also testified that she believed there was another occupant in the vehicle. We don't know who that individual was. That individual could have been someone who could have delivered fentanyl to Mr. Wippert.

And I think also it's important to note that Jaynell Davis testified today that a quarter of a pill wouldn't even get you high; it would just take the edge off.

THE COURT: That was her and she was -- she was an addict at that point.

MS. MUSICK: And I would argue that Mr. Wippert was an addict as well. His mother testified today that she had seen him acting the same way that she had at dinner that night on several occasions prior to -- to the day of his death. She testified that he would act like he was falling asleep, and she would say, "You look like you're a horse standing there asleep."

So I think we've established this is not the first time that Mr. Wippert used fentanyl. I don't think we know how many times he used fentanyl, but at least he had some practice or pattern of using it. So presumably he's aware of what -- what effects certain quantities would have on him.

All of the experts also testified that the 8.9 nanograms per milliliter that was found in his femoral blood during the -- that was examined by the toxicologist and drawn during the autopsy process, that that could have been any number of pills of fentanyl. And so I think that the evidence easily shows that it's likely that Mr. Wippert ingested more than just a half a pill leading to his death. Where that fentanyl came from, we don't know because the government has not presented any evidence to eliminate that fact for us.

But at the end of the day, I don't think that the government has made the connections that are necessary to establish that Mr. Malatare is responsible for the death of Mr. Wippert.

Moving on to Count 2, possession with intent to distribute, we don't have a single witness that testified in court here today that said Doug Malatare sold me fentanyl.

We heard from Ms. Davis who testified that she was a fentanyl user. She never testified that Doug Malatare sold her fentanyl.

We heard from Sheldon Meineke who was sharing a cell with Mr. Malatare who testified that -- that Doug was bragging to him, but Mr. Meineke was also a jailhouse snitch who was trying to -- to get out of jail by assisting the government, and so I think that calls into question the veracity of his statements. He also testified under oath that he never

purchased fentanyl from Mr. Malatare, and so we don't have evidence that Mr. Malatare was distributing fentanyl to other persons.

We have evidence that he was trafficking large quantities of fentanyl but not necessarily delivery. And one of the key elements of the offense of possession with intent to distribute is delivery of that substance to another individual.

And so for those reasons, Your Honor, we don't believe that the government has met their burden and we don't believe that this case should go to the jury. And so for those reasons, we would move for a directed verdict.

THE COURT: Ms. Paisley.

MS. PAISLEY: Thank you, Your Honor. I would -- likewise, will go based on the counts.

Of course, that first count, the distribution of fentanyl, the evidence that we have for that is, of course, circumstantial, and circumstantial evidence is treated just like direct.

The circumstantial evidence supporting the fact that the defendant distributed fentanyl to Shawn Wippert is the fact that he arranged a drug deal in texts to distribute it, and he was -- Shawn asked for half of a pill. And we know that based on the lingo that was provided in those text messages:

"You looking?" saying I have some drugs to supply.

"Yeah, I'll be at home." And, you know, "I can only

afford a half a pill." Half a pill is $25.

We heard from Darlene Wippert that Shawn didn't have a lot of money. She had to give him money in order to buy the breadsticks that he wanted from Pizza Hut. He's saying he can't afford much, but he wants half a pill, and Doug Malatare agrees to bring it to the house.

We then see -- Darlene Wippert sees a vehicle that she knows to be associated with Doug Malatare. Shawn tells her that he was visiting Doug Malatare. And Jade Wippert sees a tall man but older with long hair. That is a pretty darn good description of the defendant, even if she doesn't know who he is, and a Native man at that.

So the distribution from Malatare, and we know that Malatare was dealing and trafficking in drugs in November because of those text messages from -- from the informant, Adam Fixel. Those date back to November, and you can see those in Exhibit 27. So that's the distribution of the fentanyl. He knew what it was. He's making money off of this. He's dealing at the boat level.

And, of course, we have the witnesses from -- the forensic toxicologists as well as the pathologist that fentanyl is what killed him. And if he had any other source of fentanyl, he would not be buying a half a pill. If he had -- if he had a stash of pills somewhere else, he would not be purchasing a half a pill.

