UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

UNITED STATES OF AMERICA, )
)
Plaintiff, )
) Volume 3
vs. )
) Criminal Docket
DOUGLAS D. MALATARE, ) No. CR-23-80-GF-BMM
)
Defendant. )
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Transcript of Trial with a Jury

Missouri River Federal Courthouse
125 Central Avenue West
Great Falls, MT 59404
Tuesday, September 19, 2024
8:35 a.m. to 2:36 p.m.

BEFORE THE HONORABLE BRIAN MORRIS

UNITED STATES CHIEF DISTRICT COURT JUDGE

Kimberly R. Greiner, RMR, CRR, CRC, RDR
(Reporter remotely through Zoom.)
United States Court Reporter
Bob Dole Federal Courthouse
500 State Avenue
Kansas City, KS 66101
kim_greiner@ksd.uscourts.gov
(913) 735-2314

Proceedings recorded by machine shorthand, transcript
Produced by computer-aided transcription.

APPEARANCES:

PRESENT ON BEHALF OF THE PLAINTIFF,
UNITED STATES OF AMERICA:

Kalah A. Paisley
Jeffrey K. Starnes
OFFICE OF UNITED STATES ATTORNEY
119 1st Ave North.
Suite 300
Great Falls, MT 59401

PRESENT ON BEHALF OF THE DEFENDANT:

Elizabeth T. Musick
MUSICK LAW FIRM, PLLC
P.O. Box 726
Bozeman, MT 59771

Paul Gallardo
FLAHERTY GALLARDO law office
1026 1st Avenue S.
Great Falls, MT 59405

ALSO PRESENT:

Cherie Hives, legal assistant
Kyle Sinclair, BIA
William Murphy, DEA

# I N D E X

Page

Jury Instruction Conference 315

Defendant's Witnesses:

TRACIE RUTHERFORD
Direct Examination By Ms. Musick 305
Cross-Examination By Mr. Starnes 308

PATRICK W. SCHILDT
Direct Examination By Ms. Musick 311
Cross-Examination By Ms. Paisley 313
Redirect Examination By Ms. Musick 314

Jury Instructions Read by the Court 332

Closing Statement by Mr. Starnes 353

Closing Argument by Mr. Gallardo 366

Rebuttal Closing Argument by Mr. Starnes 378

Jury Note 384

Verdict 387

(Court called to order 8:35 a.m.)

(Proceedings had outside presence of the jury.)

THE COURT: Good morning, counsel.

MR. STARNES: Good morning, Your Honor.

MS. PAISLEY: Good morning, Your Honor.

THE COURT: We'll take up jury instructions after defense case, so let's not go down that path yet. I distributed a new Instruction 12 I believe it is. Yeah, we'll talk about that after -- after the evidence closed.

With regard to your request for judicial notice, as a Second Circuit case where it's *United States versus Michael*, 664 Federal Appendix 32, where, in response to a jury question, that the court instructed the jury as to what UTC time was and how it was calculated. So I think what I'll do here, I'm not going to give the instruction now. If they ask about it, I will explain what it means, this is how it's calculated, just as Second Circuit approved in the *Michael* case.

MS. PAISLEY: Thank you, Your Honor.

THE COURT: Any questions about that, Your Honor, Ms. Musick?

MS. MUSICK: I was just wondering if you can't repeat the case citation.

THE COURT: Yeah, it's -- I'll give it to you right here. It's 664 Fed Appendix 32 (2016). Here's a copy.

Okay. Are you ready to go, Ms. Paisley?

MS. PAISLEY: We are, Your Honor.
THE COURT: Do you have your witnesses, Ms. Musick?
MS. MUSICK: We do, Your Honor.
THE COURT: You have two morning.
MS. MUSICK: We do.
THE COURT: And have you discussed with Mr. Malatare here his right to testify?
MS. MUSICK: We have. We met yesterday evening after we concluded trial, and he does not wish to testify.
THE COURT: All right. And you understand your -- Mr. Malatare, that's your decision, sir?
THE DEFENDANT: Yes.
THE COURT: And you have discussed it with your counsel?
THE DEFENDANT: Yes.
THE COURT: Okay. Thank you.
All right. We'll finish up the two witnesses, take up any motions, jury instructions. You anticipate any rebuttal?
MS. PAISLEY: Depends on the defense case, Your Honor.
THE COURT: Always does.
All right. So who's your first witness?
MS. MUSICK: Tracie Rutherford.
THE COURT: Are you going to have two and three?
MS. MUSICK: Two.
THE COURT: Rutherford and Schildt, Pat Schildt, not

Jade. I've got them.

MS. MUSICK: I submitted them at the beginning so I don't forget.

THE COURT: Don't worry, Mr. Gallardo. She's on top of it. All right. You ready to go?

MS. PAISLEY: We're ready, Your Honor.

THE COURT: Ms. Musick, ready?

MS. MUSICK: Yes, Your Honor.

THE COURT: Please bring in the jury, madam clerk.

(The jury entered the courtroom, after which the following proceedings were had.)

THE COURT: Please be seated.

Good morning, members of the jury. I hope you had a nice evening. We're ready to finish our testimony this morning. The defense has several witnesses they want to call, and then I anticipate we'll get to our final jury instructions and closing arguments probably about 9:30, ten o'clock this morning. You'll deliberate after that.

So now please call upon Ms. Musick for your first witness for Mr. Malatare.

MS. MUSICK: The defense calls Tracie Rutherford.

COURTROOM DEPUTY: Please raise your right hand.

TRACIE RUTHERFORD,

called as a witness on behalf of the Defendant, having first been duly sworn, testified as follows:

COURTROOM DEPUTY: Thank you. Please have a seat.

THE COURT: Good morning, ma'am.

THE WITNESS: Good morning.

THE COURT: Will you pull that microphone toward you please. Could you please state your full name and spell your last name.

THE WITNESS: Tracie G. Rutherford.

THE COURT: How do you spell your last name please?

THE WITNESS: R-u-t-h-e-r-f-o-r-d.

THE COURT: Thank you.

Go ahead, Ms. Musick.

MS. MUSICK: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. MUSICK:

Q. Good morning, Ms. Rutherford. How are you today?

A. Good.

Q. Good. How do you know Shawn Wippert?

A. He was my cousin.

Q. And did he come by your home earlier in the evening before he passed away?

A. Yeah. He came by, yes.

Q. Were you home when he came by?

A. No, I was not.

Q. And so how do you know that he was there?

A. I was in Cut Bank getting groceries, and he sent me a text

message that he had stopped by.
Q. Okay. Do you recall about what time he sent you that text message?
A. No. Had to be later afternoon, maybe early evening.
Q. Okay. Why was he stopping by your house?
A. Well, he -- we have a football pool, and he was stopping by to drop money off for him and his mother for the games.
Q. Okay. And that's just a family thing that you guys --
A. Yes.
Q. -- do?
A. Yes.
Q. Where do you live in comparison to his mother Darlene's home?
A. It's across town. I live on the south side, and she lives on the north side.
Q. Okay. Do you know Mr. Wippert's daughter, Jade Wippert -- Wippert?
A. I know who she is, yeah.
Q. Do you happen to know where her mother lives off Old Low Rent?
A. No.
Q. You don't. Oh, okay.
So -- so Shawn would have had to drive across town to get to your home then?
A. Yes.

Q. And then he would have had to drop -- drive back to get back to his mother Darlene's home?
A. Yes.
Q. How much money did he drop off at your house that day?
A. It had to be -- I think it was, like, $10 because they were $5 squares.
Q. I'm sorry, what was the --
A. It was $10.
Q. And then what is --
A. The squares were $5 each.
Q. Oh, okay. I see.
So he dropped off five for himself and five for his mother?
A. Yes.
Q. Okay. That makes sense.
Had other people in the family dropped off money prior to him being there?
A. Not prior, but they had previously --
Q. Okay.
A. -- in the same spot.
Q. How often would you guys collect money for this sports betting pool?
A. It would be every week.
Q. Every week?
A. Yeah.
Q. And would they --

A. Or sometimes he'd pay ahead for the next week.
Q. Okay. So sometimes he might drop off $10 for each of them at once?
A. Yeah.
Q. Okay. But on that occasion it was just five for each?
A. Yes.
Q. Okay. And can you explain where people drop things off, where they would drop the money off at your home?
A. Okay. My front door is hidden from the roadway in front, and then I have a shelf by the door, and then I had a bucket that it was hidden from sight that -- where they would drop it off at.
Q. Okay. So it's a hiding spot where people would drop off the money?
A. Yes.
Q. Nothing further, but the government may wish to ask you questions as well.

THE COURT: Cross-examine please.

MR. STARNES: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. STARNES:
Q. Good morning, ma'am.
A. Good morning.
Q. Just a couple of follow-up questions for you. The first thing I wanted to do is just kind of clarify so the jury's not

confused. So there was a sports betting pool that members of your family have?
A. Yeah, you know, a 25 -- 25 square pool, $5 a square.
Q. And this is like a -- just to explain, in case anybody doesn't know, there's, like, a grid?
A. Yes, yes.
Q. And then every person that wants to participate in the pool will buy one of the squares in the grid?
A. Yes.
Q. And those typically will correspond to, like, a score at the end of the game?
A. Right.
Q. At the end of the quarter, something like that; right?
A. Yes.
Q. And then if you win the square, you get the money associated with that square --
A. Right.
Q. -- is that fair?
How many people in your family were involved in this pool?
A. Maybe 10 to 11.
Q. And was it all family members? Were there friends or other --
A. It was all family.
Q. All family.
And you said that Shawn Wippert was a member of this pool?

A. Yes.
Q. And so was his mom, Darlene?
A. Yes.
Q. Do you know where Shawn would have gotten the money in order to participate in the pool? Did he ever talk to you about that?
A. No, he never talked about where he got the money.
Q. Okay. Is it possible that other people gave him the money to then participate in the pool?
A. Maybe his mom may have gave him the money to.
Q. Thank you. I have no further questions.

THE COURT: Redirect?

MS. MUSICK: No redirect, Your Honor.

THE COURT: The witness excused?

MS. MUSICK: Yes, Your Honor.

THE COURT: You may step down. Thank you, ma'am.

THE WITNESS: Thank you.

THE COURT: Next.

MS. MUSICK: Defense calls Pat Schildt as our second witness.

COURTROOM DEPUTY: Please raise your right hand.

PATRICK W. SCHILDT,

called as a witness on behalf of the Defendant, having first been duly sworn, testified as follows:

COURTROOM DEPUTY: Thank you. Please have a seat.

THE COURT: Good morning, sir.
THE WITNESS: Good morning.
THE COURT: Would you please state your full name and spell your last name for the record.
THE WITNESS: Patrick Wayne Schildt.
THE COURT: Spell your last name please.
THE WITNESS: What?
THE COURT: Spell your last name please.
THE WITNESS: S-c-h-i-l-d-t.
THE COURT: Thank you.
Go ahead, Ms. Musick.
MS. MUSICK: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. MUSICK:
Q. Good morning, Mr. Schildt. How are you today?
A. Good.
Q. How did you know Shawn Wippert -- Wippert? I apologize.
A. I've known him a good part of my life, and he worked for me a lot.
Q. Okay. What kind of work would he do for you?
A. Anything and everything. Anything that I -- that I had asked.
Q. Okay. Can you -- can you give us some examples?
A. Well, I own a herd of buffalo. He -- he did everything. He did fencing. He did help me -- helped me with them in every

way possible. And then I own a store, and he did a lot of construction work for me, maintenance. I mean, probably the last -- I'm just going to guess and say probably the last 8 to 10 years the guy worked for me at -- literally every time I asked him if he wasn't busy helping his mother. But spent a lot of time with him.
Q. Okay. And so he was a pretty good worker then?
A. Absolutely.
Q. Okay. And you said it was about 8 to 10 years that he worked for you off and on?
A. Yeah.
Q. Okay. Did you talk to him on the day that he died?
A. He actually was working for me the day before. We work -- we would work until dark, come into -- come back to Browning and get something to eat, and I would take him home. And we were going to work the next day, and that night I -- I talked to him about 9:30 for 15-20 minutes and he said, "Pick me up in the morning."
Q. Okay. When you spoke with him, did he seem normal to you?
A. Yeah, he said he was just going to watch some TV and see you in the morning.
Q. Was he slurring his words at all?
A. No.
Q. Okay. Did he seem impaired at all?
A. No.

