UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

UNITED STATES OF AMERICA, )
)
Plaintiff, )
) Volume 4
vs. )
) Criminal Docket
DOUGLAS D. MALATARE, ) No. CR-23-80-GF-BMM
)
Defendant. )
...................................

Partial Transcript of Trial with a Jury
Opening Statements

Missouri River Federal Courthouse
125 Central Avenue West
Great Falls, MT 59404
Tuesday, September 18, 2024
9:44 a.m. to 10:00 p.m.

BEFORE THE HONORABLE BRIAN MORRIS

UNITED STATES CHIEF DISTRICT COURT JUDGE

Kimberly R. Greiner, RMR, CRR, CRC, RDR
(Reporter remotely through Zoom.)
United States Court Reporter
Bob Dole Federal Courthouse
500 State Avenue
Kansas City, KS 66101
kim_greiner@ksd.uscourts.gov
(913) 735-2314

Proceedings recorded by machine shorthand, transcript
Produced by computer-aided transcription.

APPEARANCES:

PRESENT ON BEHALF OF THE PLAINTIFF,
UNITED STATES OF AMERICA:

Kalah A. Paisley
Jeffrey K. Starnes
OFFICE OF UNITED STATES ATTORNEY
119 1st Ave North
Suite 300
Great Falls, MT 59401

PRESENT ON BEHALF OF THE DEFENDANT:

Elizabeth T. Musick
MUSICK LAW FIRM, PLLC
P.O. Box 726
Bozeman, MT 59771

Paul Gallardo
FLAHERTY GALLARDO law office
1026 1st Avenue S.
Great Falls, MT 59405

ALSO PRESENT:

Cherie Hives, legal assistant
Kyle Sinclair, BIA
William Murphy, DEA

INDEX

| | Page |
|---|---|
| Opening Statement by Ms. Paisley | 4 |
| Opening Statement by Ms. Musick | 9 |

(Beginning of requested excerpt.)

MS. PAISLEY: Thank you, Your Honor.

Snorting a line of fentanyl can kill a man. November of 2022, Darlene Wippert was at home with her son, Shawn, with whom she resided on the Blackfeet Indian Reservation. Shawn was 49 years old.

That afternoon they had run errands to Cut Bank and returned to the house. At some point Shawn went outside and visited with his friend, Doug Malatare, and then he came back and they had dinner. She made him soup because just a couple days before Shawn had had oral surgery. It was hard for him to eat. At dinner he started looking a little weird. After dinner, she heard him snoring downstairs, and so she turned in.

In the morning Shawn's dog was up wanting to be taken outside, and that worried Darlene. She went down to find her son unconscious and unresponsive in the bathroom. She called law enforcement, and they responded.

The Glacier County coroner came out to the house to investigate the unattended death, and what he discovered -- at first he suspected it might have been a heart attack due to the nature of how the body was found, but then he started seeing signs that indicated to him it might have been by a drug overdose. He saw foaming from the mouth. And upon inspection of the room where Shawn Wippert lived, he found crushed up powder of a bluish hue as well as a straw.

Jade Wippert is Shawn's daughter. She was there for part of that afternoon, evening. She was headed down to Bozeman with a friend and had been hanging out at her grandma's house. When she went to leave with her friend, she went to say good-bye to her dad, and he was in a car, a car that Darlene can identify as being used by Doug Malatare. Her dad was in the passenger seat, and there was a big, tall man with long hair in the driver's seat. Her dad opened the door, told her he loved her and to have fun, and that was the last time she saw her father alive.

Mike Brown is the coroner who responded. He'll talk to you about what he saw, what he did and how he sent the body for an autopsy to the Montana Crime Lab. You'll hear from three scientists from the Montana Crime Lab: two toxicologists who examined the blood and urine of Mr. Wippert, of Shawn, and Dr. Fusaro, who is a medical examiner who conducted the autopsy of Shawn.

At their conclusion of their testing, what they determined -- what Dr. Fusaro determined killed Shawn Wippert was acute fentanyl intoxication. Dr. Fusaro will describe how acute fentanyl intoxication, or more colloquially called overdose, takes a person's life, what happens in their body that results in their death. He will describe that for you.

You will hear from witnesses who will talk to you about drug use on the Blackfeet Indian Reservation, the

prevalence of fentanyl, how fentanyl is sold, what the prices were for fentanyl back in the end of 2022, and the language people use to communicate between a user and a buyer when they're interested in buying illicit substances.

