IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

GREAT FALLS DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs.

DOUGLAS DARREN MALATARE,

Defendant.

Criminal Docket No. CR-23-80-GF-BMM

Court of Appeals No. 25-675

Transcript of Motion Hearing

Missouri River Federal Courthouse
125 Central Avenue West
Great Falls, MT 59404
Tuesday, December 10, 2024
3:36 p.m. to 3:55 p.m.

BEFORE THE HONORABLE BRIAN MORRIS

UNITED STATES CHIEF DISTRICT COURT JUDGE

Yvette Heinze, RPR, CSR
United States Court Reporter
Missouri River Federal Courthouse
125 Central Avenue West
Great Falls, MT 59404
yvette_heinze@mtd.uscourts.gov
(406) 454-7805

Proceedings recorded by machine shorthand
Transcript produced by computer-assisted transcription

# APPEARANCES

PRESENT ON BEHALF OF THE PLAINTIFF,
UNITED STATES OF AMERICA:

Kalah Paisley
Assistant U.S. Attorney
OFFICE OF THE U.S. ATTORNEY
119 1st Avenue North, Suite 300
Great Falls, Montana 59401

PRESENT ON BEHALF OF THE DEFENDANT:

Elizabeth T. Musick
MUSICK LAW FIRM, PLLC
PO Box 726
Bozeman, MT 59771

Paul Gallardo
FLAHERTY LAW OFFICE
1026 1st Ave. South
PO Box 1968
Great Falls, MT 59401

PROCEEDINGS

(Open court.)

(Defendant present.)

THE COURT: Madam Clerk, please call the next case on the Court's calendar.

THE CLERK: This Court will now conduct a motion hearing in CR-23-80-GF-BMM, United States of America versus Douglas Malatare.

THE COURT: Good afternoon, Ms. Paisley.

MS. PAISLEY: Good afternoon, Your Honor.

THE COURT: Good afternoon, Ms. Musick.

MS. MUSICK: Good afternoon, Your Honor.

THE COURT: Mr. Gallardo and Mr. Malatare.

We are here on a motion filed by the defendant for a new trial.

Anything else to address, Ms. Musick?

MS. MUSICK: I don't believe so, Your Honor.

THE COURT: All right. Go ahead, please.

MS. MUSICK: Thank you, Your Honor.

As the Court is aware, we've asked, pursuant to Rule 33 of the Rules of Criminal Procedure, for a new trial. This is based on the interest of justice provisions set forth in Rule 33 and is based on the fact that the text message evidence at issue in the trial, that was discussed frequently at trial and admitted over our objection, was admitted

erroneously because the testimony from the government's testifying witness through which the exhibit was admitted conclusively established that the text messages would not on their face subject either declarant to any sort of criminal liability or any sort of potential criminal charge.

The statements specifically at issue is the words "a half." On their face, the words "a half" do not mean anything in our opinion, especially nothing that would be indicative of any sort of crime. The government would have the Court believe that a half specifically refers to a half of a pill of fentanyl.

But there's nothing in the text message evidence to allude to whether or not that is what these people were referring to in this text message conversation.

And so we believe that it was error for the Court to admit the text messages. The government repeatedly argued during the course of trial that the text message evidence were a key piece of evidence.

We also believe that it's extremely likely that the text messages led directly to the conviction in this case for Count 2 of the indictment, which is --

THE COURT: Why do you say that?

MS. MUSICK: Because on the -- after the conclusion of the case, when the case had been submitted to the jury, at one point the jurors submitted a note to the Court. They

wanted to know what the conversion was from Mountain Time to UTC -- or I think it was the opposite direction, actually, UTC to Mountain Time.

And then shortly after the Court instructed the jury on the conversion of the time, the jurors came back with a note saying they had reached a verdict.

We believe that that's indicative that the text message evidence was a key factor in their decision-making process when choosing to convict Mr. Malatare of Count 2.

THE COURT: The government presented a witness about the language used in persons involved in the drug trade, and no one says, "I'm looking to buy 500 kilos of cocaine." They use euphemisms and different kinds of things to describe what it is they are buying or selling or trying to buy and sell.