So we know that -- where those drugs came from because it was that evening that he arranged for Doug Malatare to come and bring them -- bring him some. So that is -- those meet the elements of Count 1.

For Count 2, the possession with the intent to distribute, we, of course, have the ongoing trafficking between him and Adam Fixel where he's bringing significant boats of -- or significant loads of fentanyl to the Browning reservation, and at one point having Adam Fixel bring those -- those pills to him in Browning.

You have the fact that on this particular day he's making the same trip that he's made numerous times to Washington. Law enforcement sees him going and they find however many -- I don't do math -- over 600 pills. A lot of the pills, a lot of them were found in the back seat secreted behind the armrest. It's very possible that people in the back seat don't even know that they're there. They might not even know that armrest comes down.

The blue and white pills were found in the same little bag, little Pendleton fanny pack that Malatare driver's license was. You see it on the video. As he reaches for his wallet, he has him hand him that bag, and that bag has the blue and white fentanyl pills.

And we know he was possessing it with the intent to distribute because he told Sheldon Meineke that. And as much

as Ms. Musick wants to call him a jailhouse snitch, she did not get any testimony from him that he was seeking advantage by talking about this stuff or that he got any advantage from this. So he's testifying to what he knows, and it seems like he has an interest because he doesn't like fentanyl.

And, of course, the third element is met because of the lab results. We know that more than 40 grams of fentanyl was involved.

And so for those reasons, the government has proved these elements and they should go to the jury.

THE COURT: So, Ms. Paisley, how do you explain you've Mr. Whipple -- Wippert bought half a pill? There's half a pill on the dresser.

MS. PAISLEY: So it's not a whole half pill left. So a pill of fentanyl, there's some that's crushed up, right. So it gets crushed up and perhaps he only snorted enough to take the pain off from the oral surgery. Maybe he was saving the rest. But what we do know about fentanyl -- it didn't necessarily come out -- is that any small amount can kill a person. And so --

THE COURT: And so you think he snorted less than half a pill and that -- and that less than half a pill is what killed him?

MS. PAISLEY: I do. If you look at that picture, the residue that's left is not significant, and that's why it's

called residue by the -- by the lab.

THE COURT: Okay. All right. And whose name was the car registered? Mr. Malatare?

MS. PAISLEY: It's Doug Malatare's car.

THE COURT: All right.

MS. PAISLEY: And that came through Jesse Harwood?

THE COURT: Ms. Musick, we have testimony that -- again, this is the light most favorable to the prosecution at this stage, right. We have testimony that -- from the victim's mother that he had been acting strangely recently. She thought he might be on something, and then she -- they come back from a trip to Cut Bank, the tire store.

She made him dinner, but someone called him outside. She recognized -- I think she testified she recognized the car, not the person driving, as Mr. Malatare's car. And an hour later -- or short period of time later he's falling asleep at the table mumbling to her and died shortly thereafter.

Isn't that, based on circumstantial evidence, a *prima facie* case for the government?

MS. MUSICK: Your Honor, there was actually conflicting testimony about the timeline. Ms. Jade Wippert testified that she was at the home after they had eaten dinner and testified that her father seemed to be fine. And then she would have seen him in the car, that appeared to be Doug Malatare's car, after dinner.

THE COURT: All right. And you say there's conflicting testimony, but that's, again, for the jury to sort out that conflict. But if the jury decides that the victim's mother was more credible or more reliable teller of events, then that might -- that would establish the whereabouts of Mr. Malatare in the timing of this incident.

MS. MUSICK: That's true, Your Honor.

THE COURT: Okay. All right. So, again, I'm looking at this in the light most favorable to the government at this stage.

So on the Count 2, the distribution, well, let's go back to Count 1 for a second. The cause of death clearly was -- was fentanyl. You're not disputing that?

MS. MUSICK: That's correct, Your Honor.

THE COURT: And Mr. -- the victim had some health issues, but they don't appear to have been the contributing factor to his death --

MS. MUSICK: Correct.