Q. And you said this was about 9:30 that night?
A. Yeah, because I had -- I had just dropped him off probably -- I don't even think it was an hour before that.
Q. I see. Did you learn about his death the following morning?
A. I got a phone call about 2:30-3:30 in the morning. I really can't remember, but I got a call early in the morning that he had passed away.
Q. I see. I have nothing further now, but the government may want to ask you some questions.
THE COURT: Cross-examine.

CROSS-EXAMINATION

BY MS. PAISLEY:
Q. Mr. Schildt, so you own the C-Store in Browning; right?
A. Correct.
Q. And wasn't the last big job that he did for you actually in the summer when he painted the front of your store?
A. Yeah.
Q. Okay. So your testimony that he worked the night before, your testimony is that he -- you didn't drop him off until 8:30 that night?
A. I think it was about 8:30, yeah.
Q. So to your knowledge he wasn't in Cut Bank that day?
A. He -- he was with me all day.
Q. He was with you all day. So if witnesses saw them -- saw

him that day, they're confused, they're wrong?
A. I would say, yeah.
Q. Okay. And you recall this day -- why are you so specific that it's that day? What day was it?
A. I don't recall what day it was.
Q. Okay.
A. I just know that, I mean, you -- I don't pay attention to days, times, because I work all the time. I'm always doing something. And if he was in Cut Bank, which is a possibility, because we wouldn't always go to work in the morning --
Q. Okay.
A. -- sometimes we'd go to work in the evening.
Q. So some time around November of 2022, one night you dropped him off and you spoke to him that night?
A. Yeah.
MS. PAISLEY: No further questions.
THE COURT: Redirect?

REDIRECT EXAMINATION

BY MS. MUSICK:
Q. Mr. Schildt, just to clarify, you recall this being the day before he passed away because you learned of his death the following morning, and you were supposed to work together that day?
A. Yes.
Q. Okay.

MS. MUSICK: Nothing further.

THE COURT: The witness excused?

MS. MUSICK: Yes, Your Honor.

THE COURT: You may step down, sir. Thank you.

Ms. Musick?

MS. MUSICK: The defense rests its case.

THE COURT: All right. Thank you.

Members of the jury, we're done sooner than expected. I'm afraid I have to excuse you for a few minutes while we finalize the jury instructions, get ready for our closing arguments.

(The jury left the courtroom, after which the following proceedings were had.)

THE COURT: No, rebuttal by the government, so we're ready to finalize jury instructions and proceed with jury instructions; correct?

MS. PAISLEY: Correct, Your Honor.

THE COURT: I think the only instruction in dispute now is No. 12, which we have managed to create quite a controversy. Let's talk about this.

So the first thing, the previous instruction in the bold letters said first, second, and special instruction. So I think that might have been confusing to the jury why it was a special instruction, so I just changed that to third.

MS. PAISLEY: Works for us.

THE COURT: Okay. The second part was an attempt to use active voice here, maybe that it caused the death as opposed to was the result of. So that was the intent there. Get rid of the "was the result of" and make sure it was clear the fentanyl that Mr. Malatare allegedly supplied to Mr. Wippert caused Mr. Wippert's death. That's the intent here.

MS. PAISLEY: I would prefer to stick with the Ninth Circuit "but for" language, and, I mean, I just think that's...

THE COURT: Well, so do we go back to the entirety of the Ninth Circuit language?

MS. PAISLEY: I would think so, Your Honor. That's why it's model instructions. That's why the government likes them, because the Ninth Circuit likes them.

THE COURT: Well, it's an instruction. I wouldn't say it's a model instruction. It's a version.

Ms. Musick, you want to weigh in on this?

MS. MUSICK: Your Honor, we like the court's proposed instruction. I would note that it does still have the "but for" language. You've removed the quotations, which I think is appropriate because I think the quotations kind of called too much attention to the "but for" portion, and you've removed the paragraph that we objected to.

MS. PAISLEY: Well, and you removed two, Your Honor.

THE COURT: Yeah, removed to -- removed to -- removed

to of the paragraph. The although paragraph -- these are from the comments as opposed to the model instruction, that's why I removed them.

MS. PAISLEY: I don't think -- I don't think they're from the comments, Your Honor. They're just from the bracketed, which is not the comments. They're actually --

THE COURT: No, I have -- I have -- okay. The bracketed language is -- talks about distributing and the government is not required not required to prove. We -- we removed -- you're right. The paragraph that reads "the government is not required to prove the amount of quantity of fentanyl," that's the bracketed language. I thought that relates more to distribution.

MR. STARNES: That's what happened; he distributed.

MS. PAISLEY: Right, that's what happened in this case; we have the distribution.

THE COURT: Right. Well, that's the first element, the fentanyl -- he only distributed fentanyl.

MS. PAISLEY: Right. We don't have to prove any amounts, and that's why that bracket is important.

THE COURT: Okay. All right. And then the "although" language though, that comes from the comment. I have -- I have the model instructions right here if you want to look at it.

MS. PAISLEY: I have it up. Are we looking at the June 2024 ones?

THE COURT: What have we got here? The June -- yes? Yes, June 2024. All right.

MS. PAISLEY: Should say at the bottom.

THE COURT: The comments at the bottom. So it says -- hold on. Yeah, June -- revised June 2024.

Okay. So the -- the document I have in front of me, it says first -- so the defendant is charged with all that, and then the first paragraph fentanyl -- knowingly distributed fentanyl, okay. We all agree to that.

Second, the defendant knew that it was fentanyl or some other -- some other federally controlled substance.

And then we have a couple bracketed instructions, distributing language, and that's -- that's included there.

MS. PAISLEY: Yeah.

THE COURT: And then the government required to prove the amount, I agree that's a bracketed language. I think that's appropriate to include.

The "although" language, though, that's in the comments at the bottom of the first page, "although the government must prove the death as a result from use of controlled substance."

MS. PAISLEY: So it's actually the paragraph right above comment. It's just this must be from the March -- this paragraph must be from the March one. It's "the government does not have the burden of establishing that the defendant

intended that death result from the use of fentanyl, nor does the government have the burden of establishing that the defendant knew or should have known that death would result from the use of fentanyl that the -- "

THE COURT: That's -- that's in the instruction.

MS. PAISLEY: That's in the instruction. That's the last paragraph above the comment --

THE COURT: All right.

MS. PAISLEY: -- on page 239.

THE COURT: I don't have the page numbers here.

MR. STARNES: If you show our computer screen, Your Honor, we can --

THE COURT: Madam clerk, can you pull that up for everyone.

MR. STARNES: So this is Instruction 12.4, and so the first two bullet points are the first two elements that we're already discussing. And we're just going to scroll down to the bracketed area, and it's the last paragraph before the comment Ms. Paisley mentions.

MS. PAISLEY: Well, that one's not even bracketed.

THE COURT: Okay. All right. So they all -- go to the bottom of that page, if you would, the very bottom. That's what the government -- keep going. I'm sorry. There's the paragraph all the government must prove.

MR. STARNES: Right.

MS. PAISLEY: Right.

THE COURT: That's the language we were getting rid of.

MS. PAISLEY: Okay. Then but --

THE COURT: I think we should have the language in the model instruction.

MS. PAISLEY: Yes.

THE COURT: All right. Ms. Musick, you want to comment on it? We don't have -- unfortunately, don't have a lot of cases involving this charge, so we don't give the instruction very often.

MS. MUSICK: Okay. I just want to make sure I'm understanding --

THE COURT: Scroll -- scroll to the top of the page; sorry.

So here's what we're going to do, paragraph as written on the screen, the first paragraph there --

MS. MUSICK: Uh-huh.

THE COURT: -- and that corresponds with what's on our current -- current version.

All right. The paragraph that says first and then knowingly, that's on there.

Second: Defendant knew.

And then third -- so the third where you say special instruction I struck on the -- on the version I had, it said

special instruction. I changed it to third. That's the paragraph if you find the defendant is guilty of distributing, you must determine whether Mr. Wippert's death was the result of use -- so this language here. Do you want the "to find" paragraph, to find distributed controlled substance?

MS. PAISLEY: I think the next one would be appropriate. Although if you do go to the active voice, I don't know you need that because I think that's what the active voice...

THE COURT: So the version I gave you, the only thing -- do you have any problem with the third paragraph as it's set forth there?

MS. PAISLEY: I think if we use this paragraph, then we don't need these two that are in the model instruction but...

THE COURT: But which one do you want to add?

MS. PAISLEY: Government always like the model instruction but...

MR. STARNES: The last, "The government does not have the burden of establishing the defendant intended that death result --"

THE COURT: So add that to what I have proposed here. Is that all right?

MS. PAISLEY: Yes.

THE COURT: Ms. Musick?

What I propose, the version that my clerk gave me this morning, in adding the paragraph "does not have the burden of establishing the defendant intended the death."

MS. MUSICK: We are fine with that.

THE COURT: Okay. That's the paragraph we'll -- I'm going to go back and revise that instruction to add the paragraph "the government does not have the burden of establishing the defendant intended the death."

MS. PAISLEY: And the one about we don't have to prove the amount; right?

MS. MUSICK: That's the paragraph we object to.

MS. PAISLEY: We are not charging an amount.

THE COURT: Where -- where -- okay. Well, that's in the model instruction, too. I think that's appropriate. So you can object, that's fine. State -- state your objection for the record. I'll revise the paragraph, we'll get this done, move on.

MS. MUSICK: Okay. We would object to the bracketed paragraph that states --

THE COURT: About the amount?

MS. MUSICK: Yes.

THE COURT: What -- to clarify, Ms. Paisley, where do you want the amount paragraph to go?

MS. PAISLEY: I think in the -- the order -- Mr. Starnes clearly has an opinion, we'll let Mr. Starnes weigh

in.

MR. STARNES: I think -- yeah, I think that -- so first, second, third is fine, but then it would fall underneath that third element, Your Honor --

THE COURT: Okay. Right there.

MR. STARNES: -- the explanatory paragraph.

THE COURT: Okay.

MR. STARNES: So I would propose that you put the language about not requiring to prove the quantity, then we would include that last paragraph "the government does not have the burden of establishing the defendant intended that death result," and that tracks the model instruction.

THE COURT: What about the distributing, do you want that paragraph?

MS. PAISLEY: Keep the distributing --

MR. STARNES: Yeah.

MS. PAISLEY: -- right below third, and then add those two below it.

THE COURT: After distributing?

MS. PAISLEY: Yes.

MR. STARNES: Correct.

THE COURT: Okay. So it's going to be first, second, third, the paragraph about distributing, the next paragraph about not proving quantity?

MS. PAISLEY: Then that last paragraph.

THE COURT: Paragraph about intending the death.

MR. STARNES: Correct.

THE COURT: All right. Understood, Ms. Musick?

MS. MUSICK: Understood. And just for the record --

THE COURT: Note your objection.

MS. MUSICK: Thank you.

THE COURT: Thank you.

All right. We'll get that instruction revised, and I think we're ready to go after that.

MS. PAISLEY: Well, Your Honor, I'd like to talk about closing before we get to closing if we can.

THE COURT: Okay. Tell me.

MS. PAISLEY: So in opening, we heard a lot of stuff that didn't come in as evidence, and I want to talk about that so it isn't brought up in closing.

THE COURT: What kind of stuff?