You will then see text messages between Shawn and the defendant in the hours before he died.

MS. MUSICK: Objection, Your Honor.

MS. PAISLEY: Not substance.

THE COURT: Overruled. Stick to the rulings please.

MS. PAISLEY: But the case didn't end there, ladies and gentlemen. It wasn't a one-off with the distribution of drugs to Shawn, because before the autopsy was even concluded in this case, before the toxicology came -- came back, law enforcement became aware that the defendant was trafficking large amounts of drugs, specifically fentanyl, between Washington and the Blackfeet Indian Reservation.

You will hear from the DCI investigators that the Montana Department of Criminal Investigations -- or Division of Criminal Investigations who began this investigation, how he learned about this, the evidence that he had, the informant who told him and showed him text messages about his trafficking specifically with a man named Doug who was older in his fifties who lived on the Blackfeet Indian Reservation. And you will hear how investigators linked that description and that man to the defendant.

You will hear about their investigative tools included a ping warrant. They'll describe what a ping warrant is and how that allows an individual, law enforcement, to track where a person goes through their phone.

You will hear about how, in December of 2022, law enforcement saw the defendant moving west towards Washington on what they suspected was a drug trafficking run. You will hear from law enforcement and the task force that gathered in Browning, Montana based on this information, and then you will hear about what happened when the defendant crossed into the reservation and was stopped for speeding.

You will see body camera of that interaction of the defendant driving the vehicle. You will see him reaching into a specific bag to produce his wallet for law enforcement. You will see a drug sniff. A dog responded to the scene and alerted to narcotics on that vehicle. You will see that, ladies and gentlemen, and you will see the defendant want to keep the bag that had fentanyl in it, because when they open that bag to put him in the back seat of the car they found hundreds of fentanyl pills.

But, ladies and gentlemen, that wasn't all. Because then they seized the car and conducted a search warrant and search of the vehicle, and they found, in addition to those pills, hundreds of more multi-colored fentanyl pills as well as cash and a scale and a list of names. You will hear how those

drugs were eventually tested by the DEA and confirmed to be fentanyl.

You will also hear from somebody who saw the defendant immediately after the traffic stop. You will hear from Sheldon Meineke who is currently in custody on a state -- a state felony. And you will hear from him about how he shared a cell with the defendant immediately after the traffic stop and what the defendant told him, how he was bragging about what he was doing and why he was in jail.

Finally, you will hear from Agent Murphy with the DEA, and he will tell you that not only did -- were the drugs that were tested fentanyl, he will tell you how much fentanyl they were, how many grams it was, and also that the DEA determined that the powder on the nightstand belonging to Shawn was, in fact, fentanyl.

At the conclusion of that, my colleague will be up here to ask you to hold the defendant responsible for what he did because what he did was he possessed hundreds of pills of fentanyl with the intention of distributing it and he distributed it to one man, Shawn Wippert, who died as a result of that.

Thank you, ladies and gentlemen.

THE COURT: Thank you, Ms. Paisley.

Ms. Musick.

Before Ms. Musick speaks, I just want to clarify

something. You see on your screen in front of you a person you've not seen before, and my court reporter is absent in front of you as well. She has other obligations this morning, so we're using a remote court reporter who is listening in by Zoom and taking down every word that's being said here today, so please don't be distracted by her.

When we put exhibits up on the screen, her face will go -- be covered up by those. And one thing about the exhibits, often times the lawyer will show a witness the exhibit first before you can see it and some of the -- some of the exhibits have been admitted already. If that's the case, you're going to see it right away; otherwise, I have to say first the witness -- the exhibit is admitted, go ahead and show the jury. So don't be worried we're looking at something you can't see it yet. The lawyer will ask for it to be admitted if that's the case.

All right. Go ahead, please, Ms. Musick.

MS. MUSICK: Thank you, Your Honor.

Ladies and gentlemen of the jury, thank you so much in advance for your time these next two days. I only spoke with you briefly yesterday, so once again my name is Elizabeth Musick, and I represent Doug Malatare in this case along with my co-counsel Paul Gallardo. You got to know Paul a little bit during voir dire yesterday.

This is not going to be an easy case to sit through.