MS. MUSICK: That's true.

THE COURT: Okay. So why isn't -- in the context here, why isn't "I can only afford a half if you stop by," in the context of this conversation relevant evidence of drug trafficking between the parties?

MS. MUSICK: Your Honor, it could also be evidence that the decedent was seeking to purchase, for example, a half of a gram of marijuana or a half of an ounce of marijuana or a half of a pound of marijuana, which is also, yes, a drug. However, the testimony at trial by the federal agents and I believe local law enforcement was that even though Montana has

recreational marijuana use and it's not federally legal, that the federal government is not in the practice of pursuing criminal charges for marijuana.

So even if the decedent is referring to marijuana, which a half could easily refer to as he had marijuana in his dresser at the time of his death, and Mr. Malatare had with him at the time of the traffic stop, that was at issue in this matter as well -- if, for example, Mr. Wippert's statement "a half" was referring to marijuana, rather than a fentanyl pill, that's not indicative of a crime according to the trial testimony by the agents.

THE COURT: Well, okay. And you argued that at trial that this -- you know, you talked about the marijuana at the trial. The government focused on the fentanyl.

So why isn't that just something for the jury to sort out?

MS. MUSICK: Your Honor, we don't believe that the evidence ever should have gotten to the jury. We don't believe --

THE COURT: Well, I understand that. But your argument is that it's not -- the language doesn't potentially subject the declarant to prosecution or arrest or anything like that. And the government put on witnesses saying this is how the drug trade works. People have these conversations using euphemisms and acronyms or whatever it might be to avoid saying

out loud what it is they are buying and selling.

MS. MUSICK: And, typically, in my experience in drug cases, when we get those phone records, oftentimes they are riddled with these euphemisms that you are referring to. "Can I get some blues? Can I get some fetties?" They don't necessarily say, "Can I purchase fentanyl?" But they are using other drug slang that when you are taking the entire conversation as a whole makes it more clear that we're talking about a drug transaction.

Here, Mr. Wippert's phone records were completely devoid of any mention of fetties or blues or fentanyl or any of the other indicators that we typically see in these cases talking about drugs.

THE COURT: Well, if this were the government's only evidence, you know, if someone is being charged similar to Mr. Malatare and the person ingests a drug and dies, and the only evidence was a conversation saying, "Can I get some of the blues?" or the fetties or other euphemisms, that's one thing.

Now, we don't have as clear cut a case as to what the half means, but we also have other evidence to support the government's theory of the case.

MS. MUSICK: But, Your Honor, I think this is precisely why we have the rule against hearsay because this highlights the inherent unreliability of these text message statements by a decedent that we can't put on the stand and

call as a witness to clarify, "What were you really referring to?" We don't know, and I don't think we ever will know.

But the words "a half" can be interpreted a number of different ways, and it's not necessarily the government's interpretation that it's a half of a pill of fentanyl. It could be a number of things.

THE COURT: All right. This isn't the only case in the country going on right now where this type of evidence is presented and put up for admission.

How have courts dealt with this issue?

MS. MUSICK: Well, Your Honor, as we --

THE COURT: You quote a link from the US Supreme Court, but that's -- I'm sure there's a hundred cases that have applied this language. How have they sorted it out?

MS. MUSICK: It seems that what they do is a similar act that this Court did during the trial process, where we took what the government originally wanted to introduce into evidence, which was a much larger string of text messages. The Court analyzed the different statements and took ones that were clearly not against self interest and said, "Okay. Those can't come in." That's what, I believe, the Supreme Court case, the *Williams* case or *Williamson* -- *Williamson*, I apologize -- and then the *Davis* case from the Ninth Circuit that we argued during the course of trial as well.

Those cases are saying, you know, you have to parse

out all of the non- -- non- -- I'm sorry. I'm blanking on the word.

THE COURT: Inculpatory.

MS. MUSICK: -- inculpatory statements and only admit ones which are clearly statements against interest. And then the phrase that most of the courts are typically using is that it has to be something that would clearly subject the declarant to criminal liability.