THE COURT: -- at this stage? Okay.

On Count 2, Mr. Malatare's driving the car registered in his name; correct?

MS. MUSICK: Yes.

THE COURT: And the drugs are found in his car?

MS. MUSICK: Yes.

THE COURT: There was no testimony that the drugs

belonged to anyone else in the car?

MS. MUSICK: No, Your Honor.

THE COURT: All right. And the evidence was, through the officer's testimony, they've gotten a tip on Mr. Malatare from -- what was his name?

MS. PAISLEY: Adam Fixel, Your Honor.

THE COURT: -- Adam Fixel, yes, right, and they were tracking him.

So all that -- all that testimony on its face would imply that Mr. Malatare, given the quantity of pills involved, it seemed much more than a user quantity in this case, unless Mr. Malatare was a huge user, that he was -- consistent with the informant's information, he was coming back from Washington with a load of fentanyl to be distributed.

And whether Mr. Meineke's a reliable witness, that's for the jury to sort out. He had -- Mr. Malatare seemed to be proud of the fact he purchased the pills for a couple bucks a piece in Washington state and were going to sell them for 50 bucks a piece on the reservation.

MS. MUSICK: I think Mr. Malatare would have also been proud of the fact he got a good deal by going.

THE COURT: Yeah, I mean, so you're suggesting it was user amounts. I don't have any testimony this was user amounts. The testimony -- the only testimony I've heard is from the agents investigating saying that they were

investigating Mr. Malatare's alleged trafficking.

So, again, I see your point. If you want to present that evidence that might raise doubts for the jury, but at this stage I have to look at a light most favorable to the government on Rule 29.

So I'm inclined to grant it, but I'll wait and hear the rest of the testimony and defer ruling until the end of the trial, but I think that pretty clear the government's met its burden at this stage.

MS. MUSICK: Yes, Your Honor.

THE COURT: Okay. My practice, Ms. Paisley, I defer until the end of trial.

MS. PAISLEY: I was just confused because you said you're inclined to grant the motion.

MS. MUSICK: He misspoke.

THE COURT: I'm inclined to agree with you you established a *prima facie* case.

MS. PAISLEY: It's their motion. I'm sorry. I'm totally used to you waiting, Your Honor.

THE COURT: Fifteen witnesses, Ms. Paisley.

MS. PAISLEY: I apologize for the confusion.

THE COURT: All right. So I think the government -- I'll defer ruling on it. I feel like the government has made a *prima facie* case on both counts.

All right. Let's talk for a moment about jury

instructions and verdict form. So it's my understanding the disputes that we do have involve around -- what was Instruction 11?

MS. MUSICK: Twelve, Your Honor.

THE COURT: Is 11 all right? This is the statutory language.

MS. MUSICK: We have no objection to 11.

THE COURT: Ms. Paisley?

MS. PAISLEY: No objection.

THE COURT: All right. And 12, this is the elements for Count 1.

MS. MUSICK: Yes, Your Honor.

THE COURT: What's your objection, Ms. Musick?

MS. MUSICK: So, Your Honor, there have been several recent changes in the Ninth Circuit pattern instructions for this particular instruction. There was one update that was in the March 2024 pattern instruction updates, and then there was another one more recently in June of 2024. And in each of them the paragraph that states "the government is not required to prove the amount of quantity of fentanyl, it need only prove beyond a reasonable doubt that there was a measurable or detectable amount of fentanyl," in both of the most recent pattern instruction updates, that particular paragraph is in brackets signifying that it is not necessarily required to be given as part of this pattern instruction; it's an optional

paragraph.

We believe that when you're reading the portion of the instruction that states special instruction and it says, If you find that the defendant is guilty of distributing fentanyl, then you must determine whether John Doe's death was a result of the use of the fentanyl distributed by the defendant. To find that the use of a drug resulted in death, you must unanimously and beyond a reasonable doubt find that "but for" the use of the fentanyl that the defendant distributed to John Doe -- or distributed, John Doe would not have died.