MS. PAISLEY: Specifically that the defendant is a drug user. There was no evidence whatsoever that Mr. Malatare has ever used illicit drugs.

THE COURT: You're free to point that out. You're free to point out what evidence is presented.

MS. PAISLEY: But they're not allowed to argue facts not in evidence. And the government's concern, we don't want to have to be standing up objecting. So I just want to clarify --

THE COURT: You want --

MS. PAISLEY: -- for the record --

THE COURT: You want --

MS. PAISLEY: -- what facts --

THE COURT: You want --

MS. PAISLEY: -- are laid out.

THE COURT: You're worried Ms. Musick will argue Mr. Malatare himself was a drug user?

MS. PAISLEY: Well, there was a lot in opening that wasn't, and without --

THE COURT: All right. Ms. Musick, do you intend to argue Mr. Malatare was a drug user himself? I'm trying to think who --

MS. MUSICK: Your Honor, there was testimony related to the fact that Mr. Malatare brought a fanny pack out of the vehicle during the traffic stop. We saw the body cam footage of it. And I believe it was Officer Denney who testified that the amount of fentanyl that he found in the bag was consistent with a user amount of fentanyl.

THE COURT: In the fanny pack?

MS. MUSICK: In the fanny pack that Mr. Malatare pulled out of the vehicle on the body cam video.

THE COURT: Ms. Paisley.

MS. PAISLEY: I would be more concerned about the 15 pills a day, because she said he's a 15-day a pill --

THE COURT: Yeah --

MS. PAISLEY: -- or 15 pills a day user.

THE COURT: -- I don't -- I don't believe we had any evidence about the quantity.

MS. PAISLEY: There was no evidence at all.

THE COURT: Hold on. No evidence about the quantity of drugs he's using.

MS. MUSICK: No, Your Honor.

THE COURT: And I think that's -- unless someone testifies to that fact, I don't want the jury hearing that kind of information, just the fact he was a drug user.

MS. MUSICK: And Mr. Gallardo is going to do our closing so --

THE COURT: Mr. Gallardo, you can talk about you saw for yourself on the video he had a fanny pack where his wallet was, there was a container of pills that he was using, that's fine, but don't get into the fact he was using "x" number of pills and he -- for "x" periods. We don't have -- we don't know about -- no one testified about how many or how long he's using, that sort of thing. Understood?

MS. MUSICK: Just for clarification, Your Honor, could Mr. Gallardo state that the reason that that evidence is not in is because Mr. Malatare chose not to testify himself?

MS. PAISLEY: Absolutely not.

THE COURT: No, no, no --

MS. MUSICK: No? Okay. I just thought I'd ask.

THE COURT: -- let's not get into that.

MS. PAISLEY: It's providing a little --

THE COURT: All right.

MS. PAISLEY: -- summation is my concern.

THE COURT: Anything else?

MS. PAISLEY: There's no evidence -- other than the mother saying she saw her son sleeping, there's no evidence Shawn Wippert ever consumed any type of illicit drugs before this fentanyl. So any argument about that --

THE COURT: Well, I thought she --

MS. PAISLEY: -- is not based on the facts.

THE COURT: -- he testified he had been using before.

MS. PAISLEY: No. Her testimony was that she had no knowledge of that.

THE COURT: Well, he was acting strangely.

MS. PAISLEY: What she said was she -- after she learned that he had died from fentanyl, she started going back and sort of wondering if those things --

THE COURT: All right. So the testimony --

MS. PAISLEY: -- were --

THE COURT: -- acknowledge the testimony of the mother that, as the mother testified, in hindsight she realized her son was likely using drugs. Understood?

MR. GALLARDO: Understood.

THE COURT: All right. Anything else, Ms. Paisley?

MS. PAISLEY: Yes, Your Honor, if there's going to be argument that somebody else in the vehicle possessed the Skittles that were in the back seat, we would be requesting an aiding and abetting instruction because Mr. Malatare can still be -- can still be held accountable. So if that's going to be the argument --

THE COURT: All right.

MS. PAISLEY: -- we have it prepared.

THE COURT: I think you're free to argue we don't know whose they were as opposed to it belongs to this -- the people in the back must have known it because they're their drugs.

MS. PAISLEY: But even if he were just driving them back, he could still be convicted as aiding and abetting.

THE COURT: If he knew they were there. If he knew they were there.

MS. PAISLEY: Well, but the point is that the instruction would cover that --

THE COURT: Yeah, all right --

MS. PAISLEY: -- anybody else's conduct --

THE COURT: -- we'll hear what Mr. Gallardo has to say.

So anything else?

MS. PAISLEY: So would the -- if we think that it is brought up, would we then ask after the closing, I mean --

THE COURT: Before your rebuttal closing, yes.

MR. STARNES: Just so the court's aware, we have copies of 4.1, Jury Instruction 4.1, which is the aiding and abetting instruction --

THE COURT: All right.

MR. STARNES: -- so we can pass those around prior to closing if the court would like.

THE COURT: Have those available please.

MR. STARNES: Thank you.

THE COURT: All right. Mr. Gallardo, you understand what you're up against here?

MR. GALLARDO: I understand. I'll work with it. And I understand --

THE COURT: You understand.

MR. GALLARDO: -- if the government wants to put strings here, I respect that, I understand that.

And just so, I guess the government's concern, there was talk about UTC, if government wants to explain or convert UTC during it's closing, I'm happy --

THE COURT: So you are happy? I wasn't going to allow that. I was going to --

MR. GALLARDO: I didn't plan on objecting if they wanted to clarify that timeline.

THE COURT: Okay. Well, leave that up to you.

I have the aiding and abetting instruction. I'm going

to go get No. 12.

How long do you need for closing, Mr. Starnes?

MR. STARNES: I'd ask for 20 minutes total, Your Honor.

THE COURT: We're on a good schedule here.

How about you, Mr. Gallardo?

MR. GALLARDO: My closing would probably be a tad less than the government's.

THE COURT: All right. You got rebuttal too Mr. Starnes.

MR. STARNES: Correct, Your Honor.

THE COURT: You know, I -- if we get to half an hour, I might --

MR. STARNES: Well --

THE COURT: -- I'd encourage you to wrap it up.

MR. STARNES: -- if you start throwing things, I'll stop talking, Your Honor.

THE COURT: All right. We'll go get -- how about the jury verdict, verdict form?

MR. STARNES: No objection, Your Honor.

THE COURT: You're okay?

MS. MUSICK: No objection, Your Honor.

THE COURT: All right. And I'll show the verdict form to the jurors after I -- the instruction comes up at the end about the verdict form as I usually do.

All right. I'll go get the new Instruction 12, I have 4.1 aiding and abetting in the event I need it, and we'll get on this. Okay. Thank you.

(Recess at 9:08 a.m. to 9:26 a.m.)

(Proceedings had outside presence of the jury.)

THE COURT: All right. You ready, Mr. Starnes?

MR. STARNES: I am ready to proceed, Your Honor.

THE COURT: Mr. Gallardo, you ready?

MR. GALLARDO: Yes, Your Honor.

THE COURT: And let's get a couple things done. Do the parties consent to the use of JERS, electronic jury exhibits?

MR. STARNES: Yes, Your Honor.

THE COURT: Ms. Musick?

MS. MUSICK: Yes, Your Honor.

THE COURT: In the event that any juror still wants to go out for a smoke break, you consent to a CSO would escorting them outside?

MS. PAISLEY: Besides the Surgeon General would ask me --

THE COURT: I can't control urgency.

MS. MUSICK: As long as they're accompanied.

THE COURT: Let's bring in the jury please.

Exhibits are all agreed?

MS. PAISLEY: Yes, Your Honor.

MS. MUSICK: Yes, Your Honor.

(The jury entered the courtroom, after which the following proceedings were had.)

THE COURT: Please be seated. Welcome back, members of the jury. I'm now going to give you your final jury instructions to use in evaluating the -- to use in deciding of the case. You'll have a copy of the jury instructions with you as you deliberate.

After I give you the final instructions, then counsel for each party gets to make a closing argument. And because the government has the burden of proof, they get the chance to give a rebuttal argument as well.

So please follow along on the screen in front of you.

Instruction No. 1

Members of the jury, you've heard all the evidence. The evidence record is closed. Additional evidence will not be presented. It is now my duty to instruct you in the law that applies to this case. A copy of these instructions will be available in the jury room for you to consult.

It is your duty to find the facts from all the evidence in the case. To those facts, you apply the law as I give it to you. You must follow the law as I give it to you, whether you agree with it or not. You must decide the case solely on the evidence before you. You will recall you took an oath promising to do so at the beginning of the case.

In following my instructions, you must follow all of them and not single out some and ignore others. The order in which the instructions are given is of no significance. All of the instructions are equally important. You must not read into these instructions or into anything the court may have said or done as any suggestion as to what verdict you should return; that is a matter entirely up to you.

Instruction No. 2

Do not decide the case based on implicit biases. As we discussed during jury selection, everyone, including me, has feelings, assumptions, perceptions, fears, and stereotypes, that is implicit biases, that we may not be aware of. These hidden thoughts can impact what we see and hear, how we remember what we see and hear, and how we make important decisions.

Because you are making a very important decision in this case, I strongly encourage you to evaluate the evidence carefully and to resist jumping to conclusions based on personal likes or dislikes, generalizations, gut feelings, prejudices, sympathies, stereotypes, or biases, including unconscious biases. Unconscious biases are stereotypes, attitudes, or preferences people may consciously reject but may be expressed without conscious awareness, control, or intention. You should not be influenced by any person's race, color, or religious beliefs, national ancestry, sexual

orientation, gender identity, gender, or economic circumstances.

The law demands you return a just verdict based solely on the evidence, your individual evaluation of that evidence, your reason and common sense, and these instructions. Our system of justice count on you to render a fair decision based on the evidence, not on biases.

Instruction 3

The evidence you are to consider in deciding what the facts are consist of:

1. The sworn testimony of any witness;

2. The exhibits that have been received in evidence; and

3. Any facts to which the parties have agreed.

Four

In reaching your verdict, you may consider only the testimony and exhibits received in evidence. The following things are not evidence, and you may not consider them in deciding what the facts are:

1. Questions, statements, objections and arguments by the lawyers are not evidence. The lawyers are not witnesses. Although you must consider lawyer's questions to understand the answers of a witness, the lawyer's questions are not evidence.

Similarly, what the lawyers have said in their opening statements, will say in their closing arguments, and have said

other times is intended to help you interpret the evidence, but it is not evidence.

If the facts as you remember them differ from the way the lawyers state them, your memory of the facts controls.

2. Any evidence that I have stricken -- excluded, stricken, or instructed you to disregard is not evidence.

3. Anything you may have seen or heard when the court was not in session is not evidence. You're to decide the case solely on the evidence received at the trial.

Instruction 5

Evidence may be direct or circumstantial. Direct evidence is a direct proof of a fact such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is indirect evidence, that is, it is proof of one or more facts from which you can find another fact.

You are to consider both direct and circumstantial evidence. Either can be used to prove any fact. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

Instruction 6

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, part of

it, or none of it.

In considering the testimony of any witness, you may take into account:

1. The witness's opportunity and ability to see or hear or know the things to which the witness testified;

2. The witness's memory;

3. The witness's manner while testifying;

4. The witness's interest in the outcome of the case, if any;

5. The witness's bias or prejudice, if any;

6. Whether other evidence contradicted the witness's testimony;

7. The reasonableness of the witness's testimony in light of all the evidence; and

8. Any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide the testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may

choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence to a fact does not necessarily depend on the number of witnesses who testify about it. What is important is how believable the witnesses are and how much weight you think their testimony deserves.

Instruction 7

You are here only to determine whether the defendant is guilty or not guilty of the charges in the indictment. The defendant is not on trial for any conduct or offense not charged in the indictment.