As you heard from the judge and my colleagues during jury selection and the government's opening statements just now, this is a case about fentanyl, specifically a fentanyl overdose. But I want you to remember that this is also a case about Doug Malatare. So let me tell you a little bit about Doug.

Doug is 59 years old and he is an addict. Sadly, he, like so many other people in our country and in our communities, became addicted to fentanyl late in his life. I'm happy to say that he's been clean and sober for about two years now. But at the time of the events in this case, he was actively using large quantities of fentanyl. Doug was using up to 15 fentanyl pills per day at the height of his addiction. Fifteen pills a day, that's about a hundred pills per week.

And the evidence that you will hear in this case will teach you that fentanyl pills are sold on our reservations here in Montana for about 40 to $50 per pill. So supporting a heavy fentanyl addiction is expensive.

Addicts are also concerned about the possibility of going through withdrawals, so they like to make sure that they have plenty of their substance of choice available to them so they don't begin to go through withdrawals.

So what did Doug do to support his addiction? He began to travel to Washington to obtain fentanyl at cheaper prices and bring it back to Montana. Like most addicts, Doug

also used marijuana, and he obtained marijuana in Washington and brought it back to Montana. Although Montana is legal under state law in Montana, it's still a substance that is illegal under federal law and specifically on reservation land which is under federal jurisdiction.

The evidence in this case will show you that law enforcement became aware of Doug's activities through several informants, and they obtained a warrant to get ping locations on Doug's phone. So what did they do with that information? They intercepted Doug's vehicle when he was on his way back from a trip to Washington.

They conducted a sniff search with a canine partner who alerted them to the presence of contraband in the vehicle. Law enforcement then used that information to obtain a search warrant to search Doug's vehicle, and fentanyl and marijuana were located inside the vehicle. That is the government's basis for Count 2 of the indictment against Doug.

But let's step back a bit and talk about Count 1. About a month prior to this traffic stop, a man named Shawn Wippert overdosed on fentanyl in Browning, Montana. Shawn Wippert was a friend of Doug's. Shawn had just had mouth surgery earlier in the week, and we anticipate that the witnesses will tell you that he was in a lot of pain after his surgery. He had a prescription for hydrocodone, but it had run out.

You're going to hear a lot of testimony today about Shawn's last day on earth. He spent his last day running to Cut Bank with his mother, Darlene, so she could get new tires on her car. She stopped at Pizza Hut. She grabbed some breadsticks on their trip back to the home in Browning.

That afternoon Shawn left the house for a while to go take his dog on a ride. He dropped off some money for the family sports betting pool. He picked up his daughter, Jade, and he gave her a ride back to Darlene's house.

A short time later, Jade left with her friends to go to Bozeman, and Darlene prepared dinner for herself and Shawn. But Shawn wasn't acting right during dinner. He seemed like he was falling asleep at the dinner table and Darlene was concerned about him. But you'll hear testimony today that this wasn't the first time that Darlene had seen Shawn act like that. And why is that? Because Shawn was a fentanyl addict as well. Shawn was also a marijuana user.

After dinner that night, Shawn went downstairs to his bedroom, and the following morning his mother found him deceased in his bathroom. The autopsy report states that his cause of death was acute fentanyl intoxication.

So where did he get the fentanyl? The government would have you believe that he obtained that fentanyl from our client, Doug. But we don't know where Shawn obtained the fentanyl and we probably never will.

You heard quite a bit in the government -- about the government's burden of proof in a criminal case during voir dire yesterday. And in the words of Judge Morris, we don't put people in jail for probably committing crimes, and that is because the government's burden of proof is beyond a reasonable doubt, and reasonable doubt absolutely exists in this case.

We're not talking about possibilities or probabilities here. We're talking about beyond a reasonable doubt. The government will not be able to meet that burden and convince you all unanimously beyond a reasonable doubt that Doug Malatare provided the fentanyl to Shawn Wippert that caused his death. So please pay attention closely to the evidence that's presented to you over these next two days, and at the end of this trial, we will ask you to find Doug Malatare not guilty.

THE COURT: Thank you, Ms. Musick.

(End of excerpt.)

CERTIFICATE

I certify that the foregoing is a true and correct transcript from the stenographically reported proceedings in the above-entitled matter.

DATE: October 10, 2024

/s/Kimberly R. Greiner
KIMBERLY R. GREINER, RMR, CRR, CRC, RDR
United States Court Reporter