And that's what we're saying here is that the words "a half" do not subject someone to criminal liability. And as testified at trial by Katherine Donohue, who is a special agent with the FBI, she specifically stated that on their face that statement and the shortened abbreviated exhibit, which was admitted over our objection at trial, would not have subjected either of the individuals to any sort of crime.

Mr. Gallardo asked Ms. Donohue at trial. He stated, quote, "And I mean sitting here today is there, based on this alone, I mean, do you see any crime being committed? Would either of these individuals, could they be charged with a particular crime just based on this alone in your experience?"

"ANSWER: Based off of just these text messages?

"QUESTION: Yes.

"ANSWER: No. No."

THE COURT: Is that the standard? Just the language -- the language of the text message is the only thing

I can consider?

MS. MUSICK: I think that the -- that that is the standard, is would the statement itself on its face subject the declarant to criminal liability?

And it can be taken in context of the entire conversation. But even looking at the entire conversation, it's not clear that they are referring to a half a pill of fentanyl. That is never mentioned, and I don't think it can be inferred from that conversation.

THE COURT: Let's look at one of your excerpts from *Williamson*, on page 6 of your brief.

MS. MUSICK: Okay.

THE COURT: "In our view, the most faithful reading of Rule 804(b)(3) is that it does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory. The district court may not just assume for purposes of the Rule 804(b)(3) that a statement is self-inculpatory because it is part of a fuller confession, and this is especially true when the statement implicates someone else."

Here, the statement -- is it implicating anyone else? It's the declarant saying, "I can only afford a half." It's his own guilt. Right?

MS. MUSICK: But we don't know what the half is.

THE COURT: I know. I know. But he's not

implicating Mr. Malatare. He's just telling Mr. Malatare what he wants. Right?

MS. MUSICK: We don't know what he's telling Mr. Malatare.

THE COURT: Well, we can -- he's asking for something. He's telling him -- Malatare is offering to do something. The guy says, "I can only afford a half." And then, "Look for me." "Okay."

So he's not saying Mr. Malatare's committed a crime. He's talking about his own crime. Right?

I'm trying to find other cases that have analyzed how to apply this very broad language by the Supreme Court in *Williamson*. Can you give me anything you think that precludes these statements from coming in?

MS. MUSICK: I think that Special Agent Katherine Donohue's testimony --

THE COURT: No, no. Any cases?

MS. MUSICK: Oh, any cases.

THE COURT: I understand your position is that she's testified these statements alone wouldn't subject Mr. Wippert to prosecution.

MS. MUSICK: No, Your Honor. We've cited our best cases in our briefing. I think this is an extremely unique issue.

THE COURT: All right. Anything else?

MS. MUSICK: No, Your Honor.

THE COURT: I'll give you a chance to rebut.

Ms. Paisley.

MS. PAISLEY: Your Honor, this is just not the vehicle for this. I mean, the Court made its evidentiary ruling based on the case law. That stands.

I think the Court nailed it on the head. That's not the standard, is whether or not a particular FBI agent would necessarily arrest somebody and charge somebody based solely on these messages. That's not what the rule says, and that's not what any case says. It's whether it's against their penal interest.

And this -- I think the Court did a great job parsing it down to this specific contract to buy.

Despite all of these conversations about marijuana, there was zero evidence at all that Malatare either sold marijuana to anybody or that Shawn Wippert ever bought marijuana from anybody.

THE COURT: What was found in the car?

MS. PAISLEY: I think he had some stuff from Washington, like a small amount of marijuana, like purchased from a dispensary over there.

Again, the fact that the two of them possessed marijuana, there's been zero testimony at all, and there was zero testimony from anybody that I can recall, that even said

that that's how they referred to marijuana in making drug deals.

You had specific testimony from a fentanyl user at the time in that location who basically used these exact words when describing for the jury how she would purchase -- how dealers made it indicative that they had stuff to sell and how they bought it.

And that's exactly what the government expected to come out in the foundation. That's what the Court asked to lay that foundation before admitting it. Because this is essentially the contract to buy. And that is against their penal interest, his penal interest.

And the Court -- the Court, you know, ruled. And whether a panel wants to say that it was an abuse of the Court's discretion, I can find no court or no case where anybody's held that that was an abuse of discretion.