We believe that that -- that those two paragraphs are contradictory, and I believe that the first paragraph that I read aloud actually lowers the government's burden of proof in this case because it specifically says they're not required to prove the amount or the quantity of fentanyl, only that it was a measurable or detectable amount of fentanyl.

And the way that I read that, that means that they wouldn't be required to prove -- well, I guess the issue that I have with it, that it's possible that the jury could just make inferences that through all of the testimony that they heard today and that they will hear tomorrow that Shawn Wippert had additional fentanyl in his possession that he also could have ingested.

So hypothetically he could have had 10 fentanyl pills at home already. Hypothetically Doug Malatare brings him an

additional half of a pill of fentanyl. But the way that this instruction is drafted that the jury could then find Mr. Malatare guilty just if they believe that the -- the government's version of events that Doug Malatare provided him with half of a pill.

So, first, we believe it lowers the government's burden because there could be other fentanyl that could have been the cause of the death, and then we also believe that it's contradictory with the special instruction paragraph.

So since it is an optional paragraph in the pattern instructions, we believe that it would be clearer if we just removed that paragraph that states the government's not required to prove the amount or quantity of fentanyl, and that would solve the problem.

THE COURT: Ms. Paisley.

MS. PAISLEY: Thank you, Your Honor.

Your Honor, it's in parenthesis because this is the pattern instruction for all kinds of distribution, not just distribution resulting in death.

And in some cases it does matter that the government has to prove a certain amount; for example, in our pleading in Count 2 we're alleging 40 grams. So that paragraph is saying that, like, the distribution, it doesn't matter the amount, and it doesn't matter for this one either.

The concern that Ms. Musick raises about that he could

have -- they could be confused is alleviated by the last sentence of the special instruction because it says beyond a reasonable doubt that but for the use of the fentanyl that Mr. Malatare distributed to the victim, the victim would not have died.

THE COURT: I think we should insert, after the word distributed in special instruction, distributed to, t-o. Do you agree with that, Ms. Musick?

MS. MUSICK: I do agree with that, yes.

THE COURT: So that's the standard there; right?

MS. PAISLEY: Yes.

THE COURT: So what's the purpose of this second -- last "the government not required to prove the amount of fentanyl?"

MS. PAISLEY: Well, as the court noted, this is less than half of the pill.

THE COURT: Yes.

MS. PAISLEY: Because fentanyl can kill with less than half a pill or you could be a user that uses 30 pills a day, we don't have to prove the amount because any amount of fentanyl can be lethal, and that's -- that's where this comes from. We don't have to prove that he took at least five pills and that's what caused the death.

THE COURT: Well, so, I mean, to be repetitive here, wouldn't we say the government is not required to prove the

amount or quantity of fentanyl that defendant distributed to John Doe? Isn't that what we're talking about?

MS. PAISLEY: Yes.

THE COURT: It need only prove beyond a reasonable doubt that the defendant distributed a measurable or detectable amount of fentanyl to John Doe.

MS. PAISLEY: Yes, that's essentially what it says, Your Honor.

THE COURT: Yeah, I know but, I mean, I said to be -- to be repetitive and to be very clear, make sure we're talking about the same thing.

MS. PAISLEY: Yes.

MS. MUSICK: Your Honor, I just disagree, and I think that this paragraph is meant to be inserted in cases where the government is not alleging a mandatory minimum and they're not required to prove any sort of, like, quantifiable amount. I think that it's -- it's just stating that in cases where they're not alleging a quantity that they don't have to prove a quantity, and that's where I think that it's misleading to the jury.

THE COURT: All right. I'll take --

MS. PAISLEY: We're not --

THE COURT: No, I'll take another look at this and --

MS. PAISLEY: We're not alleging a quantity.

THE COURT: I'm going to -- I'm going to add the

language above, the "to," and I'll look at this paragraph and give you my proposed final in the morning. Okay.

Let's move on then. The next -- what's your next objection? Either side. I've got Instruction 18 depending whether Mr. Malatare chooses to testify. Let's pick 18A and B depending what happens tomorrow.

Anything?