Instruction No. 8

The indictment is not evidence. The defendant has pleaded not guilty to the charges. The defendant is presumed innocent unless and until the government proves the defendant guilty beyond a reasonable doubt. In addition, the defendant does not have to testify or present any evidence. The defendant does not have to prove innocence. The government has the burden of proving every element of the charges beyond a reasonable doubt.

Instruction 9

Proof beyond a reasonable doubt is proof that leaves you firmly convinced that the defendant is guilty. The

government is not required to prove guilt beyond all possible doubt.

A reasonable doubt is a doubt based upon reason and common sense. It is not based purely on speculation. It may arise from a careful and impartial consideration of all the evidence, or from a lack of evidence.

If after a careful and impartial consideration of all the evidence, you are not convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant not guilty. On the other hand, if after a careful and impartial consideration of all the evidence, you are convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant guilty.

Instruction 10

Count 1 of the indictment charges that on or about November 18th, 2022, at or near Browning, in Glacier County, in the State and District of Montana, and within the exterior boundaries of the Blackfeet Indian Reservation, being Indian Country, the defendant, Douglas Darren Malatare, knowingly and intentionally distributed a substance containing a detectable amount known as fentanyl, a Schedule II controlled substance, and the distribution of said fentanyl caused the death of John Doe, in violation of Title 21, United States Code, Section 841(a)(1) and Section (b)(1)(C).

Instruction No. 11

Section 841(a)(1) of Title 21 of the United States Code provides:

It shall be unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense a controlled substance.

Instruction No. 12

The defendant is charged in Count 1 of the indictment with distribution of fentanyl resulting in death, in violation of Title 21, United States Code, Section 841(a)(1) and Section (b)(1)(C).

For the defendant to become guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant knowingly distributed fentanyl; and

Second, the defendant knew it was fentanyl or some other federally controlled substance; and

Third, if you find the defendant is guilty of distributing fentanyl, then you must determine whether the fentanyl distributed to John Doe by the defendant caused John Doe's death. To find that the fentanyl caused John Doe's death, you must find unanimously and beyond a reasonable doubt that John Doe would not have died but for John Doe's use of the fentanyl that the defendant distributed to John Doe.

Distributing means delivering or transferring possession of fentanyl to another person with or without any financial interest in that transaction.

The government is not required to prove the amount or quantity of the fentanyl that the defendant distributed. The government need only prove beyond a reasonable doubt that there was a measurable or detectable amount of fentanyl.

The government does not have the burden of establishing that the defendant intended that death result in the use of fentanyl, nor does the government have the burden of establishing the defendant knew or should have known that death would result from the use of the fentanyl the defendant distributed to John Doe.

Instruction No. 13

Count 2 of the indictment charges that on or about and between September 20th -- September '22 and December 2022, at Browning and East Glacier, in Glacier County, in the State and District of Montana, within the exterior boundaries of Blackfeet Indian Reservation and elsewhere, the defendant, Douglas Darren Malatare, knowingly possessed with intent to distribute 40 grams or more of a substance containing a detectable amount of fentanyl, a Schedule II controlled substance, in violation of Title 21 U.S. Code, Section 841(a)(1) and Section 841(b)(1).

Instruction No. 14

The defendant is charged in Count 2 of the indictment with possession of fentanyl with intent to distribute in violation of Title 21, U.S. Code, Section 841(a)(1). For the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant knowingly possessed fentanyl; and

Second, the defendant possessed it with the intent to distribute it to another person.

It does not matter whether the defendant knew the substance was fentanyl. It's sufficient that the defendant knew that it was some kind of a federally controlled substance.

To possess with intent to distribute means possess with intent to deliver or transfer possession of fentanyl to another person with or without any financial interest in the transaction.

Instruction 15

If you find the defendant guilty of the charge in Count 2 of the indictment, you will then determine whether the government proved beyond a reasonable doubt that the amount of fentanyl that the defendant intended to distributed -- distribute equaled or exceeded 40 grams. Your determination of weight must not include the weight of any packaging material. Your decision as to weight must be unanimous.

The government does not have to prove the defendant

knew the quantity of fentanyl.

Instruction 16

A separate crime is charged against the defendant in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count.

Instruction 17

An act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident. The government is not required to prove the defendant knew his acts or omissions were unlawful. You may consider evidence of the defendant's words, acts, or omissions, along with all the other evidence in deciding whether the defendant acted knowingly.

Instruction 18

A defendant in a criminal case has a constitutional right not to testify. In arriving at your verdict, the law prohibits you from considering in any manner that the defendant did not testify.

Instruction No. 19

You have heard testimony from Gavin Lawson, Scott Schlueter, and Aldo Fusaro who testified about their opinions and the reasons for those opinions. This opinion testimony is allowed because of the specialized knowledge, skill, experience, training, or education of these witnesses. Such --

such opinion testimony should be judge like any other testimony. You may accept it or reject it, and you may give it as much weight as you think it deserves considering the witness's knowledge, skill, experience, training, or education, the reasons given for the opinion, and all the other evidence in the case.

Instruction No. 20

A person has possession of something if the person knows of its presence and has physical control of it or knows of its presence and has the power and intention to control it. More than one person can be in possession of something if each knows of its presence and has the power and intention to control it.

Instruction No. 21

The indictment charges that the offenses alleged are committed on or about a certain date. Although it is necessary for the government to prove beyond a reasonable doubt the offenses were committed on a date reasonably near the date alleged in the indictment, it is not necessary for the government to prove the offenses were committed precisely on the date charged.

Instruction 22

The parties have stipulated and agreed to certain facts that are stated below. Those facts are now conclusively established:

1. On December 21st, FBI Special Agent Alex Prostko collected two items of drug evidence from Blackfeet Law Enforcement Services' evidence room and transferred them to the FBI's evidence room.

- Evidence Item 1 was a quantity of multicolored pills;
- Evidence Item 3 was a quantity of blue and white pills.

No. 2. On March 3rd, 2023, an FBI evidence technician packaged the evidence items in accordance with agency procedures and sent them to the drug enforcement -- DEA Western Laboratory located in Pleasanton, California for forensic testing. In this process, the following name changes took place:

- Evidence Item 1, the multicolored pills, became evidence -- Exhibit 1B1; and
- Evidence Item No. 3, the blue and white pills, became Exhibit 1B3.

3. The DEA laboratory received Exhibits 1B1 and 1B3 on March 10th of 2023.

4. On August 8th of 2023, DEA Special Agent Matthew McIntyre collected one item of drug evidence from the Bureau of Indian Affairs, BIA, as originally placed into evidence by BIA Special Agent Kyle Sinclair. That item was referred to as BIA Exhibit 1.

5. BIA Exhibit 1 was listed as a white/blue/green/ powder/chunks from an unknown crushed pill.

6. On August 11th, 2023, Special Agent McIntyre packaged BIA Exhibit 1 in accordance with agency procedures and sent the evidence to the DEA Western Laboratory located in Pleasanton, California for forensic testing.

7. The DEA laboratory received BIA Exhibit 1 on August 15th of 2023.

Drug Testing

8. Jared J. Farias is a forensic chemist employed by the DEA Western Laboratory charged with analyzing evidence for the presence or absence of controlled substances.

9. Shana M. Irby is a forensic chemist employed by the DEA Western Laboratory charged with analyzing evidence of the presence or absence of controlled substances.

10. Radhiyah Himawan is a senior forensic chemist employed by the DEA Western Laboratory charged with analyzing evidence of the presence or absence of controlled substances.

Exhibit 1B1 Multicolored Pills

No. 11. Jared J. Farias tested Exhibit 1B1 using various tests at the lab. On April 14th, 2023, Farias issued a report which discussed the testing techniques used as well as findings from those tests. Farias's report shows the following:

- Exhibit 1B1 was 476 multicolored pills (pink,

orange, purple, green, and yellow) in a plastic bag;

- A random sampling of nine of the pills were tested from this exhibit;
- Testing identified the substance fentanyl in the pills tested;
- The net weight of the fentanyl identified was 500 -- excuse me, 52.574 grams plus or minus 0.003 grams.

Exhibit 1B3 (blue and white pills):

No. 12. On April 6th, 2023, Shana Irby tested Exhibit 1B3 using varies tests at the lab. On April 6th, 2023, Irby issued a report which discussed the techniques used as well as findings from those tests. Irby's report shows the following:

- Exhibit 1B3 was 173 blue and white pills in a plastic bag;
- A random sampling of nine of the pills were tested from this exhibit;
- Testing identified the substance commonly known as fentanyl in the pills tested;
- The net weight of the fentanyl identified was 18.2 grams plus or minus 0.2 grams.

BIA Exhibit 1

No. 13. On August 22nd, 2023, Radhiyah Himawan tested

BIA Exhibit 1 using various tests at the lab. On August 23, Himawan issued a report which discussed the techniques used as well as findings from those tests. Himawan's report shows the following:

- BIA Exhibit 1 was residue from a crushed substance; and
- Testing identified this substance commonly known as fentanyl in the residue.

Fentanyl is a Schedule II controlled substance.

Instruction No. 23

I've decided to accept as proved the fact that fentanyl is a Schedule II controlled substance even though no evidence was presented on this point because this fact is of such common knowledge.

(Court off record with clerk.)

THE COURT: So Instruction 23 -- and, you guys, it is as I read to you. All right.

Instruction 24

When you --

I'll go back to 23. I'll sure make sure it was in the record.

All right. Instruction 23, I'll repeat this again.

I have decided to accept as proved the fact that fentanyl is a Schedule II controlled substance, even though no evidence was presented on this point, because of the fact it is

of such common knowledge. You may accept this fact as true, but you're not required to do so.

Instruction 24

When you begin your deliberations, you elect one member of your jury as your foreperson who will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors. Reach agreement if you can do so. Your verdict, whether guilty or not guilty, must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you considered all the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not be afraid to change your opinion if the discussion persuades you that you should, but do not come to a decision simply because other jurors think it is right.

It is important you attempt to reach a unanimous verdict, but, of course, only if each of you can do so after having made your own conscientious decision. Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Perform these duties fairly and impartially. You must not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances.

Also, do not allow yourself to be influenced by personal likes or dislike, sympathy, prejudice, fear, public opinion, or biases, including unconscious biases. Unconscious biases are stereotypes, attitudes, or preferences people may consciously reject but may be expressed without conscious awareness, control, or intention.

It is your duty as a juror to consult with one another and deliberate with one another with a view towards reaching an agreement if you can do so.

During your deliberations, you should not hesitate to re-examine your own views and change your opinion if you become persuaded that it is wrong.

Instruction 25

You must base your verdict only on the evidence received in the case and on these instructions. I remind you that you must not be exposed to any other information about the case or to issues it involves.

Except for discussing the case with your fellow jurors during your deliberations, do not communicate with anyone in any way, do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This restriction includes discussing the case in person, in writing, by phone, tablet, computer, or other means via e-mail, text messaging, or any Internet chat room, blog, website, or any other forms of social media. This restriction applies to

communicating with your family members, your employer, the media or press, and the people involved in the trial.

If you are asked or approached in any way about your jury service or anything about this case, you must respond you have been ordered not to discuss the matter and report the contact to the court.

Do not read, watch, or listen to any news or media accounts or commentary about the case, or anything to do with it. Do not do any research such as consulting dictionaries, searching the Internet, or using any other reference materials, and do not make any investigation or in any other way try to learn about the case on your own.

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address. A juror who violates these restrictions jeopardizes the fairness of the proceedings, and a mistrial could result that will require the entire trial process to start over. If any juror is exposed to any outside information, please notify the court immediately.

Instruction 26

Some of you have taken notes during the trial. Whether or not you took notes, you should rely on your own memory what was said. Notes are only to assist your memory. You should not be overly influenced by your notes or those of your fellow jurors.

Instruction 27

The punishment provided by law for this crime is for the court to decide. You must not consider punishment to decide whether the government has proven its case against the defendant beyond a reasonable doubt.