THE COURT: Do you have any case where a court has analyzed similar language, and had --

MS. PAISLEY: To be honest, it was all of the stuff we litigated during trial. I haven't really gone back into the case law because I was confident in it then; I still remain confident in it now.

This is -- somebody died. Right? I mean, Congress has made this a crime, delivery of controlled substance resulting in death, because it is a very serious thing.

This is evidence of the actual contract to buy the substance that killed the man. And if that's not admissible because it's against penal interest, you know, then I think that 804 -- I mean, then I think that rule is gone.

And then if that's where the courts are going to go, then Congress can deal with that as an evidentiary issue. But the very contract for the drug that killed the person -- and, again, there's been zero evidence. There's speculation. It's interesting -- well, I'll keep that as an aside.

But, anyway, so, no. I expect through the Ninth Circuit litigation that I will find more cases, Your Honor, as I brief up the testimony, the trial testimony and, you know -- but I think the best stuff that -- we have that case where all of that other evidence was excluded, and the court found that that was an abuse of discretion.

And this Court really, really worked on tailoring it down to those specific contractual statements. And because of that, it was well within this Court's discretion, and I fully believe will be upheld by the Ninth Circuit. Because, again, those statements are against pecuniary interest, and there's zero evidence that they were talking about anything else besides fentanyl. And, you know, that's just -- yeah.

So let's get to sentencing, get to the appeal, and find those cases.

THE COURT: I admire your confidence.

MS. PAISLEY: Thank you, Your Honor.

THE COURT: All right. Ms. Musick, do you want to rebut at all?

MS. MUSICK: Very briefly. Just that the government seems to believe that the phrase "a half" could only refer to fentanyl, when in fact Jaynell Davis, the individual who they used to lay the foundation for the admission of the text messages, was testifying about a number of different drugs, not just fentanyl specifically. She spoke about methamphetamine as well.

And I did want to point out that the actual transcript and the language that was used at trial was pertaining to methamphetamine, not fentanyl.

THE COURT: The transcript of --

MS. MUSICK: So it was on page 172 of the trial transcript.

THE COURT: I just want to make one note. On the transcript, it says, "The District of Kansas." Our court reporter was visiting from the District of Kansas.

MS. MUSICK: She was.

THE COURT: She apparently used her regular form for the cover.

All right. We're on 172.

MS. MUSICK: Yes. So at the top of the page, Mr. Starnes asked Ms. Davis:

"All right. Hold on one second. If you were going to purchase the normal amount that you would get, a half of a pill of methamphetamine, what is the language that you would use in order to set up that transaction?"

"ANSWER: Can I get a half?"

I think testimony right there conclusively establishes that the words "a half" do not have to refer exclusively to fentanyl, as the government is arguing.

THE COURT: All right. I don't think he's arguing it exclusively. He's arguing in the context of the evidence presented at trial that it was a reasonable interpretation.

MS. MUSICK: Based solely on what was in the decedent's body at the time of his death, but not based on any of the other text message evidence in his phone.

THE COURT: All right. Anything else, Ms. Musick?

MS. MUSICK: No, Your Honor.

THE COURT: All right. Thank you, Counsel, for your arguments. I'll take it under admission. I'll have an order out, I hope, in the next ten days.

MS. MUSICK: Thank you, Your Honor.

THE COURT: We'll be in recess. Thank you.

(The proceedings concluded at 3:55 p.m.)

--o0o--

REPORTER'S CERTIFICATE

I, Yvette Heinze, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Verbatim Reporter-Steno, certify that the foregoing transcript is a true and correct record of the proceedings given at the time and place hereinbefore mentioned; that the proceedings were reported by me in machine shorthand and thereafter reduced to typewriting using computer-assisted transcription; that after being reduced to typewriting, a certified copy of this transcript will be filed electronically with the Court.

I further certify that I am not attorney for, nor employed by, nor related to any of the parties or attorneys to this action, nor financially interested in this action.

IN WITNESS WHEREOF, I have set my hand at Great Falls, Montana, this 4th day of March, 2025.

/s/ *Yvette Heinze*

Yvette Heinze
United States Court Reporter