MS. PAISLEY: I think 19 is not appropriate.

THE COURT: Do we have anyone on 19, Ms. Musick, you think is a drug abuser?

MS. MUSICK: Mr. Gallardo was going to handle this.

THE COURT: Okay. Mr. Gallardo, remain seated, please, so the court reporter can hear your voice.

MR. GALLARDO: Well, Sheldon Meineke comes to mind and Jaynell Davis.

THE COURT: Right. Ms. Davis testified she was a former addict. Is this supposed to be given when -- for a person at the time they testified or an addict at any time in their life?

MR. GALLARDO: Well, I think it's -- I don't think it's necessarily fixed in time, but at the time all of the events that she perceived were happening, she was a drug user, and I think because of that this instruction applies.

THE COURT: I mean, she just provided testimony about what's the language used by drug dealers in striking deals

online.

MR. GALLARDO: Correct.

THE COURT: It was like she was -- she's telling us, now that she's straight and sober, what was done when she was -- she was buying drugs.

I thought the purpose of this instruction was if we have a person who is -- has an addiction problem testifying in court to recognize, you know, you got to be careful, a person with that kind of addiction has highs and lows and anywhere in between, and we better be careful -- listen to what they say carefully -- extra carefully because they tend to be unsteady that way.

MR. GALLARDO: So as we're reflecting on the testimony, we originally submitted this because we were anticipating some additional witnesses who would be drug users, including Ms. Davis. She didn't go down a line of testimony that I think we were anticipating. So I hear -- you know, I hear the judge -- the court's concern there. And looking back on Sheldon Meineke's testimony, yeah, I don't -- I don't know.

THE COURT: He testified, like, he didn't like fentanyl because it killed people on the reservation, but he admitted to use of some other drugs in his life.

MR. GALLARDO: Right.

MS. PAISLEY: I don't believe he did, Your Honor. I think he just said he doesn't like fentanyl. He's never used

fentanyl. He's had a family been affected by that.

THE COURT: All right. So it wasn't a part of the testimony. I'm not sure this is appropriate given the testimony. I was expecting to hear more from drug users, but we didn't get that. So I'm not sure 19's appropriate.

MR. GALLARDO: We understand that, Your Honor.

THE COURT: All right. Anything else, Ms. Paisley, on the instructions?

MS. PAISLEY: No, Your Honor.

THE COURT: Ms. Musick?

MS. MUSICK: No, Your Honor.

THE COURT: All right. So 19 will be removed. Renumber the rest. Do you have something, Mr. Starnes?

MS. PAISLEY: Not specific to the jury instructions.

THE COURT: Sorry, let me finish. I'll remove 19. Renumber those afterwards. Eighteen we'll wait until tomorrow until Mr. Malatare makes a final decision on testifying. I'll take another look at 12 and make -- I'll give a final version -- my proposed final in the morning talk about it then.

MS. PAISLEY: If defense has any cases I can look at to say that's not given, I would really appreciate it.

THE COURT: Any of those cases given to the court as well.

MS. MUSICK: Your Honor, I was researching it over lunch trying to find some of the cases that would be

applicable. I haven't found any. I'm certainly happy to do more research tonight.

THE COURT: Give me any findings tonight.

Anything else related to jury instructions?

MS. PAISLEY: About jury instructions, was there one on judicial notice about controlled substances? I know that we put that in a -- we put it in the trial brief. I guess it's in the stipulation.

But would the court be willing to take a judicial notice about the time difference between UTC and Montana -- or Mountain Standard Time?

MS. MUSICK: I think we would object to that.

THE COURT: I think there's --

MS. MUSICK: There was no testimony establishing --

THE COURT: -- no testimony.

MS. PAISLEY: No, I know there's not. I mean, it's something we can identify and find out. I mean, it's not -- it's something that's readily known.

THE COURT: Right, but it involves -- well, you can go ahead and make your motion; I'll hear it.

MS. PAISLEY: Well, I would just ask that the court take judicial notice that UTC is seven hours advanced --

THE COURT: And what is UTC? No one --

MS. PAISLEY: Universal Time standard or Universal Time --

THE COURT: Well, I don't know.