A verdict form has been prepared for you. After you reach a unanimous agreement on a verdict, your foreperson should complete the verdict form according to your deliberations, sign and date it, and advise the bailiff you're ready to return to the courtroom.

Madam clerk, please put the verdict form on the screen.

The verdict form has three separate questions. The first form, whether Mr. Malatare is guilty or not guilty of distribution resulting in death, put an X or check mark in the appropriate line. Don't put anything about numbers. Just an X or check mark on what the appropriate verdict is.

We go on to Question 2. Question 2 is whether Mr. Malatare is guilty or not guilty of possession with intent to distribute fentanyl. Again, the appropriate check or X mark there.

If you say guilty on Count 2, you have to answer Question 2.A, which is whether the government proved it involved more than 40 grams of fentanyl. If you say not guilty on 2, you're finished, sign the form, and let the bailiff know.

Only if guilty on Count 2, must you determine the quantity proved.

Now, again, I emphasize to the foreperson, let the bailiff know you have a verdict. Bring the verdict form yourself to court. The bailiff will collect it from you here in open court. All right.

Instruction 29

If it becomes necessary during your deliberations to communicate with me, you may send a note through the bailiff, signed by one or more of you. No member of the jury should ever attempt to communicate with me except by a signed writing, and I will respond to the jury concerning the case only in writing or here in open court.

If you send out a question, I will consult with the lawyers before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question.

Remember, do not tell anyone, including me, how the jury stands, numerically or otherwise, on any question submitted to you, including the questions on the guilt of the defendant, until after you reached a unanimous verdict or have been discharged.

All right. Members of the jury, those are your instructions. You'll have a copy in the room with you.

I'm now going to call upon counsel for the government

to make a closing statement.

MR. STARNES: Ladies and gentlemen, yesterday morning Ms. Paisley stood before you and she told you that snorting half a line of fentanyl can kill a man. And as you've seen over the last 24 hours or so through 15 witnesses, through close to 30 exhibits, you now know that's exactly what happened to Shawn Wippert in November of 2022. He snorted half a line of fentanyl, or a line of fentanyl, and then it killed him.

Think back to the evidence that you saw in this case. We started with Darlene Wippert, Shawn's mom. She told you that she had been with Shawn earlier in the day. They had gone to Cut Bank. She was getting her tires fixed. They stopped at Pizza Hut to get some breadsticks. They get back home probably around four o'clock in the afternoon.

He was having some trouble with his mouth. She decided that she was going to fix the barley soup for dinner so that he would be able to eat it.

And at some point she saw the defendant's vehicle there. She looked out the window and knew that a guy named Doug was at the house because that's what Shawn told her, and she believed it was Doug Malatare. She then identified Mr. Malatare in court for you as the person who was -- well, she didn't see him but she saw his car.

We also heard from Mr. Wippert's daughter, Jade. She was there at some point in the evening and actually put eyes on

an individual who was a tall Native man, dark hair, it was in a ponytail; the same description of the defendant, Doug Malatare.

Her father, the last time she saw him, was in that car, the car that Darlene told you belonged to Doug Malatare with an individual who Jade Wippert said fit the description of Doug Malatare.

And through the course of yesterday's testimony, you learned why Mr. Malatare was at that home that night, and that takes us to Count 1 of the indictment, ladies and gentlemen, possession -- or excuse me, distribution resulting in the death of John Doe.

Madam clerk, can we please have Instruction No. 12?

COURTROOM DEPUTY: Did you say 12, I'm sorry?

MR. STARNES: Twelve, yes, please.

So, ladies and gentlemen, when we finish up this morning, you're going to have the task of going back in that room and conferring amongst yourselves and telling both parties what -- what was proven in this courtroom beyond a reasonable doubt. And your task is tied to these elements. There's two offenses, okay?

The first offense, Count 1, the distribution resulting in the death of John Doe, there's three elements.

First: The defendant knowingly distributed fentanyl;

Second: The defendant knew that it was fentanyl or some other federally controlled substance; and

Third: You have to believe beyond a reasonable doubt based on the credible evidence you heard in this courtroom that it was the fentanyl that Doug Malatare gave to Shawn Wippert that Shawn Wippert consumed on the evening November the 18th that ultimately killed him.

There's not a lot of dispute about what the nature of the drugs that are involved in this case is. In fact, you heard a stipulation at the very beginning of the case and you heard the stipulation again. The only drug really involved in this case was fentanyl. I know the defense talked a little bit about marijuana, but we're here to talk about fentanyl, ladies and gentlemen, because marijuana never killed anyone. At least as far as Dr. Schlueter -- or Scott Schlueter knew as a toxicologist, it's just not a thing.

We know that that residue that was on that nightstand was fentanyl because it got collected by Special Agent Sinclair and by the coroner, Mike Brown. They collected that fentanyl, sent it to the DEA lab. You have those lab results in the government exhibits. That's the residue quantity of fentanyl. It was fentanyl. It was on Shawn Wippert's nightstand next to a straw.

And think back to the pictures you saw of Shawn Wippert's last moments where he was found in that bathroom. The reason we showed those to you was not to be gratuitous, it was not to try to get you to feel bad for Mr. Wippert, although

what happened to him was a tragedy. It was because of the way in which his body was found. The folks that do this for the living, the coroner, Mike Brown; the medical examiner, Dr. Fusaro, that foamy discharge that was on the face of Mr. Wippert we heard referred to as pulmonary edema -- that's a symptom of pulmonary edema, and that's a symptom that's commonly associated with drug overdose, and in particular to opioid overdose, the opioid that was found on the nightstand of Mr. Wippert's bedroom.

So there's really no dispute it was fentanyl that killed Shawn Wippert. I think the only dispute we have this morning regarding Count 1 is whether or not it was the defendant who provided that fentanyl to Mr. Wippert.

How do we know that it was Doug Malatare? I know we have a couple of crime show junkies on the panel here this morning, and it's just like one of these shows where you get some circumstantial evidence and some direct evidence, but you have to put the pieces together. They're not that hard to put together, ladies and gentlemen. Think back to the evidence that you have. What do we know that Shawn Wippert was doing his last day after he got home?

You saw some text messages.

Can we please have Government Exhibit 30 up, madam clerk? Thank you.

You remember this text exchange? The green bubbles on

the right, that's Shawn Wippert. The blue bubbles on the left, that's the defendant. What's the first exchange that occurs the afternoon before? "Catch up with you, little bro. You looking?" That's the defendant, Doug Malatare, asking Shawn Wippert are you looking.

The response, "Yeah, I'll be home. Just got off work. I can only afford a half. Can you stop by?"

Now, perhaps to you that means nothing. But in Browning, Montana, in November of 2022, we heard from Jaynell Davis that means something. "You looking," that has a meaning. That means do you want some drugs that I have. That's what Jaynell told us. They don't use words like I have fentanyl, would you like some -- to buy some from me. That's just not the way people talk. In fact, Jaynell specifically used the phrase "you looking."

And then the response, "I can -- I can only afford a half," again, I can only afford half of a pill of fentanyl.

Not uncommon for people to buy fentanyl in different quantities. Quantities can be a lot. You can have a boat, which is a thousand fentanyl pills. You can have a roll, which is a hundred fentanyl pills. You can have one pill. You can have half a pill. If you're really hard up and you have no money and you need to take the edge off, you can even get a quarter pill.

Shawn Wippert was asking for half a pill of fentanyl.

Doug Malatare had fentanyl to sell because Doug Malatare was a fentanyl distributor, and that will get us to Count 2 here in just a minute.

Ladies and gentlemen, I think you heard through the testimony of our two toxicologists and our medical examiner, it doesn't take a lot of fentanyl to kill you. We're talking nanograms, microscopic amounts in somebody's system. You heard a lot from Scott Schlueter about how fentanyl works on the body, why street fentanyl in particular can be super dangerous as opposed to pharmaceutical grade fentanyl.

So don't get wrapped up in the quantity involved here. That's not something that you really have to figure out: Did Mr. Malatare give him enough of a quantity to kill him? Because it only takes very little bit to kill a man, and that's what happened.

Remember what Scott Schlueter told us: Illicit fentanyl is an especially large problem because nobody knows what's in it.

Pharmaceutical grade fentanyl, if you were to walk into the hospital to get something to numb your pain or if you needed to be in surgery and you needed to be anesthetized, knocked out so they could work on you, they know what's in that fentanyl because it's pharmaceutical grade. There's quality control.

Street fentanyl, on the other hand, it's a crap shoot,

throw of the dice. You're playing Russian roulette. A half a pill have some, all, or none of the ingredients necessary to kill you.

And in this case we heard from the experts who examined the body. It was fentanyl that killed Shawn Wippert. I don't think that's in dispute at all.

So how do we know that Doug Malatare was a drug dealer? Because this case isn't just about a half a pill that he gave to Shawn Wippert in November. Going back before that, and then after that as well, the defendant was involved in bringing fentanyl from the state of Washington back to the state of Montana. You know that primarily through the testimony of Special Agent Cam Pavlicek -- Agent Cam Pavlicek with Montana DCI.

Remember he had an informant, an individual that was involved in the drug trade that got caught up in it, himself got busted with drugs and decided to start providing information in exchange for favorable consideration in his own case. Not an uncommon scenario in the drug world. That the name, Adam Fixel, that we heard about through Cam Pavlicek, and through working with Mr. Fixel, Cam Pavlicek was able to obtain some additional text messages in this case.

Can we, please, have Government Exhibit 27, page 2?

And it will take just a minute for that to come up. But remember the text exchange that was going on between Adam

Fixel's phone and the defendant. It was drug talk. It was a negotiation for quantities, for prices. You're hearing the defendant talking to Mr. Fixel about boats, half boats, and rolls. Right?

This is the first sort of substantive part of that text exchange as that began. This was a negotiation for a drug dealer to acquire drugs at one price so he could then take it or have it brought back to Montana where he could get a significantly higher price for those drugs. And we know that this discussion was taking place before Shawn Wippert ever died.

Go to the next page please.

It's hard to see, but at the very, very bottom of this text stream, ladies and gentlemen, you will see the month of October of 2022 where it's kind of cut off, but unfortunately, it's the best we have.

We know that the defendant was talking to Adam Fixel about drugs, negotiating prices, and looking for prices at least in October of 2022.

We know that Doug Malatare showed up at Shawn Wippert's home in November after there was a discussion about whether or not Mr. Wippert was looking and Mr. Wippert saying I can only afford a half.

We know that at some point that evening Shawn Wippert crushed up some portion of a pill of fentanyl and snorted it.

And we know that he died as a result of snorting the fentanyl. There's no other explanation out there, ladies and gentlemen.

You just got the instruction. What is proof beyond a reasonable doubt? It's proof that leaves you firmly convinced. There's no contradictory evidence here.

The defense spent some time yesterday talking a bit about marijuana. That's a distraction. It's a red herring. Marijuana has nothing to do with this case. And you know that because we don't know the amount of marijuana that it would take to kill a person. We heard that from Scott Schlueter. He said the toxicologist in me wants me to say there's got to be some amount, but I've never seen it, not in the 30-odd years he's been doing it.

We heard from Jesse Harwood with Blackfeet Police Department. We heard about marijuana cases. Marijuana is everywhere. It's just not a thing we're worried about.

This is not about Doug Wippert [verbatim] going to the home to try to consummate a marijuana deal, and that's not even in the context of what those two were talking about. "Half" has nothing to do with marijuana. "Half" is a specific reference to fentanyl, specifically half a pill of fentanyl.

So if we can go back to those elements, Instruction No. 12, please, madam clerk.

So, ladies and gentlemen, when you go back into the

room here in just a little while, take a look at this. These are the elements. Clearly the third one John Doe died. Shawn Wippert died from using fentanyl. The defendant knows that it's fentanyl. You got text messages where he's using the lingo. He understands what's going on.