MS. PAISLEY: -- clock, yeah, and it's -- and it's known to be seven hours in advance of Mountain Standard Time.

THE COURT: Known to whom?

MS. PAISLEY: Known to anybody that knows UTC.

THE COURT: I don't know, so I --

MS. PAISLEY: It's known to the world.

THE COURT: I've never seen this before.

MS. PAISLEY: Everybody but Kate, Your Honor.

THE COURT: Okay. I'll consider that for the morning as well.

MS. PAISLEY: All right. Thank you.

THE COURT: I'm sorry, I forgot to discuss the verdict form. Any problems with the verdict form? It's pretty straightforward.

MS. PAISLEY: It is different now that there is a special instruction. I drafted that back in January, so I don't know if the court wants to do it the way that the instructions have changed since -- since --

THE COURT: Which -- which portion?

MS. PAISLEY: -- since the June -- well, it's just the new --

THE COURT: Oh, that -- yes.

MS. PAISLEY: -- jury instruction has it as these elements and then a special instruction. So, like, I don't

know if the court wants to say that we find that he has distributed or -- I mean, I'm comfortable with this verdict form, I'm just noting that it looks slightly different.

THE COURT: Yeah, do you have any issues on the verdict form? I'll make sure -- I want to make sure it conforms to the new instructions issued by the Ninth Circuit. I'll give you a final version in the morning as well, yep.

MS. MUSICK: Thank you.

THE COURT: Okay. Let's see. Any other issues we need to address before we break tonight?

MR. GALLARDO: I thought Mr. Starnes had something.

MR. STARNES: No.

THE COURT: Ms. Musick, anything else you had?

MS. MUSICK: Nothing further from us, Your Honor.

THE COURT: Okay. And we have a couple witnesses in the morning.

MS. MUSICK: Two.

THE COURT: Who are they?

MS. MUSICK: I'm blanking out right now. Pat Schildt and Tracie Rutherford.

THE COURT: And have you discussed with Mr. Malatare his right to testify?

MS. MUSICK: We have. And in our discussions previously, he has indicated that he does not wish to testify.

THE COURT: Okay. Wait. Let's make a final decision

tomorrow morning.

Mr. Malatare, you understand, sir, you have a right to testify? You understand that?

THE DEFENDANT: Yeah.

THE COURT: Okay. And you also understand your right not to testify, you cannot be compelled to testify against yourself? Do you understand?

THE DEFENDANT: Yes.

THE COURT: All right. So please discuss this again with your counsel, and I'll ask you about it in the morning if you made a decision.

Okay. All right. So we start at 8:30. What time are question going to finish witnesses?

MS. MUSICK: They will both be very brief, Your Honor.

THE COURT: So by 9:00?

MS. MUSICK: Yes.

THE COURT: All right. And then I think we -- final instructions and closings. It goes to the jury about 10:00, something like that. I'll give you whatever time you think you need on closing. Your openings were nice and to the point. You know, anything up to 30 minutes would be fine at this point. Try not to go beyond that. Is that enough time?

MS. PAISLEY: You're lucky, Your Honor, I'm not closing. Mr. Starnes is.

MS. MUSICK: Mr. Starnes and Mr. Gallardo are going to

be handling closings.

THE COURT: Is that enough, Mr. Gallardo?

MR. GALLARDO: That ought to suffice, Your Honor.

THE COURT: All right. Something in that range. We got -- we got 15 witnesses, we only got one day of testimony.

Let me make sure I don't have anything else. Okay. We'll see you in the morning, and I'll have final proposed instructions from the court and a resolution of that proposal. Thank you.

(Proceedings adjourned at 4:26 p.m., to recommence September 19, 2024.)

CERTIFICATE

I certify that the foregoing is a true and correct transcript from the stenographically reported proceedings in the above-entitled matter.

DATE: October 1, 2024

/s/Kimberly R. Greiner
KIMBERLY R. GREINER, RMR, CRR, CRC, RDR
United States Court Reporter