And if you still have something lingering in the back of your head that you need to hang your hat on when it comes to this, remember Sheldon Meineke. He was the individual that came out in custody yesterday. Right after Mr. Malatare was arrested on the drug traffic stop -- or the traffic stop where they pulled the drugs out of the car, he ends up in a jail cell in Browning with the defendant -- or the defendant ended up with Sheldon Meineke, and the defendant was bragging about how he could acquire fentanyl pills in Washington for as little as $2 a pill and he could sell them in Browning, Montana for 50 to $60 a pill. It's a heck of a markup.

There's nothing really left in dispute here, ladies and gentlemen. That's what the evidence shows you. Anything else is speculation.

Now, I want to go to the next count in the indictment, Count 2, possession with intent to distribute. Again, I think you're going to be able to find this one pretty straightforward.

Can we please have Instruction No. 14, madam clerk?

So this one's -- you're going to have Instruction 14

and Instruction 15 that both relate to Count 2, okay.

Instruction 15, we'll get to that in a minute.

Two elements, initial elements:

First: The defendant knowingly possessed fentanyl;

The second: He possessed it with the intent to distribute it to another person.

If you find that he committed these two elements of this offense, then you have to ask the follow-up question: How much fentanyl did he have? Was it at least 40 grams?

We've done the heavy lifting for you on that. It's not even in dispute. It's been stipulated to. That long instruction where the parties agree about how the drugs got from evidence to the DEA lab, was tested, and then we got the drug testing reports Special Agent Murphy ran over for you yesterday afternoon, shows you just the multicolored pills alone, the Skittles, the term everybody was using, that was over 50 grams of fentanyl. So we have more than 40 grams straight up.

There's an additional quantity of blue and white fentanyl pills that were pulled out of the Pendleton colored fanny pack that the defendant was carrying that we saw on the video of the traffic stop where he had the blue and white pills. That was 18 grams of fentanyl.

So 18 and 50, certainly more than 40 grams. The weight here is not really in dispute.

Did he possess it -- did he possess it with intent to distribute it? Well, that takes us to the traffic stop. How do we know that was happening? Circle back to Agent Pavlicek. Remember he got into the defendant as a potential drug target in a little bit earlier in the fall, some time around September-October, something like that.

They start working a drug case on him, a trafficking case on him. They can see, after they get some process on the defendant's phone -- you heard discussion about a ping warrant. Don't be confused about that. It's location monitoring on someone's phone. They got an e-mail every 15 minutes. They could see when the defendant's phone was moving back and forth.

And they saw him on a trip where he was moving back and forth from Browning -- Browning area, and he headed west to the Yakima area, Spokane area. He was there for a period of time and then he started to head back toward Montana.

They had a meeting. We talked about the drug task force up there in the Browning area. They got together. Blackfeet Law Enforcement -- we have some of the officers that are still here in the back of the courtroom -- they were all ready to go. There was an FBI agent there. Special Agent Murphy was there. DCI agents were there.

Then we had Officer Denney conduct the traffic stop. Not purely out of drug suspicion, although probably the real reason they wanted him to pull him over. They caught him going

55 in a 45.

From the outset, he asked for driver's license, identification. Confirmed that the driver of that vehicle was the defendant, Doug Malatare. The same Doug Malatare that Montana DCI was working a drug investigation on. The same Doug Malatare that was talking to Adam Fixel through those texts about quantities and prices of fentanyl. The same Doug Malatare that would eventually tell Sheldon Meineke what he was doing, which was buying low and selling high. The same Doug Malatare that had a fanny pack that had fentanyl in the fanny pack that he possessed that night that he was at first reluctant to turn over to law enforcement when they pulled him over after the dog alerted on the vehicle.

And then there was the search of that car, and that's where those multicolored fentanyl pills, those Skittles, were found in the armrest of the back seat. That was 476 pills there possessed in the vehicle registered to and being driven by the same individual that was bragging about distributing drugs, and the same individual who had fentanyl on his own person, the same individual who gave half a pill to Shawn Wippert a month before causing Shawn Wippert's death.

Ladies and gentlemen, this is not a complicated case. We had a lot of witnesses. Each one of them gave you a couple of facts that are important to help you know, to help you be firmly convinced about what happened in the fall and winter of

2022. And what happened was a drug dealer dealt some drugs to a man who used half a line, or a line, of that fentanyl from the half pill that he received, and that fentanyl killed him.

And for those reasons, ladies and gentlemen, this man is guilty. He's guilty of Count 1, distributing fentanyl to Shawn Wippert resulting in Shawn Wippert's death, and he's guilty of Count 2, for possessing over 640 fentanyl pills with the intent to distribute.

Thank you.

THE COURT: Thank you, Mr. Starnes.

Mr. Gallardo.

MR. GALLARDO: Yes, Your Honor.

MR. STARNES: Would it be okay if I relocate, Your Honor? Thank you.

MR. GALLARDO: Folks, your work here as jurors is done the minute that you find reasonable doubt exists in this case, and it absolutely exists in this case.

Good morning again. Here in a little while during deliberations you'll have primarily three jobs.

One of your jobs is going to be to make decisions about the case.

Your second job is going to be to make sure that everyone follows the law in the case, which was just provided through the jury instructions -- the jury instructions.

Now, your third job is going to be to explain to each

other why you feel the way you do about this case, and I'm taking this time to offer some suggestions as to how to do that.

First, folks, it comes down to one question: Did the prosecution rule out all reasonable doubts, those possibilities based on common sense that favor Doug Malatare in this case? The prosecution either did or did not, and that's -- that's what we're here to decide.

And I'm just going to say this as to Count 1, the fentanyl overdose count, that one -- that's a little easier. That's a no. There are just too many -- too many unanswered questions, too many -- too many other considerations.

Mr. -- it's a tragic case. I believe Shawn Wippert was a good man who was struggling with some things, but Doug Malatare is not responsible for his death.

Now, Count 2, the -- the just regular distribution, that's -- I mean, that -- that's a harder question, right. There are some things to think about how we know that Mr. Malatare was found with a good amount of fentanyl in his vehicle. And, you know, we heard from some witnesses, but we didn't actually hear anyone come and say that they purchased fentanyl from Mr. Malatare. We didn't. Nobody came in and said I saw him; I know that he sells to these people. We didn't hear that. So these are things that you're going to want to talk about.

Now, the prosecution put a lot of work and effort trying to connect Mr. Malatare to Wippert, and that's a big deal. Somebody -- somebody lost their life, somebody passed away. So since there was a lot of focus on that count, I'm going to put a lot of focus into that count as well.

And we're just going to say Shawn Wippert did not overdose from marijuana. He overdosed from fentanyl. We want to make that clear. There was talk about marijuana, there was, but we know that Shawn Wippert at some point received fentanyl from someone.

Now, we were bringing up marijuana, and we will here pretty soon, because we know that Shawn Wippert, he had -- he had marijuana on him. We know that Doug Malatare has -- he had large amounts of marijuana. There was marijuana found at Shawn Wippert's house, and we know that there was a -- it sounds like there was some sort of encounter or meeting between Malatare and Wippert that day.

Now, I want to talk about reasonable doubt. So the prosecution needs -- they have the burden. They have to rule out all the reasonable doubt. Now, they have to rule out the possibility -- the logical possibility that Mr. Malatare did not provide Shawn with anything. So I'm just going to do some doodling for you, some writing.

First thing the prosecution is going to have to rule out, and they'll probably touch on this, is that it's possible

that during that encounter, Mr. Malatare did not provide Wippert with anything. That's a possibility that they're going to have to rule out. I put RD is short for reasonable doubt.

Reasonable Doubt No. 2: It's possible that Malatare provided Wippert with marijuana. Now I'm going to expound on these here in a few minutes.

Now, I'm just focusing on some of the larger reasonable doubt points. There may be other points that you thought of or scribbled down throughout the case. That's fine; I'm just focusing on a few.

Reasonable Doubt No. 3: They need to eliminate the possibility that Wippert received fentanyl from some other person either that day or the day before from someone else. All right. That third point, they need to rule out the possibility that Shawn received fentanyl from another person that day or the day before.

Now, the prosecution, they're not required to remove all possible doubt, just those reasonable ones based on common sense. All right. Now, here there's just too much speculation as to what happened. We don't really know who gave Mr. Wippert the fentanyl. We didn't know -- we don't know when he received it.

Now, some of you may think that reasonable doubt -- you might believe that reasonable doubt is there. And if that's not the case, then those of you who don't have those

feelings, listen -- listen to the other jurors. Those of you with reasonable doubt, share why you feel the way you do about this case. If you have notes or anything like that, talk about that. And I'm -- over the next two minutes or so, I'm going to highlight some -- some nuggets that we heard throughout the trial these past few days.

Now, we did not hear or learn that Doug Malatare provided fentanyl to Shawn Wippert that night, not expressly. We don't -- we just didn't hear that. The prosecution has some thoughts that they're trying to -- they're trying to connect over here. We have no witness to that.

We do know that Doug Malatare had lots of marijuana around him, and that would -- we saw that in one of the -- one of the exhibits. When Mr. Malatare was pulled over in December, we saw that he had a lot -- he had a lot of -- he had a good amount of fentanyl. He also had a good amount of marijuana. There was a smaller container of marijuana and a larger container of marijuana.

We know that Shawn -- I'm sorry, that Shawn Wippert had marijuana in his dresser. We saw the agents going through the dressers. They took out the plastic. "It's marijuana. He must be self-medicating." They put it back. They didn't hold on to that plastic.

They could have held on to that plastic. They could have ran fingerprints. That would have made our jobs a lot

easier if we -- that we could have had them confirm that, oh, on that day, Malatare provided him with some marijuana.

We know that Shawn Wippert did consume some here and there from what we heard. We also know that marijuana is illegal in Browning, in the Blackfeet area, and because of that, someone like Shawn Wippert would need to rely on somebody else to provide him with that marijuana.

And the marijuana that was found in Shawn Wippert's dresser here, kind of see in the bottom in the plastic, that was never -- that wasn't retained. That wasn't kept. So we're not able to test the batches to compare, like, did this marijuana come from the same stuff that Malatare had.

We heard one of the -- one of the drug agents who specialize in these kind of crimes testify that fentanyl is typically sold in tablets, whereas drugs like marijuana is sold in weight. He specifically said, "Yeah, it's sold in, like, ounce or half an ounce." There's that word: half.

We saw texts between Mr. Malatare and Mr. Wippert. They used the word half.

"Hey, you looking?"

"Ah, I can only afford a half."

We don't really know for sure what they were -- what they were talking about.

Doug -- later on in those texts, we saw Mr. Malatare asking Mr. Wippert if he's good. You know, they're friends.

Shawn is going through some hard times.

We heard from Jade Wippert. She said that she saw another person with Malatare in the vehicle that day. We heard that there were also two other individuals in the vehicle that Mr. Malatare was pulled over in later on. And on that day, it's entirely possible that Mr. Wippert received fentanyl from someone else. It's possible that he had this stash of fentanyl before that day. These are things we just don't know.

We heard from Tracie Rutherford that Shawn Wippert, on that day -- earlier that day, he was out on his own. He was driving around their town. He dropped off some money here and there. Not saying that there was anything, you know, heinous there, but he was out on his own around the town. It's possible that he got something then.

And on the path -- on the topic of amounts, the prosecution seems to think "half" in those texts must mean half a pill of fentanyl. The texts don't say that, and it really doesn't make a whole -- whole lot of sense. So we saw -- we saw the powder. We saw the fentanyl that was on Mr. Wippert's dresser. It's that type of pill. It's like the chalky aspirin one. If you try to cut that in half, what's going to happen? It's going -- it's going to crumble. And just seems unlikely that they would be talking about half a pill of fentanyl.

And, again, we saw and perhaps the prosecution will pull up the photo later, but we saw Mr. Wippert's dresser. We

saw that there was a good amount of fentanyl on the dresser, right?

If they were talking about half a pill of fentanyl, let's say they cut it, somehow they were able -- I don't know -- how much would Shawn Wippert have had to ingest from that half a pill when there's so much left over? We would probably be talking about a quarter, maybe less than a quarter of a pill of fentanyl. It just seems unlikely.

You know, I'm not an expert or anything. It seems unlikely that he would overdose from such a small quantity when the prosecution brought up a witness who -- her name was Jaynell Davis, who says that she takes a quarter of a pill on the regular and it doesn't even get her high; it just -- it just takes the edge off.

And let's talk about what we don't have. So we have some texts. We have some texts between them. Now, if it happened the way the prosecution wants you to think it happened, wouldn't we have some texts from Shawn -- sorry, from Shawn Wippert telling Mr. Malatare: Hey, thanks for hooking me up. I didn't have a lot of money.

That's another thing, Mr. Wippert's mom said that Shawn didn't have a lot of money. So how could he have afforded something like this that day?

But we don't have texts from Wippert to Malatare saying: Hey, thanks for hooking me up. Thanks for whatever.

We don't have texts from Wippert to Malatare saying later: Hey, man, I ain't feeling that great. Where did you get this stuff? We don't have that.

But we do know that later on that evening, around 9:30 or so, Pat Schildt was talking to Shawn Wippert, and he remembers that day because they were -- they'd been close friends for years, and he found out the next day that his good friend has passed away. So he knows what day this was and he knows that it was around 9:30. And he said: When I was talking to him he sounded just fine; he was not slurring.

So we know -- we know now that Shawn Wippert was conscious and capable of communicating. And if it happened the way the prosecution says it happened, there would have been some sort of follow-up text; right? Especially when Mr. Malatare's saying: Hey, bro, how's it going?

Take this down.

We heard from some -- some other witnesses, some agents, some experts from the prosecution speak. You know, they all play a very important role in this court and in our -- in our community. We're not trying to knock them. They -- you know, they're making valiant efforts to battle a dangerous epidemic facing -- facing our community; it's true. And they get this -- you know, they do their work and they bring it here to you folks where you're placed in the position to decide whether the prosecution has met its burden of proving its case

beyond a reasonable doubt, whether they've crossed off those -- those pieces there.

That's the question: reasonable doubt. It's not about possibility or probability. We could talk all day and night and then some about whether it was possible or probable that Mr. Malatare provided fentanyl to him, but that doesn't get us there. The founders of our nation decided with good reason that the prosecution must prove its case beyond a reasonable doubt.

And pretty soon you're going to go in that room and your work is really going to begin. It's going to be a little hard, different personalities. Now, I want to emphasize that deliberations are not bullying sessions. You know, we're not politicians or anything like that. You're jurors. If you have an honest belief either way, that's your honest belief. And you're called upon to not compromise it and not try to force somebody else to see things your way. Now, you're allowed to share why you feel the way you do, but, I mean, but that's about the extent of it, and to discuss.

Now, if -- if you do not think that there is reasonable doubt here but somebody else, one of your fellow jurors thinks -- has an honest belief that there's a reasonable doubt, it's possible that there's reasonable doubt there even if you don't believe it if it's a logical possibility that you acknowledge whether you share it or not, and that's kind of --

that's -- it's worded weird and it's a weird thought, so I got to -- I got to rely on a little story I told during voir dire, and it has to do with cookies.

My wife just happened to make cookies last night. You folks remember the hypothetical about the dog who may have eaten the cookie versus the toddler? I put it on the coffee table. Went and changed. Came out. The cookie was gone.

Now, it could be that my wife thinks that the toddler ate it. Now, I -- I don't believe that. I think it was the dog, and I have my reasons, but I recognize that it's possible that the toddler ate it. I can't rule that out. That's reasonable doubt.

On the flip side, though, she thinks the toddler ate it. She can't rule out the possibility that the dog ate it. That's reasonable doubt. She doesn't -- you know, she doesn't believe that the dog ate it, but she recognizes there's reasonable doubt.

And in that hypothetical, we're talking about just two possibilities and there's reasonable doubt. In this case we're talking about multiple points of reasonable doubt. So it would be, like, if the cookie were in the same room as, like, two or three dogs and a toddler.

Now, I'm talking about cookies and dogs and stuff; that's not to take away from the gravity of this situation here. The defendant came here, he chose a jury trial, and you

were chosen on this jury. The defendant entrusted his freedom to you.

Now, you probably didn't want to come here and be jurors. You probably -- you were probably hoping to go home that day. There was probably something that you could have said to get you home, but something made you stay. Out of so many people that left that morning, you stayed.

And more than that, throughout this case, the long day we had yesterday, you paid close attention to the evidence, the testimony. You took notes. Your concern over the past few days has been that of -- for a total stranger, and not a lot of people would do that. Something put you here for a reason. You were chosen to come here to take time away from your busy lives and be a protector of our constitutional rights.

Now, we've explained why there's reasonable doubt, why there are too many unanswered questions or not enough to walk to that guilty verdict. And it's like the judge told us earlier in this trial, we don't put people in jail for probably committing crimes.

Because of all that, we ask you to take out your verdict form after you -- after you discuss, mark not guilty as to Count 1 and not guilty as to Count 2.

Thank you so much for your time and your attention.

THE COURT: Mr. Gallardo.

Mr. Starnes, brief rebuttal.

MR. STARNES: Thank you, Your Honor.

Can I please have Government Exhibit 19?

All right. Ladies and gentlemen, I want to touch on a few things that the defense was just discussing with you, those three bullet points they claim are reasonable doubt.

I talked to you about this before; marijuana in this case is a red herring. It is a distraction from what you need to be focusing on, which is where did the fentanyl come from.

We talked about where the fentanyl came from. There's only one logical explanation based on evidence that was presented to you in this courtroom about where that fentanyl came from.

So remember, Instruction No. 4, statements of the lawyers are not evidence, things that were said in opening statement or during closing argument are not evidence. There is no evidence that Shawn Wippert was a habitual drug user. None. We don't know.

There is no evidence that Doug Malatare was a drug user. Not one witness took that witness stand and said Shawn Wippert was a drug abuser. Not one witness took the witness stand and said Doug Malatare was a drug user.

They told you Doug Malatare was a drug dealer. In fact, Doug Malatare through Sheldon Meineke told you that's what he was doing: I got caught on a drug run where I could go buy in Washington for low and sell in Montana for real high.

When it comes to Pat Schildt's testimony we heard this morning, I think Mr. Schildt was confused about his timeline. You heard he doesn't really track his days all that well.

His timeline cannot possibly be correct because he said Shawn was working for him that day. But you heard through Ms. Paisley's cross-examination, the last time Shawn did a big job for Mr. Schildt was a couple months before the end of summertime when he helped paint the store, C-Store, the gas station store, the Shell store that Mr. Schildt owned.

And we know that Doug -- excuse me, that Shawn was not with Pat Schildt all day because he was with his mom in Cut Bank some 30 miles away from Browning. So he couldn't have been in two places at once. So I think Mr. Schildt's timeline, he's just misremembering his dates about the last time he was hanging out with Shawn.

But it doesn't really matter because here's the rub: We don't know the exact time that Shawn snorted that fentanyl that killed him. We know he had it on his nightstand. We know that he was found in the morning. The last time somebody saw him alive is when Darlene went to bed around 9:00-9:30 when she typically gets ready for bed and winds down. She woke early in the morning and found him dead. He could have snorted that fentanyl any time between that day and the time she saw him deceased in the bathroom.

Why didn't he reach out to the person who gave him the

fentanyl once he was going through it and passing away? Well, there's a couple of reasons why that could be, but the honest answer is we don't know for sure.

But you can think back to the testimony in how fentanyl works on the body through Scott Schlueter and Aldo -- Dr. Fusaro. What do we know? Fentanyl shuts down your breathing. The type of fentanyl that you get could have an unknown dose in it. In this case it was street fentanyl, unknown dose.

Method of ingestion, we heard the word insufflation that nobody could spell right. That's taking it through the nose. That's what happened in this case. But that matter of ingesting fentanyl has the potential to get you high really quickly because it bypasses the liver. Remember that testimony? So we know that he was using illicit fentanyl. So we don't know what quantity of bad substance was in that pill, that half a pill in this case. We know that he snorted it through his nose. It was going to act upon him quicker. It was going to have a bigger impact.

We know fentanyl shuts down your breathing. Quite possibly Shawn didn't have time or wasn't thinking about, hey, I need to text the guy that gave me this pill. He's probably thinking what is happening to me if he's thinking at all. We just don't know. We don't need to speculate about it because all the evidence, when you put all the pieces together, points

to one conclusion, and that's that a drug dealer reached out to somebody that needed something.

Why, if Shawn Wippert was not a habitual drug user, was he looking for fentanyl? We don't know. We know he had some surgery just prior to this and he was in pain. We know he was taking that prescription pain medication and some ibuprofen that quite possibly wasn't doing it for him.

Perhaps Shawn and the defendant were friends and the guy that had a bunch of fentanyl was trying to help his friend out and accidentally gave him the pill that killed him. And if that's the case, he's still guilty. He's still guilty of giving fentanyl to somebody else, somebody taking that fentanyl and then dying.

You see the law does not require the government to prove that the defendant gave a specific quantity of that drug to Shawn Wippert. The government is not required to prove to you that the defendant knew that that drug would kill him, or that he wanted that result, or that he'd even foresee that that would happen.

The fact of the matter is, the law simply says if you give fentanyl to somebody else and they take it and they die, you're on the hook for that distribution because fentanyl is a dangerous drug. You saw it, just a line killed him.

And I want to remove any remaining doubt you have about this case, and that's why I asked Ms. Paisley --

I'm sorry, not 19, 17, thank you. I couldn't read my own handwriting.

We're going to pull up Exhibit No. 17 here, because what I want you to do is take a look at that bag of multicolored pills. Do you remember how much was in there? 476 pills. You can write that number down. You can add the number 173 to it. That's the number of blue and white pills that were there.

You can take that number and you can multiple it by 50 to $60 per pill, and what you're looking at there is in excess of $30,000 of fentanyl. Ladies and gentlemen, this case is simple. You want to understand the drug trade: its economics. Don't let Shawn Wippert be a cost of doing business. Hold Doug Malatare accountable for what he did: possession with intent to distribute and distributing fentanyl that killed Shawn Wippert.

Thank you.

THE COURT: Thank you, Mr. Starnes.

Members of the jury that completes the arguments. Before I can release you to deliberate, however, I have to -- we have to select the alternate. As I explained to you, we don't do that until now to make sure everyone is paying careful attention. I'm sorry the alternate won't get to deliberate unless someone else will be excused. We -- in that way we have a fair and impartial jury.

Madam clerk, will you please select the alternate juror.

COURTROOM DEPUTY: The alternate juror is Juror No. 7.

THE COURT: Juror No. 7, [redacted]. If you please wait, sir, after taking the jury out, the clerk needs to get some information from you.

All right. Would the bailiff please come forward.

COURTROOM DEPUTY: Please raise your right hand.

(Bailiff sworn.)

COURTROOM DEPUTY: Thank you.

THE COURT: All right. Bailiff please escort the jury out to the jury room to deliberate. We'll hear from you when you're ready.

(The jury left the courtroom, after which the following proceedings were had.)

THE COURT: Please be seated. Anything before we break?

MS. PAISLEY: No, Your Honor.

THE COURT: Ms. Musick, anything before we break?

MS. MUSICK: No, Your Honor.

THE COURT: All right. Thank you. We'll let you know when we hear from the jury. Please stay in contact. You don't have to stay in the courtroom.

We need the courtroom now, if you wouldn't mind clearing out, we have a naturalization ceremony.

Thank you for your time. We'll be in touch.

(Recess at 10:49 a.m. to 1:18 p.m.)

(Proceedings had outside presence of the jury.)

THE COURT: Good afternoon.

MR. STARNES: Good afternoon, Your Honor.

THE COURT: I have a note from the jury. I'm not surprised I guess. It says, Government No. 30, convert times to Mountain Standard Time on text." Signed by the foreperson.

So in light of that request, I'd be inclined to give an instruction and pass it out. Very similar to the instruction given by the court *United States versus Michael* we discussed this morning, 664 Federal Appendix 32, and approved by the Second Circuit it would read: Coordinated Universal Time, abbreviated as UTC, is the primary time standard by which the world regulates clocks and time. Local time in Montana is seven hours behind the UTC during Standard Time but six hours behind the UTC during observance of Daylight Savings Time. You may but are not required to accept this fact as proven.

Ms. Paisley?

MS. PAISLEY: Considering it's within two weeks of the changing of Daylight Savings Time, do you care to tell them it was Standard Time? In November of '22, Daylight Savings Time ended November 6th.

THE COURT: Is that a fact of judicial notice?

MS. PAISLEY: I'll leave it with the court.

Government doesn't objection to this instruction, Your Honor.

THE COURT: Mr. Gallardo, any objection? Ms. Musick?

MR. GALLARDO: No. No, Your Honor.

THE COURT: All right. Bring in the jury. I'll give the instruction; we'll move on.

(The jury entered the courtroom, after which the following proceedings were had.)

THE COURT: Please be seated. Good afternoon. I have a note from the jury reads, "Government No. 30, convert time to Mountain Standard Time on text." Signed by Juror No. 1.

So I assume you're asking how to convert the time on the text messages to Mountain Time, so I'm going to read the instruction to you.

Madam clerk, do you have a copy?

COURTROOM DEPUTY: Yes.

THE COURT: All right. It will be on the screen in front of you.

Instruction No. 30

Coordinated Universal Time, abbreviated as UTC, is the primary time standard by which the world regulates clocks and time. Local time in Montana is seven hours behind UTC during Standard Time, but six hours behind UTC during observance of Daylight Savings Time. You may but are not required to accept this fact as proven.

I hope that clarifies things for you. Now, I'm going

to ask you to please continue to the jury room and continue your deliberations. Thank you.

(The jury left the courtroom, after which the following proceedings were had.)

THE COURT: Please be seated. All right. I'll let you know when we hear again from the jury. I have a couple arraignments and suppression hearing to conduct in the meantime. Please stay close by.

(Recess at 1:22 p.m. to 2:24 p.m.)

(Proceedings had outside presence of the jury.)

THE COURT: Good afternoon, counsel.

MS. PAISLEY: Good afternoon, Your Honor.

THE COURT: I have a note, We have reached a verdict -- or reached our verdict. Signed by foreperson 1:57 p.m.

Any issues before I bring in the jury, Ms. Paisley, Ms. Musick?

MS. PAISLEY: Nothing, Your Honor.

MS. MUSICK: No, Your Honor.

THE COURT: Ms. Boland, if you'll bring in the jury.

(The jury entered the courtroom, after which the following proceedings were had.)

THE COURT: Please be seated.

Good afternoon, members of the jury. I hope we didn't disturb you too much. We had a naturalization ceremony for new citizens. We had a hearing in court. I hope we didn't disturb

you.

Madam foreperson, I hear you have a note. Do you have the verdict form? Will you please give it to the bailiff.

Thank you.

Madam clerk, please publish the verdict.

COURTROOM DEPUTY: Ladies and gentlemen of the jury, this is your verdict in cause No. CR 23-80-GF-BMM, *United States of America versus Douglas Darren Malatare*.

We, the jury, in the above-entitled matter, unanimously find the defendant, Douglas Darren Malatare, guilty of distribution of fentanyl resulting in death, in violation of 21 U.S.C. Section 841(a)(1) and (b)(1)(C).

We, the jury, in the above-entitled matter, unanimously find the defendant, Douglas Darren Malatare, guilty of possession with intent to distribute fentanyl, in violation of 21 U.S.C. Section 841(a)(1).

2(A). Having found the defendant guilty of Count 2 of the indictment, we unanimously find beyond a reasonable doubt that the offense involved 40 grams or more of a substance containing a detectable amount of fentanyl: True.

Dated this 19th day of September, 2024. Signed by the foreperson.

Ladies and gentlemen of the jury, was that your unanimous verdict as read?

ALL JURORS: Yes.

THE COURT: Ms. Musick, would you like the clerk to poll the jury?

MS. MUSICK: Yes, please.

THE COURT: Madam clerk, please poll the jury.

Juror No. 1, is that your verdict as read?

JUROR NO 1: Yes.

COURTROOM DEPUTY: Juror No. 2, was that your verdict as read?

JUROR NO 2: Yes.

COURTROOM DEPUTY: Juror No. 3, was that your verdict as read?

JUROR NO 3: Yes.

COURTROOM DEPUTY: Juror No. 4, was that your verdict as read?

JUROR NO 4: Yes.

COURTROOM DEPUTY: Juror No. 5, was that your verdict as read?

JUROR NO 5: Yes.

COURTROOM DEPUTY: Juror No. 6, was that your verdict as read?

JUROR NO 6: Yes.

COURTROOM DEPUTY: Juror No. 7, was that your verdict as read?

JUROR NO 7: Yes.

COURTROOM DEPUTY: Juror No. 8, was that your verdict

as read?

JUROR NO 8: Yes.

COURTROOM DEPUTY: Juror No. 9, was that your verdict as read?

JUROR NO 9: Yes.

COURTROOM DEPUTY: Juror No. 10, was that your verdict as read?

JUROR NO 10: Yes.

COURTROOM DEPUTY: Juror No. 11, was that your verdict as read?

JUROR NO 11: Yes.

COURTROOM DEPUTY: Juror No. 12, is that your verdict as read?

JUROR NO 12: Yes.

THE COURT: Thank you, madam clerk.

All right. Members of the jury, I want to thank you for your service. I'm going to have the bailiff escort you back to the jury room, and I'll be there momentarily to relieve you of your summons in person.

Bailiff, please escort the jury back to the jury room.

(The jury entered the courtroom, after which the following proceedings were had.)

THE COURT: Please be seated.

All right. Mr. Malatare, the jury having rendered its verdict, it's my obligation to sentence you. I'm going to set

the sentencing hearing for Wednesday, January 22nd, 2025, at 1:30 p.m. this courthouse in Great Falls.

Ms. Paisley, Mr. Malatare is not in custody. What's the government's position regarding custody?

MS. PAISLEY: Your Honor, under 18 U.S.C. 3143(2), it is mandatory in this case, it's also unless the court's going to find there's a basis for a new trial.

The United States, of course, is bound by the 20-year mandatory minimum on Count 1 in this case. If the court is going to consider conditions, I'd ask which prong under 2. He was looking at. And if that were, in fact, true, we'd ask him to be taken into custody now for a detention hearing so I could bring witnesses.

I have information that Mr. Malatare's girlfriend is a citizen and resident of Canada and recently asked probation about Mr. Malatare moving to Canada with -- with her. That was raised to the United States Probation Office. Because of his status, he needs no documentation other than possibly an ID to cross into Canada. And given the 20 mandatory minimum on Count 1 and his age, I do not believe he should be released at all after now a guilty verdict.

THE COURT: All right. Ms. Musick, your position?

MS. MUSICK: Your Honor, we believe that Mr. Malatare should be permitted to stay out on conditional release pending sentencing in this matter. I am unaware of any violations that

he has had while this case has been pending, and it has been pending for I believe nearly a year since his arraignment, Your Honor.

Mr. Malatare's girlfriend did ask me about the potential for him to possibly go to Canada to work. She had work opportunities that were available to him, and she thought that it would behoove him to be gainfully employed in a full-time status while this matter was pending.

I reviewed the conditions of release with her, and I advised her that I could not -- could not say whether or not the court would permit him to go to Canada, or not while this matter was pending, given his conditions of release. And I advised him that if he wished to discuss that, he could ask his pretrial officer.

Mr. Malatare very much understands that he has to follow all of the rules of probation, and it's my understanding that he has no intention of leaving the country without the court's permission. And if the court's -- if the United States Probation Office informed him that he was not permitted to leave the country while this matter was pending, I feel certain that he would not do so.

I have no concerns whatsoever about Mr. Malatare's ability to continue to follow his conditions of release pending sentencing, and I would ask that the court continue his conditional release.

THE COURT: All right. We have the mandatory minimum sentence here. And this is a presumption case?

MS. PAISLEY: Yes, Your Honor. And -- and, Your Honor, I have the code right in front of me, and this is 3143(a)(2), "The judicial officer shall order that a person who has been found guilty of an offense in the case described in subparagraph (A), (B) or (C)," and that is this one, a controlled substance violation over 10 years, "of subsection (f)(1) of Section 3142 and is awaiting imposition of sentence be detained unless:

(A)(i) the judicial officer finds there is a substantially likelihood that a motion for acquittal or new trial will be granted; or

(ii) an attorney for the government has recommended that no sentence of imprisonment be imposed on the person.

And if one of those two factors are met, then the court must find by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person in the community, because unless the court is going to find that a judgment of acquittal is likely or there's going to be a new trial, we, as the United States, will not be recommending that no sentence be imposed.

So I don't believe those factors are met here.

THE COURT: Ms. Musick, how do we get past that statutory requirement?

MS. MUSICK: Your Honor, I would just like to note that the court's practice typically in cases, even with a mandatory minimum where -- where the defendant has been out on a conditional release order pending trial, if convicted at trial the court's typical stance is to allow the defendant to remain on release on conditions pending sentencing. And we believe that this case is no different than any other that this court typical hears, and it would be a disparity for the court to take Mr. Malatare into custody today.

THE COURT: Ms. Paisley, are you aware of any violations in the conditions by Mr. Malatare?

MS. PAISLEY: I'm not, Your Honor.

THE COURT: Okay. Well, this is -- there is a presumption of detention here. Mr. Malatare's facing a significant period of time in custody.

I'm not sure -- Ms. Musick, I understand in other situations I've made a finding that the person did not pose a danger or threat and released them, but here I've got either a motion the government required or a determination by the court that Mr. Malatare is likely to get a new trial or some other immediate review of the verdict. I don't think that's going to happen here. Certainly have an issue on appeal regarding the text messages, but that's -- I've already made a ruling about that and that's where the Ninth Circuit should review. I've already made that decision myself.

I'm aware that Mr. Malatare has had no violations of his conditions. I think it would be appropriate for him to have a full detention hearing as soon as possible.

I think Judge Johnston's available when, madam clerk?

COURTROOM DEPUTY: Monday.

THE COURT: Monday, okay, 1:30.

All right. So in light of all that, having the jury found you guilty, Mr. Malatare, I'm afraid I'm going to have to put you into custody for now for a hearing Monday at 1:30 for Ms. Musick to present to Judge Johnston. He's more aware of what his conditions of release have been, what his release plan will be that's appropriate.

The main concern I have about Mr. Malatare trying to go to Canada -- and I hope you don't take that step, Mr. Malatare. It will be a big mistake. So for now I think the safest route, to keep the government involved, give you a chance to reflect and absorb what happened here, to keep you in custody, have a detention hearing with Judge Johnston Monday afternoon.

Anything else, Ms. Paisley?

MS. PAISLEY: No, Your Honor. Thank you.

THE COURT: Ms. Musick?

MS. MUSICK: No, Your Honor.

THE COURT: All right. Thank you. We'll be in recess.

(Proceedings adjourned at 2:36 p.m.)

CERTIFICATE

I certify that the foregoing is a true and correct transcript from the stenographically reported proceedings in the above-entitled matter.

DATE: October 1, 2024

/s/Kimberly R. Greiner
KIMBERLY R. GREINER, RMR, CRR, CRC, RDR
United States Court Reporter